IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MATTHEW MALONE, individually,
and as Personal Representative of
Michael Malone, deceased,

     Plaintiff,

vs.                                No. CIV 15-0876 JB/GBW

BOARD OF COUNTY COMMISSIONERS FOR
THE COUNTY OF DONA ANA, in their official
capacities, CHASE THOUVENALL, in his official
capacity; THE CITY OF LAS CRUCES; and JOHN
DOE(S), unknown Las Cruces Police Department
officers, in their individual and official capacities,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendants' Motion and Supporting
Memorandum for Qualified Immunity and Summary Judgment, filed January 5, 2016 (Doc.
25)("MSJ"); (ii) the Motion and Memorandum for Summary Judgment Based on Qualified
Immunity, filed February 16, 2016 (Doc. 34)("Original City Motion"); and (iii) the Amended
Motion and Memorandum for Summary Judgment Based on Qualified Immunity, filed February
18, 2016 (Doc. 37)("City's Motion").[1]   Defendant Board of County Commissioners for the
County of Dona Ana County, and Defendant Chase Thouvenall (collectively, "the County

---

[1] On February 16, 2016, the City of Las Cruces filed the Original City Motion.  See
Original City Motion at 1.  Two days later, on February 18, 2016, the City of Las Cruces filed an
amended motion -- the City's Motion.  See City's Motion at 1.  The Court has examined both
motions, and cannot identify any differences between them.  The City's Motion also does not
explain why the City of Las Cruces filed an amended motion.  While the Court will treat the
City's Motion as the controlling document and will focus on the City's Motion, this
Memorandum Opinion and Order disposes of both the Original City Motion and the City's
Motion.

Defendants"), submit the MSJ, and request that the Court grant qualified immunity and summary judgment under rule 56 of the Federal Rules of Civil Procedure on their behalf.  The Court held a hearing on the MSJ and the City's Motion on May 9, 2016.  The primary issues are: (i) whether Thouvenall is entitled to qualified immunity on Count II to the extent that it asserts an excessive claim under the Fourth Amendment to the Constitution of the United States of America pursuant to 42 U.S.C. § 1983; (ii) whether Plaintiff Matthew Malone's municipal liability claims under Count IV of the Complaint for Wrongful Death, filed September 30, 2015 (Doc. 1-2)("Complaint") fail, because it is undisputed that Thouvenell's actions were reasonable, and no policy or practice exists that would cause Dona Ana County to be liable under a municipal liability claim; (iii) whether the County Defendants are entitled to summary judgment on Count I to the extent that it asserts claims under the New Mexico Wrongful Death Act, N.M. Stat. Ann. §§ 41-2-1 to -4; (iv) whether Thouvenall is entitled to summary judgment on Counts I and II -- which assert claims under the New Mexico Wrongful Death Act and/or state common law, and under Article II, § 10 of the New Mexico Constitution -- because his use of force was privileged; (v) whether Dona Ana County is entitled to summary judgment to the extent that M. Malone asserts a claim for vicarious liability or respondeat superior against it in Counts I and II; and (vi) whether the Court should dismiss the City of Las Cruces and the John Doe(s), unknown Las Cruces Police Department ("LCPD") officers, in their individual and official capacities, as parties to this lawsuit.  The Court will grant in part and deny in part the MSJ.  First, the Court will deny the request that the Court grant summary judgment in Thouvenell's favor on M. Malone's excessive force claim brought under the Fourth Amendment in Count II.  While the Court concludes that there are not genuine issues of material fact, it cannot conclude that, on the

undisputed facts and drawing all inferences in M. Malone's favor, Thouvenell was justified in using deadly force.  Second, the Court will grant the MSJ in Dona Ana County's favor on Count IV, and dismiss Count IV with respect to Dona Ana County.  Third, the Court will deny the County Defendants' request that the Court dismiss Count I to the extent that it asserts claims under the New Mexico Wrongful Death Act.  Fourth, the Court will deny the MSJ on Count I and II to the extent that they are asserted against Thouvenell, because the New Mexico Legislature in the NMTCA has waived Thouvenell's immunity for M. Malone's state law claims brought under the New Mexico Wrongful Death Act and/or state common law, and under Article II, § 10 of the New Mexico Constitution, and the Court cannot conclude on the undisputed facts that, as a matter of law, Thouvenell did not use excessive force.  Fifth, the Court will deny the MSJ to the extent that M. Malone asserts a claim for vicarious liability or respondeat superior against Dona Ana County under state law in Counts I and II.  Finally, the Court will dismiss the City of Las Cruces and the John Doe(s) as parties to this lawsuit without prejudice.

## FACTUAL BACKGROUND

"On July 28, 2015, Dona Ana County[, New Mexico] Sheriff's Office ('DASO') Detective Pierce Wilber[2] was assigned a case alleging that on July 24, 2015, Michael Malone ('Malone') assaulted his spouse Crystal Malone ('Crystal')."  MSJ ¶ 1, at 4 (setting forth this fact)(bracketed material added).  See Response in Opposition to Motion for Qualified Immunity and Summary Judgment ¶ 1, at 3-4, filed January 29, 2016 (Doc. 31)("Response")(not disputing

---

[2]The MSJ sometimes spells this name "Wilber," and other times "Wilbur."  The evidence -- including interviews and affidavits -- attached to the MSJ and Response spells the name "Wilbur."  For direct quotations, the Court will spell the name as it is written, but will otherwise use the spelling "Wilbur" throughout this Memorandum Opinion and Order.

this fact).[3]  "Subsequent to receiving the assignment, Wilber met with Crystal the morning of July 29, 2015."  MSJ ¶ 2, at 4 (setting forth this fact).  See Response ¶ 1, at 3-4 (not disputing this fact).  "During Crystal's interview, she informed Wilber that on July 24, 2015, she returned home and her husband Malone -- a convicted felon -- began physically assaulting her by choking and punching her in the face."[4]  MSJ ¶ 3, at 4 (setting forth this fact).  See Response ¶ 1, at 3-4 (not disputing this fact).

> Crystal also stated that shortly after the assault, she went to the bathroom and was followed by Malone.  He then placed the barrel of a black revolver to the back of the head[[5]] while pulling the trigger.  Fortunately, the weapon did not fire and

---

[3]Throughout this Memorandum Opinion and Order, the Court will refer to Plaintiff Matthew Malone as "M. Malone," and it will refer to Michael Malone, deceased, as "Malone."

[4]In his Response, M. Malone asserts that "[t]he statements of Crystal Malone, however, are inadmissible hearsay and cannot be used to prove the truth of the matter asserted."  Response ¶ 1, at 2.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801.  "The United States Court of Appeals for the Tenth Circuit has stated courts cannot consider hearsay in deciding a motion for summary judgment."  Stark-Romero v. Nat'l R.R. Passenger Co. (AMTRAK), 805 F. Supp. 2d 1145, 1151 n.1 (D.N.M. 2011)(Browning, J.)(citing Gross v. Burggraf Const. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.  Hearsay testimony cannot be considered because [a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill." (internal quotations and citations omitted))).  The Court will not accept this evidence for the truth of what occurred on July 24, 2015 between Malone and C. Malone.  The Court will accept this evidence, however, as proof of what C. Malone told Wilbur during her July 29, 2015, interview, and what information he had at the time, which goes to his state of mind and the total mix of information available to the officers at that time.

[5]The MSJ does not state against whose "head" Malone allegedly placed the barrel of the black revolver.  The Court assumes, however, that the MSJ is referring to C. Malone's head given that several sentences later it states that "Malone gave chase, following her and continuing to point the revolver at her and pull the trigger."  MSJ ¶ 5, at 4.

> Crystal, fearing that Malone was going to kill her, grabbed a knife to protect
> herself and walked out of the home.[6]

MSJ ¶ 4, at 4 (setting forth this fact).  See Response ¶ 1, at 3-4 (not disputing this fact).  "Malone gave chase, following her and continuing to point the revolver at her and pull the trigger.  Crystal was eventually able to go to a neighbor's house where she made an initial call to report the incident."[7]  MSJ ¶ 5, at 4 (setting forth this fact).  See Response ¶ 1, at 3-4 (not disputing this fact).

"During the interview with Crystal, Wilber was also informed that after the initial incident, Malone later called Crystal threatening suicide.  His threat included the sound of Malone rotating the cylinder on the revolver and then pulling the trigger resulting in a gun shot."[8]  MSJ ¶ 6, at 4 (setting forth this fact).  See Response ¶ 1, at 3-4 (not disputing this fact).  "After this interview Wilber conducted a background check of Malone and determined he was a felon."  MSJ ¶ 7, at 5 (setting forth this fact).  See Response ¶ 1, at 3-4 (not disputing this fact).  "Based on this information provided to Wilber by Crystal, Wilber filed a criminal complaint against Malone for aggravated assault with a deadly weapon on a household member, possession

---

[6]The Court incorporates its analysis from footnote 4 and applies it here.  The Court will not accept C. Malone's statement to Wilbur for the truth of what occurred between Malone and C. Malone on July 24, 2015, but it will accept it as proof of what C. Malone told Wilbur during her July 29, 2015, interview.

[7]The Court incorporates its analysis from footnote 4 and applies it here.  The Court will not accept C. Malone's statement to Wilbur for the truth of what occurred between Malone and C. Malone on July 24, 2015, but it will accept it as proof of what C. Malone told Wilbur during her July 29, 2015, interview.

[8]The Court incorporates its analysis from footnote 4 and applies it here.  The Court will not accept C. Malone's statement to Wilbur for the truth of what occurred between Malone and C. Malone on July 24, 2015, but it will accept it as proof of what C. Malone told Wilbur during her July 29, 2015, interview.

of a firearm by a felon, and battery against a household member."  MSJ ¶ 8, at 5 (setting forth

this fact).  See Response ¶ 1, at 3-4 (not disputing this fact).  "Additionally, Wilber obtained an

arrest warrant for Malone."  MSJ ¶ 9, at 5 (setting forth this fact).  See Response ¶ 1, at 3-4 (not

disputing this fact).

"Because Malone was a convicted felon and used a firearm to assault his spouse, Wilber

approached Sergeant Joshua Bryant ('Bryant') of DASO's Special Response Team ('SRT') to

determine if the SRT could assist in executing the arrest warrant."  MSJ ¶ 10, at 5 (setting forth

this fact).  See Response ¶ 2, at 4 (not disputing this fact).  The DASO's SRT Operations Manual

("SRT Operations Manual") defines SRT members as only those with expert training in tactical

operations.  See Response ¶ 17, at 7-8 (setting forth this fact).[9]

> Based on the Dona Ana County Sheriff's Office Standard Operating Procedures,
> the SRT can be used to assist in the service and execution of arrest or search

---

[9]M. Malone sets forth this factual assertion in his Response.  See Response ¶ 12, at 6.
D.N.M.LR-Civ. 56.1(b) provides:

> The Response may set forth additional facts other than those which respond to the
> Memorandum which the non-movant contends are material to the resolution of
> the motion.  Each additional fact must be lettered and must refer with particularity
> to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).  Here, in compliance with the local rules, M. Malone has set forth an
additional fact in paragraph 17 of his Response, other than those in the County Defendants' MSJ,
which he contends is material to the MSJ's resolution.  M. Malone supports this fact by citing to
the DASO's SRT Operations Manual, filed January 29, 2016 (Doc. 31-6)("SRT Operations
Manual"), which says what M. Malone contends it says.  In their Reply, the County Defendants
do not address this fact by admitting it or disputing it.  See D.N.M.LR-Civ. 56.1(b)("The Reply
must contain a concise statement of those facts set forth in the Response which the movant
disputes or to which the movant asserts an objection.").  The Court therefore deems undisputed
that the SRT Operations Manual defines SRT members as only those with expert training in
tactical operations.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Response will
be deemed undisputed unless specifically controverted.").

warrants under hazardous circumstances.  Such circumstances include where there is reason to believe that a suspect is armed and may use weapons against law enforcement officers or where the suspect's background reveals a propensity toward violence.

MSJ ¶ 11, at 5 (setting forth this fact).  See Response ¶ 2, at 4 (not disputing this fact).  "The SRT must have authorization from the Sheriff or his designee before deployment."  Response ¶ 18, at 8 (setting forth this fact).[10]  During tactical situations, "[t]he SRT or assisting patrol units must establish inner and outer perimeters."  Response ¶ 19, at 8 (setting forth this fact).[11]  "The goal of the SRT in assisting with high risk warrants is to use the least amount of force necessary under the circumstances."  Response ¶ 20, at 8 (setting forth this fact).[12]  Pursuant to the SRT Operations Manual, "[p]rior to any surveillance operations, 'the proposed tactical operation shall be described in an Operational Order submitted to the SRT Commander for approval and recommendation to the Sheriff or designee.[']"  Response ¶ 21, at 8 (setting forth this fact).[13]  "During surveillance, deputies are required to report in on a routine basis to be certain their location is known by other officers."  Response ¶ 22, at 8 (setting forth this fact).[14]  "Prior to any

---

[10]The Court incorporates its analysis from footnote 9 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[11]The Court incorporates its analysis from footnote 9 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[12]The Court incorporates its analysis from footnote 9 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[13]The Court incorporates its analysis from footnote 9 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[14]The Court incorporates its analysis from footnote 9 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

stakeout, a tactical briefing should be held to discuss fields of fire and contingency plans for apprehension.  An events Log reflecting all information pertinent to the surveillance should be kept."  Response ¶ 23, at 8 (setting forth this fact).[15]

In this case, "[a] warrant service risk assessment was conducted by Bryant and it was determined that a small SRT unit would be used to serve the warrant on Malone."  MSJ ¶ 12, at 5 (setting forth this fact).  See Response ¶ 2, at 4 (not disputing this fact).

> Bryant then began to [put together] an operational plan to execute the warrant while simultaneously assembling an SRT group made up of Bryant and DASO Deputies Chase Thouvenell ("Thouvenell"), Alfred Sanchez ("Sanchez"), Eric Avilucea ("Avilucea"), Mark Rodriguez ("Rodriguez"), Adrian Gonzales ("Gonzales"), Jason Gleason ("Gleason"), Chris Moreno ("Moreno") and Curtis Yarnell ("Yarnell").

MSJ ¶ 13, at 5-6 (setting forth a version of this fact).[16]  "In his capacity as both a Deputy/Detective and SRT member, Thouvenell received training in subjects including use of

---

[15]The Court incorporates its analysis from footnote 9 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[16]In his Response, M. Malone purports to dispute this factual assertion.  He writes:

> 3.     With regards to Defendants' paragraph 13, Plaintiff denies that Bryant drafted an operational plan.  Bryant indicates in his affidavit ([Affidavit of Joshua Bryant, filed January 5, 2016 (Doc. 25-2)("Bryant Aff.")]) that he drafted a plan that included the attached risk assessment matrix and photos of Malone.  But the matrix is only a checklist of risk factors.  Neither the matrix nor the photos could conceivably offer any SRT member direction or strategy.

> 4.     Plaintiff further denies that Bryant ever assembled a "SRT group made up of DASO Deputies Chase Thouvenell (Thouvenell), Alfred Sanchez (Sanchez), Eric Avilucea, (Avilucea), Mark Rodriguez (Rodriguez), Adrian Gonzales (Gonzales), Jason Gleason (Gleason), Chris Moreno (Moreno), and Curtis Yarnell (Yarnell).  A review of the various disclosed witness statements and police reports indicate that Bryant met in person with Thouvenell and Sanchez to ask them to assist in locating Malone, as well as contact various on-

duty patrol officers, such as Yarnell, Moreno and Avilucea in order to assign them surveillance tasks.  There seems to be no indication that any deputies other than Thouvenell, Sanchez, Rodriguez and Bryant were regular SRT members.  At no time did this "team" ever meet together to discuss any details.

5. The facts instead indicate that Wilber obtained an arrest warrant on the morning of July 29, 2015, the SRT was cobbled together by noon, and that Malone was shot and killed one hour later, before the SRT had time to take positions or cover the exit points of the motel.  In support [sic]

Response ¶¶ 3-5, at 4-5.

First, with respect to the operational plan, M. Malone does not dispute what Bryant did, but, rather, is quibbling whether what Bryant did qualifies as an "operational plan."  The Court concludes that the County Defendants may characterize what Bryant did as an "operational plan," as it fits within that broad term, understanding that the debate is whether it was a sophisticated one.  The Court concludes that it makes more sense to focus on what the "operational plan" consisted of rather than on the label.  In the briefing, the County Defendants state that Bryant "began *to draft* an operational plan," MSJ ¶ 13, at 5-6 (emphasis added), while in the Bryant Aff. -- which the County Defendants cite to in support of this factual assertion -- Bryant states that he "began to *put together* an operations plan," Bryant Aff. ¶ 9, at 2 (emphasis added).  Moreover, the County Defendants do not cite to or attach to the MSJ any physical document that Bryant drafted, which is referenced as an operational plan.  The Court therefore modifies the Defendants' proposed undisputed fact to state that Bryant "began to *put together* an operational plan" rather than "began *to draft* an operational plan."

Moreover, Bryant's signed and sworn affidavit supports the factual assertion that he "put together," but did not draft, an "operational plan."  In his Affidavit, Bryant further states:

That operations plan included conducting an SRT warrant service risk assessment matrix.  A copy of the matrix and photographs prepared on July 29, 2015 is attached hereto as [SRT Warrant Service Risk Assessment Matrix for Search and/or Arrest Warrants and Inmate Photograph Print, filed January 5, 2016 (Doc. 25-2 at 5)("Operational Plan Documents")].  Additionally, in creating the operations plan, I also obtained photographs of Mr. Malone so that SRT members would know his identity and be able to recognize Mr. Malone once they encountered him.  I also conducted a criminal history check of Malone.

Bryant Aff. ¶ 9, at 2.  In support of their factual assertion that Bryant drafted an operational plan, the County Defendants cite to and attach the SRT warrant service risk assessment matrix, and the photographs of Malone.  See MSJ ¶ 13, at 5-6 (citing Operational Plan Documents at 1).  The Court concludes that the evidence establishes that: (i) Bryant prepared an operational plan, which consisted of (ii) the SRT warrant service risk assessment matrix production; (iii) the photographs of Malone and (iii) the criminal history check of Malone.  Again, this might not have been the

most sophisticated operational plan, but the Court concludes that it nonetheless qualifies as an operational plan. Last, the Court does not agree with M. Malone's suggestion that, if "neither the matrix nor the photos could conceivably offer any SRT member direction or strategy," Response ¶ 3, at 4, then Bryant's preparations did not constitute an operational plan. The productions that Bryant prepared would have been of some help to officers involved if they did not know Malone.

Second, the Court will leave unmodified the Defendants' factual assertion that Bryant assembled a "SRT group made up of DASO Deputies Chase Thouvenell (Thouvenell), Alfred Sanchez (Sanchez), Eric Avilucea, (Avilucea), Mark Rodriguez (Rodriguez), Adrian Gonzales (Gonzales), Jason Gleason (Gleason), Chris Moreno (Moreno), and Curtis Yarnell (Yarnell)." The Defendants support this factual allegation by citing to the Bryant Aff. ¶¶ 9, 11, at 2-3, the Affidavit of Chase Thouvenell ¶ 9, at 3, filed January 5, 2016 (Doc. 25-3)("Thounvell Aff."), and the Affidavit of Alfred Sanchez ¶ 6, at 2, filed January 5, 2016 (Doc. 25-4)("Sanchez Aff."). All three of the signed and sworn affidavits contain almost identical language with respect to the SRT group's composition. The Thounvell Aff., for example, states:

> On that date, SRT members including Sergeant Joshua Bryant ("Bryant"), Deputies Chase Thouvenell ("Thouvenell"), Alfred Sanchez ("Sanchez"), Eric Avilucea ("Avilucea"), Mark Rodriguez ("Rodriguez"), Adrian Gonzales ("Gonzales"), Jason Gleason ("Gleason"), Chris Moreno ("Moreno") and Curtis Yarnell ("Yarnell"), deployed to the Days End Motel on Valley Drive in Las Cruces, New Mexico in marked and unmarked Sheriff's Office vehicles with the hopes of locating Mr. Malone.

Thounvell Aff. ¶ 9, at 3. The Court concludes that the Defendants have submitted competent evidence in the form of sworn affidavits indicating that Bryant assembled an SRT group consisting of Thouvenell, Sanchez, Avilucea, Rodriguez, Gonzales, Gleason, Moreno, and Yarnell. M. Malone purports to dispute this statement by arguing that there is "no indication that any deputies other than Thouvenell, Sanchez, Rodriguez and Bryant were regular SRT members," and that "[a]t no time did this 'team' ever meet together to discuss any details." Response ¶¶ 4-5, at 4-5. M. Malone's argument does not persuade the Court. First, M. Malone does not create a genuine issue of fact by asserting that the evidence in the record does not indicate that deputies other than Thouvenell, Sanchez, Rodriguez, and Bryant were regular SRT members. M. Malone might be able to use this on cross-examination, but to create a fact issue on this point, he must submit competent evidence or cite to evidence in the record indicating that some or all of the deputies were not SRT members. Second, even if four of the eight deputies were not regular SRT members, that does not mean that Bryant did not assemble a group of deputies that would qualify as an "SRT group." Third, whether the group can be called an "SRT group" does not depend on whether the group "ever me[t] together to discuss any details" as M. Malone suggests. Response ¶ 4, at 4.

In his Response, M. Malone similarly makes the factual assertion that "[t]he officers named in the MSJ and described as SRT, do not meet all th[e] criteria" for SRT members. Response ¶ 17, at 7-8. According to M. Malone, the SRT Operations Manual defines SRT

force, basic SWAT school, advanced SWAT school, active shooter, and has been a field training officer." MSJ ¶ 40, at 9 (setting forth this fact).[17] "The training Thouvenell received with respect to use of force employs the objectively reasonable model, which is based on the Fourth Amendment and the principles of *Graham v. Connor*[, 490 U.S. 386, 395 (1989)]." MSJ ¶ 41, at 9 (setting forth this fact).[18]

> Specifically, before using force, Thouvenell has been taught to weigh several factors prior to using force, including: (1) the severity of the crime at issue; (2)

---

members as only those with expert training in tactical operations.  <u>See</u> Response ¶ 17, at 7-8.  In support of M. Malone's assertion that the officers named in the MSJ and described as SRT do not meet the definition of SRT members that the SRT Operations Manual sets forth, M. Malone cites to the SRT Operations Manual.  It is true that the SRT Operations Manual states: "The Special Response Team ("SRT") is a Special Unit of the Sheriff's Department manned with personnel expertly trained in the area of tactical operations."  SRT Operations Manual at 1.  M. Malone does not, however, cite to or attach any evidence indicating that the officers described in the MSJ as SRT were not "expertly trained in the area of tactical operations."  SRT Operations Manual at 1.  The Court cannot therefore find this proposed factual assertion undisputed.

[17]In his Response, M. Malone writes: "With regards to Defendants' paragraphs 34-43, Plaintiff can neither confirm nor deny the statements.  The events following the shooting are not relevant the [sic] qualified immunity analysis and Plaintiff is entitled to discovery before he can assess the adequacy of Thouvenell's training."  Response ¶ 16, at 7.  D.N.M.LR-Civ. 56.1(b) provides in part:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist.  Each fact in dispute must be numbered, must refer with particularity to those portions of the record upon which the non-movant relies, and must state the number of the movant's fact that is disputed.  All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

D.N.M.LR-Civ. 56.1(b).  Because M. Malone does not specifically controvert in his Response the County Defendants' factual assertions, the Court deems them undisputed.  The Court will determine if necessary whether these facts are material in its analysis.

[18]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

whether the subject poses an immediate threat to the safety of law enforcement personnel or the public; and (3) whether the subject is actively resisting arrest or attempting to flee.  Additional factors he has been trained on include whether or not the subject is armed and whether or not the subject is refusing to comply with lawful commands.

MSJ ¶ 42, at 9 (setting forth this fact).[19]  "Prior to July 29, 2015, Thouvenell received refresher training on use of force on November 13, 2014.  That training was conducted by Major Brent Barlow of the Dona Ana County Sheriff's Office."  MSJ ¶ 43, at 10 (setting forth this fact).[20]

"Wilber was able to determine that Malone was in and around the area of the Days End Motel on Valley Drive in Las Cruces[, New Mexico] by requesting that the Mesilla Valley Regional Dispatch Authority ('MVRDA') 'ping'[21] Malone's phone."  MSJ ¶ 14, at 6 (setting forth a version of this fact that the Court has modified).  See Response ¶ 6, at 5-6 (not disputing this fact).[22]  Bryant then sent Deputy Yarnell to conduct surveillance of the Days End Motel.

---

[19]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[20]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[21]Ping is defined as "triangulating [a cellphone's] position with network satellites."  Joe Palazzolo, Court Holds Police Had Right to Ping Suspect's Cellphone Without Warrant, WSJ (Aug. 1, 2016), http://www.wsj.com/articles/court-holds-police-had-right-to-ping-suspects-cellphone-without-warrant-1470076406.

[22]M. Malone does not dispute in his Response this factual assertion.  M. Malone objects, however, to other factual assertions set forth in paragraph 14 of the MSJ, and the Court will discuss them below.  In his Response, M. Malone also sets forth the following additional fact:

The evidence supports a finding that Malone attempted to flee the scene upon receiving Wilber's text message, that he had no reason to believe SRT members were nearby, and that he also complied with their demands once he came into contact with them.

<u>See</u> MSJ ¶ 15, at 6 (setting forth a version of this fact that the Court has modified).[23]  Malone's

cellular telephone was then "pinged" at the trailer park located at 1034 4th, on the corner of 4th

and Madero, at which point, Bryant sent Yarnell to conduct surveillance at the trailer park.  MSJ

---

Response ¶ 24, at 8.  The local rules permit M. Malone to

> set forth additional facts other than those which respond to the Memorandum
> which the non-movant contends are material to the resolution of the motion.  Each
> additional fact must be lettered and must refer with particularity to those portions
> of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).  M. Malone does not, however, "refer with particularly to those portions
of the record upon which" he relies for this factual assertion.  Accordingly, the Court cannot
deem this fact undisputed pursuant to D.N.M.LR-Civ. 56.1(b).

[23]The Court will address M. Malone's purported dispute with the timing of Yarnell's
surveillance relative to Wilbur calling Malone on his cellular telephone in footnote 24.  With
respect to this factual assertion, the County Defendants cite to the Affidavit of Pierce Wilbur ¶
17, at 3, filed January 5, 2016 (Doc. 25-1)("Wilbur Aff."), and the Bryant Aff. ¶ 10, at 2, to
support the proposition that Yarnell first went to conduct surveillance at the trailer park located
at 1034 4th, on the corner of 4th and Madero.  The Bryant Aff. does not support the factual
assertion that after Malone's telephone was "pinged" at the Days End Motel, Bryant sent Yarnell
to conduct surveillance at the trailer park, but instead, that he sent Yarnell to the Days End
Motel.  Bryant Aff. ¶ 13, at 3.  The Wilbur Aff. appears to support the factual assertion that
following Malone's telephone being "pinged" at the Days End Motel, Bryant sent Yarnell to
conduct surveillance at the trailer park, stating: "Shortly after receiving this information, Bryant
sent Deputy Yarnell to conduct surveillance of the trailer park."  Wilbur Aff. ¶ 17, at 3.  That
evidence is not, however, inconsistent with Bryant first sending Yarnell to the Days End Motel.
It would also make sense that Bryant would have first sent Yarnell to the Days End Motel given
that Malone's telephone had been "pinged" at that location.  This proposition is buttressed  by
the Interview of Det. Pierce Wilbur at 2-3, filed January 29, 2016 (Doc. 31-4)("Wilbur
Interview") -- to which M. Malone cites in his Response -- in which Yarnell states that after
Malone's telephone was "pinged" at the Days End Motel, Bryant sent Yarnell to conduct
surveillance at the Days End Motel.  <u>See</u> Wilbur Interview at 2-3.  Accordingly, the Court has
modified this proposed factual assertion to state that Bryant then sent Deputy Yarnell to conduct
surveillance of the Days End Motel, and not to the trailer park located at 4th and Madero.

¶ 15, at 6 (setting forth a version of this fact that the Court has modified).[24]  "While Yarnell was at the trailer park, Wilber was once again informed that Malone's phone was pinging at the Days End Motel.  As a result, the SRT team began surveillance at that location."  MSJ ¶ 15, at 6 (setting forth a version of this fact that the Court has modified).[25]  Prior to any surveillance operations, the proposed tactical operation was not "described in an Operational Order submitted to the SRT Commander for approval and recommendation to the Sheriff or designee" as the DASO's SRT operations manual requires.  Response ¶ 21, at 8 (setting forth this fact).[26]  There

_____

[24]The Court explained in footnote 23 why it deems undisputed that Bryant first sent Yarnell to conduct surveillance at the Days End Motel, rather than to the trailer park.  The evidence cited by the parties and attached to the briefing, supports the factual proposition that once Yarnell was at the Days End Motel, Malone's cellular telephone was "pinged" at the trailer park located at 1034 4th, on the corner of 4th and Madero, at which point, Bryant sent Yarnell to conduct surveillance at the trailer park.  See Bryant Aff. ¶ 13, at 3; Wilbur Aff. ¶ 17, at 3; Wilbur Interview at 2-3.  Accordingly, the Court deems this factual assertion undisputed.

[25]M. Malone purports to dispute this factual assertion, stating: "Plaintiff denies the statements contained in Defendants' paragraph 15.  Yarnell had been conducting surveillance earlier that morning in order to determine Malone's location, but his actions *preceded* Wilber's contacting Malone."  Response ¶ 7, at 6 (emphasis in Response).  The Court agrees with M. Malone that it is undisputed that Yarnell conducted surveillance of the trailer park and Days Inn Motel before Wilbur contacted Malone on his cellular telephone and not after Wilbur contacted Malone on his telephone.  First, the County Defendants cite to the Wilbur Aff. in support of their factual assertion, but the Wilbur Aff. indicates that Yarnell conducted surveillance before and not after Wilbur contacted Malone on his cellular telephone several minutes before Malone was shot.  See Wilbur Aff. ¶¶ 17-18, at 3.  Second, the Wilbur Interview -- to which M. Malone cites -- also supports the factual assertion that Yarnell conducted surveillance earlier in the morning, before and not after Wilbur contacted Malone on his cellular telephone.  Accordingly, the Court has moved this factual assertion in its factual background to a place before Wilbur contacted Malone by cellular telephone, but after the MVRDA "pinged" Malone's cellular telephone several times.

[26]M. Malone sets forth this factual assertion in his Response.  See Response ¶ 21, at 8.  As the Court explained in footnote 9, D.N.M.LR-Civ. 56.1(b) provides:

was also no tactical briefing, nor any contingency plans.  See Response ¶ 23, at 8 (setting forth this fact).[27]

"The members of the SRT who had been tasked by Bryant to assist in the execution of the arrest warrant [] arrived at the Days End Motel in [some] unmarked vehicles."  MSJ ¶ 16, at 6 (setting forth a version of this fact that the Court has modified).[28]  "There is no indication that

---

The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).  Here, in compliance with the local rules, M. Malone has set forth an additional numbered fact in paragraph 21 of his Response, other than those in the County Defendants' MSJ, which he contends is material to the MSJ's resolution.  In support of this factual assertion, M. Malone cites to the SRT Operations Manual, which states: "Prior to initiation of any surveillance, stakeout or decoy operation, the proposed tactical operation shall be described in an Operational Order submitted to the SRT Commander for approval and recommendation to the Sheriff or designee."  SRT Operations Manual at 5.  M. Malone does not cite to any deposition testimony, affidavits, or other affirmative evidence to support this factual assertion.  The Court, however, has no reason to doubt this factual assertion and in their Reply, the County Defendants do not address this fact by admitting it or disputing it.  See D.N.M.LR-Civ. 56.1(b)("The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection.").  Accordingly, the Court deems this factual assertion undisputed.

[27]The Court incorporates its analysis from footnote 26 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[28]The County Defendants ask the Court to find it undisputed that "[t]he members of the SRT who had been tasked by Bryant to assist in the execution of the arrest warrant all arrived at the Days End Motel in unmarked vehicles."  MSJ ¶ 16, at 6.  M. Malone disputes this factual assertion on the grounds that "Bryant's affidavit states that officers arrived in both marked and unmarked vehicles."  Response ¶ 8, at 6.  In support of their contention that all of the officers arrived in unmarked vehicles, the Defendants cite to the Wilbur Aff. ¶ 17, at 3, the Bryant Aff. ¶ 16, at 3, the Thounvell Aff. ¶ 11, at 3, and the Sanchez Aff. ¶ 7, at 2.  None of the paragraphs to which the County Defendants cite, however, discuss whether the officers arrived in market or unmarked vehicles.  M. Malone contends that paragraph 10 of the Bryant Aff. "states that officers arrived in both marked and unmarked vehicles."  Response ¶ 8, at 6 (citing Bryant Aff. ¶

10, at 2-3).  Paragraph 10 does not, however, mention whether the officers arrived in marked or unmarked vehicles.  It states in full:

> At the time the operations plan was being created, we were unsure as to the exact location of Mr. Malone.  We had information that Mr. Malone, although armed, could be suicidal.  We received this information from Mr. Malone's spouse. Because of the information regarding his possible suicidal ideations, Detective Wilbur asked the Mesilla Valley Regional Dispatch Authority to "ping" Malone's phone.  Based on this ping, we were able to determine that at least Malone's phone was in the area of the Days End Motel on Valley Drive in Las Cruces, New Mexico.

Bryant Aff. ¶ 10, at 2-3.  In other words, none of the evidence to which the parties cite in the record states whether the officers arrived in marked or unmarked cars.

The Court has examined, however, the Wilbur Aff., Bryant Aff., Thounvell Aff., and Sanchez Aff.  The Bryant Aff. and the Thounvell Aff. both state that the officers arrived in both marked and unmarked cars.  The Bryant Aff. states in paragraph 11: "We deployed to the Days End Motel on Valley Drive in Las Cruces, New Mexico in **marked and unmarked Sheriff's Office vehicles** with the hopes of locating Mr. Malone."  Bryant Aff. ¶ 11, at 3 (emphasis added).  The Thounvell Aff. similarly states in paragraph 9:

> On that date, SRT members including Sergeant Joshua Bryant ("Bryant"), Deputies Chase Thouvenell ("Thouvenell"), Alfred Sanchez ("Sanchez"), Eric Avilucea ("Avilucea"), Mark Rodriguez ("Rodriguez"), Adrian Gonzales ("Gonzales"), Jason Gleason ("Gleason"), Chris Moreno ("Moreno") and Curtis Yarnell ("Yarnell"), deployed to the Days End Motel on Valley Drive in Las Cruces, New Mexico in **marked and unmarked Sheriff's Office vehicles** with the hopes of locating Mr. Malone.

Thounvell Aff. ¶ 9, at 3 (emphasis added).  The Sanchez Aff., by contrast, indicates that the officers arrived in unmarked vehicles:

> On that date, SRT members including Sergeant Joshua Bryant ("Bryant"), Deputies Chase Thouvenell ("Thouvenell"), Alfred Sanchez ("Sanchez"), Eric Avilucea ("Avilucea"), Mark Rodriguez ("Rodriguez"), Adrian Gonzales ("Gonzales"), Jason Gleason ("Gleason"), Chris Moreno ("Moreno") and Curtis Yarnell ("Yarnell"), deployed to the Days End Motel on Valley Drive in Las Cruces, New Mexico in **unmarked Sheriff's Office vehicles** with the hopes of locating Mr. Malone.

Sanchez Aff. ¶ 6, at 2 (emphasis added).

there was any permission for deployment of the SRT" as the DASO's SRT operations manual

requires.  Response ¶ 18, at 8 (setting forth this fact).[29]  "Members of the SRT were shown a

photo of Malone and briefed that he was a felon, may be armed, and has assaulted his spouse."

MSJ ¶ 17, at 6 (setting forth this fact).[30]  "Bryant sent Deputies Thouvenell and Sanchez to

conduct surveillance at the rear of the motel to determine if there were any exit areas that Malone

could escape from."  MSJ ¶ 18, at 6 (setting forth this fact).  See Response ¶ 10, at 6 (not

disputing this fact).[31]  "Prior to the SRT executing the [arrest[32]] warrant, Wilber contacted

---

The Court concludes, based on this evidence, that it is undisputed that the members of the SRT whom Bryant had tasked to assist in the execution of the arrest warrant arrived at the Days End Motel in some unmarked vehicles.  The Bryant Aff., Thounvell Aff., and Sanchez Aff. all factually allege that at least some of the officers arrived in unmarked vehicles.  There is a factual dispute, however, whether any marked vehicles were used.  On the one hand, the Bryant Aff. and Thounvell Aff. support the factual proposition that some of the vehicles were marked, both using the phrase "marked and unmarked Sheriff's Office vehicles."  Bryant Aff. ¶ 11, at 3; Thounvell Aff. ¶ 9, at 3.  The Sanchez Aff., on the other hand, states that the officers arrived in "unmarked Sheriff's Office vehicles."  Because this factual dispute exists, the Court has modified the proposed undisputed fact to state: "The members of the SRT who had been tasked by Bryant to assist in the execution of the arrest warrant arrived at the Days End Motel in some unmarked vehicles."  The Court will, if necessary, determine in its analysis whether the factual dispute regarding whether the officers used any marked vehicles is material.

[29]The Court incorporates its analysis from footnote 24 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[30]M. Malone purports to dispute this factual assertion, stating: "Plaintiff admits the statements contained in Defendants' paragraph 17, but denies any implication that the SRT even met together in advance to receive a full briefing of the situation, or that they received any further information."  Response ¶ 9, at 6.  M. Malone does not cite to any evidence to support his argument.  The local rules regarding summary judgment require the responding party to "specifically controvert[]" the fact, or else the fact is admitted.  D.N.M.LR-Civ. 56.1(b).  Because M. Malone's response does not specifically controvert the Defendants' factual assertion, as D.N.M.LR-Civ. 56.1(b) requires, the Court deems this factual assertion is admitted.

[31]In his Response, M. Malone asks the Court to find undisputed that the SRT or assisting patrol units did not establish inner and outer perimeters in this case, as the SRT Operations

- 17 -

Malone on his cell phone and advised him that DASO was looking for him in reference to the

incident involving his wife.  Wilber asked Malone to turn himself in.  Malone told Wilbur he

would not."  MSJ ¶ 14, at 6 (setting forth this fact).[33]

_____

Manual requires.  See Response ¶ 19, at 8.  In support of this factual assertion M. Malone cites
only to the SRT Operations Manual.  See Response ¶ 19, at 8.  The Court agrees that the SRT
Operations Manual requires the SRT or assisting patrol units to establish inner and outer
perimeters.  See SRT Operations Manual at 2-3.  M. Malone does not, however, cite to or attach
any evidence in support of its factual assertion that the SRT or assisting patrol units in this case
did not establish inner and outer perimeters in this case.  Accordingly, the Court cannot find this
proposed factual assertion undisputed.

[32]The County Defendants make the factual assertion that "[p]rior to the SRT executing
the search warrant, Wilber contacted Malone on his cell phone and advised him that DASO was
looking for him in reference to the incident involving his wife."  MSJ ¶ 14, at 6.  The County
Defendants do not cite to or attach any evidence indicating that the SRT team had obtained a
search warrant at this point in the tactical operation.  Throughout the rest of the MSJ, the County
Defendants contend that they obtained an arrest warrant for Malone, and not a search warrant.
For example, early on in the MSJ, the County Defendants make the factual assertion that
"[a]dditionally, Wilber obtained an arrest warrant for Malone."  MSJ ¶ 9, at 5.  Moreover, the
Court has been unable to locate any evidence in the record indicating that the SRT team or any
officers involved in this tactical operation obtained a search warrant -- as opposed to an arrest
warrant -- before Thouvenell shot and killed Malone.  The Court agrees that after Thouvenell
shot and killed Malone, "[a] search warrant was obtained for Room 103.  The inventory to that
warrant shows a backpack containing Malone's personal effects was located in Room 103."
MSJ ¶ 39, at 9.  The Court believes that the County Defendants intended to refer to the arrest
warrant in this sentence.  Accordingly, the Court has modified this factual assertion to state:
"Prior to the SRT executing the [arrest] warrant, Wilber contacted Malone on his cell phone and
advised him that DASO was looking for him in reference to the incident involving his wife."

[33]In his Response, M. Malone purports to dispute these factual assertions, writing:

With regards to Defendants' paragraph 14, Plaintiff denies that prior to executing
[the arrest warrant] Wilber contacted Malone via cell phone and asked him to turn
himself in.  Defendants draw a woefully inaccurate picture of Wilber's actions
and recollections.  His contact with Malone was not part of any planned SRT
effort, and he did not indicate to Malone that there was a warrant for his arrest.
Wilber's statement, given on the day of the shooting, July 29, 2015, is hereto
attached as "Plaintiff's Exhibit 4."  Yarnell, who was on surveillance, told Wilber
that a man who might have been Malone had walked by on the street.  When

"The manager of the motel had previously been contacted by Deputy Yarnell and shown a photo of Malone to determine if he was an individual renting a room at the motel."  MSJ ¶ 19, at 7 (setting forth this fact).  See Response ¶ 10, at 6 (not disputing this fact).  "Yarnell initially informed [sic] by the manager that he had not seen Malone."  MSJ ¶ 20, at 7 (setting forth this fact).  See Response ¶ 10, at 6 (not disputing this fact).  "While continuing to conduct surveillance of the motel, the manager later approached Bryant and informed him that Malone was indeed staying with a woman in Room 103 of the motel."  MSJ ¶ 21, at 7 (setting forth this fact).  See Response ¶ 10, at 6 (not disputing this fact).  "Armed with information that Malone was in Room 103 of the motel, the SRT members approached Room 103 with the intention of knocking on the door to see if Malone was there."  MSJ ¶ 22, at 7 (setting forth this fact).  See Response ¶ 10, at 6 (not disputing this fact).  "Deputies Thouvenell and Sanchez continued to

---

Wilber arrived on scene he spoke to the motel manager who told him there no one had passed by that way.  Wilber then decided himself to call Michael from across the street.  He told him "I need you to come in and talk to me."  Malone said, "About what?"  Wilber replied, "About the incident with your girl."  Malone said "I haven't seen her in two months."  Wilber said "Look Ok, you either need to come in or we're coming to get you, like either way we need to resolve this."  Malone swore at him and hung up.  Wilber texted the following: "OK, Michael we'll see you soon."  One minute later Wilber heard the gunshots."

Response ¶ 6, at 5-6 (citation omitted)(brackets added).  The evidence to which M. Malone cites does not, however, dispute the County Defendants' assertion that, before the SRT group executed the arrest warrant: (i) Wilbur contacted Malone on his cellular telephone; (ii) advised him that DASO was looking for him with respect to the incident with his wife or girlfriend; (iii) Wilbur asked Malone to surrender; and (iv) Malone informed Wilbur that he would not surrender.  Accordingly, the Court deems the Defendants' factual assertions undisputed.

conduct surveillance at the backside of the motel to ensure Malone could not flee the area by escaping out a back window or door."  MSJ ¶ 23, at 7 (setting forth this fact).[34]

_____

[34]In his Response, M. Malone purports to dispute this factual assertion, writing:

> Plaintiff denies Defendants' paragraph 23.  Thouvenell and Sanchez had only just walked over to the back of the motel when they heard Malone climbing the fence a few feet away.  They had previously been moving between the Family Dollar parking lot and the adjacent trailer part, looking for a good place to station.  They had certainly not moved to cover any of the several egress points behind the motel prior to Wilber's ill fated phone call to Malone.  ([Interview of Det. Chase Thouvenell, filed January 29, 2016 (Doc. 31-2)("Thouvenell Interview")] and [Interview of Sgt. Alfred Sanchez, filed January 29, 2016 (Doc. 31-3)("Sanchez Interview")].

Response ¶ 11, at 6.

For the factual assertion that "Deputies Thouvenell and Sanchez continued to conduct surveillance at the backside of the motel to ensure Malone could not flee the area by escaping out a back window or door," MSJ ¶ 23, at 7, the County Defendants attach and cite to the Affidavit of Chase Thounvell at ¶ 12, at 3, filed January 5, 2016 (Doc. 25-3)("Thounvell Aff."), and the Affidavit of Alfred Sanchez at ¶ 8, at 2, filed January 5, 2016 (Doc. 25-4)("Sanchez Aff.).  In the Thouvenell Aff., Thouvenell states:

> Sergeant Bryant tasked me and Detective Sanchez to station ourselves behind the Family Dollar and the Days End Motel.  At the time of our deployment, we were armed with our Department-issued AR-15's.  The reason we were positioned in this area was so that we could prevent Malone from fleeing from any exits at the rear of the Motel while other members of the SRT executed the arrest warrant.

Thounvell Aff. ¶ 12, at 3.  In the Sanchez Aff., Sanchez similarly states:

> Sergeant Bryant tasked me and Detective Thouvenell to station ourselves behind the Family Dollar and the Days End Motel.  At the time of our deployment, we were armed with our Department-issued AR-15's.  The reason we were positioned in this area was so that Detective Thouvenell and I could prevent Malone from fleeing from any exits at the rear of the Motel while other members of the SRT executed the arrest warrant.

Sanchez Aff. ¶ 8, at 2.  This evidence supports the County Defendants' factual assertion that Thouvenell and Sanchez "continued to conduct surveillance at the backside of the motel to ensure Malone could not flee the area by escaping out a back window or door."  MSJ ¶ 23, at 7.

"Bryant knocked on the door of Room 103.  Room 103 is on the ground level of the Days End Motel.  The door was answered by Renee Williams.  Bryant then asked Williams if Malone was in the motel room."  MSJ ¶ 24, at 7 (setting forth this fact).  <u>See</u> Response ¶ 12, at 6 (not disputing this fact).  "After some conversation between the two, the Deputies heard gunshots that sounded as if they were coming from inside the room."  MSJ ¶ 25, at 7 (setting forth this fact).  <u>See</u> Response ¶ 12, at 6 (not disputing this fact).  "Deputy Bryant pulled Williams out of the doorway to ensure that if anyone was shooting from within the room, she would be safe."  MSJ ¶ 26, at 7 (setting forth this fact).  <u>See</u> Response ¶ 12, at 6 (not disputing this fact).  "After determining that gunshots were not coming from the room, the SRT members ran around towards the backside of the building."  MSJ ¶ 27, at 7 (setting forth this fact).  <u>See</u> Response ¶ 12, at 6 (not disputing this fact).[35]  "While the SRT at the doorway was talking with Williams,

---

M. Malone points to two pieces of evidence in the record to dispute the Defendants' factual assertion: (i) the Thouvenell Interview; and (ii) the Sanchez Interview.  <u>See</u> Response ¶ 11, at 6.  While M. Malone refers generally to the Thouvenell Interview and the Sanchez Interview, he does not "refer with particularity to those portions of" these documents as D.N.M.LR-Civ. 56.1(b) requires.  Instead, the Court is apparently left to comb through the Thouvenell Interview and the Sanchez Interview in search of the portions of these documents that supports M. Malone's contention that the County Defendants' factual assertion remains in dispute.  The Court need not engage in this laborious exercise, but even upon inspecting the Thouvenell Interview and the Sanchez Interview, the Court cannot find facts disputing the County Defendants' general factual assertion that "Thouvenell and Sanchez continued to conduct surveillance at the backside of the motel to ensure Malone could not flee the area by escaping out a back window or door."  MSJ ¶ 23, at 7.  Accordingly, the Court deems the County Defendants' factual assertion undisputed.

[35]In his Response, M. Malone does not dispute this fact, but also sets forth the following additional fact: "[T]hese events occurred over the course of mere seconds, and immediately before Thouvenell and Sanchez took position."  Response ¶ 12, at 6.  The local rules permit M. Malone to

Thouvenell and Sanchez were watching what could be described as an alleyway on the side of the Days End Motel where Room 103 was located."  MSJ ¶ 28, at 8 (setting forth this fact).[36]

---

set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56.1(b).  Here, M. Malone has set forth an additional fact in paragraph 12 of his Response, that is different from and in addition to those in the County Defendants' MSJ, but he does not "refer with particularly to those portions of the record upon which" he relies or otherwise attach evidence supporting this factual assertion.  D.N.M.LR-Civ. 56.1(b).  Accordingly, the Court cannot deem this fact undisputed pursuant to D.N.M.LR-Civ. 56.1(b).

[36]M. Malone purports to dispute this factual assertion, writing:

Plaintiff denies Defendants' paragraph 28.  Thouvenell and Sanchez were not watching the alleyway.  If they had been watching it they certainly would have seen Malone climbing out of a window and running toward them before he climbed the fence.  Instead, they heard a noise then rounded the corner to find Malone already on the fence.

Response ¶ 13, at 7.  In support of their assertion that Thouvenell and Sanchez were watching the alleyway on the side of the Days End Motel where Room 103 was located, the County Defendants cite to both the Thouvenell Aff. and the Sanchez Aff., which contain almost identical language on this point:

There is a space of approximately ten-feet wide between the rear of the Days End Motel and the adjacent building housing the Family Dollar.  This space runs the entire length of one wing of the Days End Motel and the Family Dollar, in essence creating an alleyway.  I have reviewed the photograph attached to the affidavit of Alfred Sanchez at [Photograph of Alleyway, filed January 5, 2016 (Doc. 25-4 at 5)("Photograph of Alleyway") and the alleyway depicted therein is the same alleyway I observed that day.

I took a position to the rear of the Days End using its wall for cover.  I then looked down the alleyway to observe any activity within that space while also being able to view the west-facing backside of the Motel.  By taking this position, I was able to observe all potential rear exit escape routes of the Motel.

Thouvenell and Sanchez suddenly heard a noise coming from the alley between the Motel and Family Dollar.  They looked into the alleyway as Malone, while holding a revolver, was attempting to climb a chain-link fence immediately in front of them.  The Deputies repeatedly commanded Malone to drop the revolver. Instead, Malone jumped off the fence[,] started to back away from Sanchez and Thouvenell while still holding the revolver in his right hand[, and lowered his arms].  Both Thouvenell and Sanchez commanded Malone to drop the weapon several times yet Malone continued to back away from them with the weapon in his hand.  Ultimately, Thouvenell, fearing for his, the public's and Sanchez's safety, fired three shots at Malone.  During this interaction with Malone, both Deputies felt that Malone could shoot them at any moment.

MSJ ¶¶ 29-33, at 8 (setting forth a version of these facts that the Court has modified).[37]

_____

Thouvenell Aff. ¶¶ 13-14, at 3-4.  See Sanchez Aff. ¶¶ 9-10, at 2-3 (setting forth almost identical language).  This evidence supports the County Defendants' assertion that Thouvenell and Sanchez were watching the alleyway on the side of the Days End where Room 103 was located. M. Malone purports to dispute this factual assertion, contending that Thouvenell and Sanchez were not watching the alleyway.  M. Malone insists that they instead heard a noise and then rounded the corner to find Malone already on the fence.  M. Malone does not, however, point to those portions of the record upon which he relies, as D.N.M.LR-Civ. 56.1(b) requires. Accordingly, the Court deems undisputed the County Defendants' factual assertion that, "[w]hile the SRT at the doorway was talking with Williams, Thouvenell and Sanchez were watching what could be described as an alleyway on the side of the Days End Motel where Room 103 was located."

[37]With respect to these factual assertions, M. Malone states:

Plaintiff admits the statements contained in Defendants' paragraphs 29-33, but denies the sequence in which these statements are presented.  Both Thouvenell and Sanchez describe a confusing situation where they were both caught by surprise and had barely registered a possible threat before Thouvenell fired.  They both agree that they suddenly saw Malone on the fence holding a gun over his head as he was climbing.  They yelled "drop the weapon" and Malone immediately jumped down, backed up and lowered his arms before he was shot. It is certainly reasonable for a jury to conclude that in the time it took for Thouvenell to register a threat and fire, Malone registered a police command and complied by jumping down, backing up, and throwing the gun to the ground. ([Thouvenell Interview] and [Sanchez Interview]).

Response ¶ 14, at 7.  First, M. Malone explicitly admits these factual allegations.  See Response ¶ 14, at 7 ("Plaintiff admits the statements contained in Defendants' paragraphs 29-33 . . .").

> When the remaining members of the SRT entered the alleyway, Malone was observed lying on the ground with a black revolver near him. Sergeant Bryant checked Sanchez and Thouvenell to determine if they had been shot. Once he determined they had not been shot, he and Deputy Moreno began providing first-aid.

MSJ ¶ 34, at 8 (setting forth this fact).[38]

"Bryant and Moreno provided first-aid until paramedics arrived on scene. Malone was then pronounced dead." MSJ ¶ 35, at 8 (setting forth this fact).[39] "Agent Norman Rhoades of the New Mexico Department of Public Safety, was assigned to document the scene where Malone was shot. In his diagram and documentation, three (3) shell casings were found near Malone's body. A cell phone, knife and .22 Ruger were also found and inventoried." MSJ ¶ 36, at 9 (setting forth this fact).[40] "The handgun was near Malone's foot, approximately two-inches

---

While he purports to dispute the sequence in which the MSJ presents these statements, he does not describe how these statements' sequence should be modified. The Court can identify, however, one additional or different fact that M. Malone asserts in his Response: that as Malone was backing up while still holding the revolver, he lowered his arms. See Response ¶ 14, at 7. M. Malone supports this additional fact by citing specifically to the record, and the County Defendants do not dispute this factual assertion in their Reply as D.N.M.LR-Civ. 56.1(b) requires. See D.N.M.LR-Civ. 56.1(b)("The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection."). Accordingly, pursuant to D.N.M.LR-Civ. 56.1(b), the Court has modified the County Defendants' factual assertion to include this additional fact from M. Malone's Response.

[38]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion. Accordingly, the Court deems this factual assertion undisputed.

[39]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion. Accordingly, the Court deems this factual assertion undisputed.

[40]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion. Accordingly, the Court deems this factual assertion undisputed.

from the south wall of the Motel."  MSJ ¶ 37, at 9 (setting forth this fact).[41]  "Malone's foot was

three-feet eleven inches from the same wall."  MSJ ¶ 38, at 9 (setting forth this fact).[42]  "A search

warrant was obtained for Room 103.  The inventory to that warrant shows a backpack containing

Malone's personal effects was located in Room 103."  MSJ ¶ 39, at 9 (setting forth this fact).[43]

## PROCEDURAL BACKGROUND

M. Malone filed suit in state court, naming Dona Ana County, Thouvenell, the City of

Las Cruces, and John Doe(s), unknown LCPD officers, in their individual and official capacities,

as Defendants.  See Complaint at 1.  On September 30, 2015, Dona Ana County and Thouvenell

removed the case to federal court, asserting federal question jurisdiction.   See Notice of

Removal, filed September 30, 2015 (Doc. 1).  In his Complaint, M. Malone asserts the following

causes of action against the County Defendants: (i) state law claims against Thouvenell and

Dona Ana County under the New Mexico Wrongful Death Act and/or for common law assault,

battery, or gross negligence (Count I), see Complaint ¶¶ 39-43, at 6; (ii) excessive force claims

against Thouvenell and Dona Ana County under the Fourth Amendment pursuant to 42 U.S.C. §

1983, and under Article II, § 10 of the New Mexico Constitution (Count II), see Complaint ¶¶

44-49, at 7; and (iii) a municipal liability claim for negligent hiring training and supervision

against Dona Ana County (Count III), see Complaint ¶¶ 53-64, at 8-9.

---

[41]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[42]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

[43]The Court incorporates its analysis from footnote 17 and applies it to this factual assertion.  Accordingly, the Court deems this factual assertion undisputed.

1.      **The Motion.**

The County Defendants filed the MSJ on January 5, 2016. <u>See</u> MSJ at 1. Pursuant to D.N.M LR-Civ.7, on January 4, 2016, Damian Martinez, the County Defendants' attorney, spoke to Samuel Kane, Matthew Malone's counsel, to determine whether M. Malone opposes the MSJ. <u>See</u> MSJ at 1. M. Malone opposes the relief that the County Defendants request. Thomas Limon, the City of Las Cruces' counsel, does not oppose the relief that the County Defendants request. <u>See</u> MSJ at 1.

In the MSJ, the County Defendants ask the Court to grant Thouvenell qualified immunity, and summary judgment in all the County Defendants' favor. <u>See</u> MSJ at 1. The County Defendants first argue that Thouvenell is entitled to qualified immunity on Count II, because "his actions were reasonable and did not violate Malone's rights under the Fourth Amendment." MSJ at 11. The County Defendants assert that a police officer's unreasonable use of lethal force amounts to a constitutional deprivation under the Fourth Amendment that the following non-exclusive factors frame the reasonableness inquiry: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." MSJ at 12 (quoting <u>Graham v. Connor</u>, 490 U.S. at 395)(brackets in MSJ). According to the County Defendants, in assessing the degree of threat, the Court can also consider: "(1) whether Thouvenell ordered Malone to drop his weapon, and Malone's compliance with those directives; (2) whether Malone made hostile motions with a weapon towards him; (3) the distance separating Thouvenell from Malone; and (4) the manifest intentions of Malone." MSJ at 12 (citing <u>Estate of Larsen v. Murr</u>, 511 F.3d 1255, 1260 (10th Cir. 2008)).

The County Defendants maintain that "[t]hese factors weigh in Thouvenell's favor and the uncontroverted evidence establishes Thouvenell's reasonableness as a matter of law."  MSJ at 12.  With respect to the first Graham v. Connor factor, the County Defendants assert that Malone's actions constitute any number of severe felonies, including aggravated assault on a peace officer and assault with a deadly weapon.  See MSJ at 12.  Second, the County Defendants contend that Malone posed an immediate threat to the officers and the public in general.  See MSJ at 12-13.  They argue that Thouvenell did not have to wait for Malone to point or shoot his weapon at him or at Sanchez before firing, and that Malone could have easily raised his weapon and fired at them.  See MSJ at 12.  The County Defendants maintain that it is undisputed that Thouvenell and Sanchez attempted to get Malone to comply with their orders, and that, "fearing for their safety and that of the public, there was no other alternative left for Thouvenell but to use that amount of force he employed."  MSJ at 12-13.  The County Defendants further explain:

> From the inception of the incident, the Deputies ordered Malone drop the revolver.  **[UF 31]**  They did so in order to avoid escalating the confrontation. Malone refused to comply; instead, he chose to slowly back away from the Deputies while armed and without giving any indication of his intention to adhere to the Deputies' lawful commands.  **[UF 30, 31]**  Due to Malone's actions, the Deputies legitimately feared for their safety and that of the public, and it was Malone's non-compliance which force Thouvenell to use lethal force.  **[UF 31]**  In short, it was only after Malone refused to heed the Deputies' orders to drop the weapon that force was used.  **[UF 29, 30, 31, 32]**

MSJ at 13 (emphasis in original).

The County Defendants next argue that the Estate of Larsen v. Murr factors[44] also "demonstrate the reasonableness of the use of force in this case."  MSJ at 13.  The County

---

[44]In Estate of Larsen ex. rel Sturdivan v. Murr, the Tenth Circuit explained that the use of deadly force "is justified under the Fourth Amendment if a reasonable officer in Defendants'

Defendants contend that: (i) the deputies repeatedly ordered Malone to drop the revolver to no avail; (ii) the deputies had knowledge that Malone, a felon, had previously used a revolver to assault his wife; (iii) Malone refused to comply with the deputies' orders to drop the revolver; and (iv) Malone's manifest intentions were to force a deadly standoff with police.  See MSJ at 13.  The County Defendants further assert:

> That Deputy Thouvenell acted constitutionally is bolstered by key pieces of irrefutable evidence.  Deputies recovered and inventories a .22 caliber Ruger near Malone's foot and feet from the chain-link fence Malone was attempting to climb. **[UF 36, 37, 38]**  Moreover, should Plaintiff argue that the handgun was in Malone's backpack and therefore he could not have been a threat to the Deputies, that argument is stunted by the undisputed fact that Malone's backpack was inventoried as found in Room 103 and not with Malone. **[UF 39]**

MSJ at 13 (emphasis in original).  In sum, the County Defendants advance that, under Graham v. Connor and Estate of Larsen v. Murr, the deputies' actions were reasonable under the circumstances, and lethal force was necessary to protect them and the public.  See MSJ at 14.

The County Defendants maintain that the United States Court of Appeals for the Tenth Circuit has routinely held that law enforcement officers can use lethal force when confronted with an armed or potentially armed suspect.  See MSJ at 14-15 (citing Thomson v. Salt Lake Cty. Utah, 584 F.3d 1304 (10th Cir. 2009), and Phillips v. James, 422 F.3d 1075 (10th Cir. 2004)).  According to the County Defendants, this case presents as strong a case for qualified immunity

---

position would have had probable cause to believe that there was *a threat of serious physical harm to themselves or to others*."  Estate of Larsen v. Murr, 511 F.3d at 1260.  The Tenth Circuit explained that to assess the degree of threat facing officers, courts should consider a number of non-exclusive factors, including: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect."  511 F.3d at 1260.  Estate of Larsen v. Murr, 511 F.3d at 1260.

as both <u>Thomson v. Salt Lake County Utah</u> and <u>Phillips v. James</u>.  <u>See</u> MSJ at 14-15.  The

County Defendants argue that Malone not only refused to comply with orders, but he was also a

known felon who several days before had assaulted his wife with a revolver.  <u>See</u> MSJ at 15.

They insist that Malone failed to drop the revolver when ordered and that he could have shot

either officer at any point.  <u>See</u> MSJ at 15.  The County Defendants further assert:

> Just like [<u>Thomson</u>] and <u>Phillips</u>, there is no question in this case as to whom
> Malone presented a threat (himself or the Deputies) because Malone made his
> intentions manifest by not dropping the weapon.  **[UF 31]**  Although Malone
> never pointed the weapon at the officers and fired, they were under no obligation
> to be shot at before firing.  As in [<u>Thomson</u>] and <u>Phillips</u>, however, qualified
> immunity is appropriate here because the undisputed material facts establish that
> the Officers' actions were imminently reasonable.  The Court must enter
> judgment as a matter of law in favor of the Officers.

MSJ at 15 (emphasis in original).  Finally, on this point, the County Defendants argue that the

Fourth Amendment does not require Thouvenell to employ lesser force.  <u>See</u> MSJ at 16.

According to the County Defendants, "[p]olice officers have no obligation to use the least

amount of force necessary when confronting an armed and dangerous suspect."  MSJ at 16

(citing <u>Jonas v. Bd. of Comm'rs of Luna Cty.</u>, 699 F. Supp. 1284, 1293 (D.N.M.

2010)(Browning, J.)).  The County Defendants insist that, after Malone repeatedly ignored

commands to drop the revolver, the deputies had probable cause to believe their lives and the

public welfare were in danger.  <u>See</u> MSJ at 16.  As a result, the County Defendants argue,

Thouvenell was reasonable in using lethal force to end the threat regardless of other means of

force at his disposal.  <u>See</u> MSJ at 16.

   The County Defendants next argue that Dona Ana County and Thouvenell "are entitled to

summary judgment on that portion of Count II asserting claims under the New Mexico Wrongful

Death Act because the [NMTCA] is the sole waiver of immunity against Dona Ana County and Deputy Thouvenell for which state tort claims may be brought." MSJ at 16. The County Defendants contend that, to the extent that M. Malone brings claims under N.M. Stat. Ann. §§ 41-2-1 through 41-2-4, the Court of Appeals of New Mexico's decision in Armijo v. Regents of the University of New Mexico, 1984-NMCA-118, 704 P.2d 437, forecloses such claims. See MSJ at 16-17. In that case, the County Defendants insist, the Court of Appeals of New Mexico dealt with an issue where a plaintiff brought suit against the University of New Mexico under both the NMTCA and the New Mexico Wrongful Death Act. See MSJ at 17. According to the County Defendants, the Court of Appeals of New Mexico "specifically stated that the provisions of the Wrongful Death Act did not control the disposition of that action." MSJ at 17. The County Defendants maintain that, because the NMTCA's § 41-4-17 provides the exclusive remedy for claims against government entities and public employees, and provides for damages for wrongful death, the New Mexico Wrongful Death Act's provisions do not apply. See MSJ at 17. The County Defendants advance that the principles that the Court of Appeals of New Mexico discusses in Armijo v. Regents of the University of New Mexico apply with equal force in this case. See MSJ at 17. They explain:

> Plaintiff may only sue Deputy Thouvenell and Dona County pursuant to the New Mexico Tort Claims Act. Plaintiff's Count I specifically states that he is entitled to relief under the New Mexico Tort Claims Act and "Wrongful Death statute." [Doc. 1-2 at ¶ 42] Therefore, any claim for wrongful death brought under Count I can only be asserted via the New Mexico Tort Claims Act. To the extent Count I brings claims under the Wrongful Death statute, the County Defendants are entitled to summary judgment and the dismissal of any claim brought under Sections 41-2-1 through 41-2-4.

MSJ at 17.

The County Defendants next argue that Thouvenell's actions did not violate the NMTCA because they were privileged. See MSJ at 17. The County Defendants therefore ask the Court to dismiss the Complaint's Counts I and II. See MSJ at 17. First, the County Defendants argue that they are entitled to summary judgment on M. Malone's battery and state constitutional claims. See MSJ at 18. The County Defendants concede that Thouvenell's shooting of Malone would constitute a battery and construes M. Malone's negligence claim in Count I in that manner. See MSJ at 18. Further, the County Defendants state that Count II asserts a state constitutional claim, which appears to be brought under Article II, § 10 of the New Mexico Constitution, which is the analog to the Fourth Amendment. See MSJ at 18. According to the County Defendants, they are entitled to summary judgment on both the battery claim and the state constitutional claim, because "Thouvenell's use of force is privileged, and he and the County are not liable for battery, if Thouvenell used only the force reasonably necessary under the circumstances." MSJ at 19 (citing Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d at 1297). Moreover, the County Defendants insist that "[s]ummary judgment is appropriate for the same reasons qualified immunity applies." MSJ at 19. The County Defendants explain that "Thouvenell incorporates those arguments here -- that his actions were reasonable under the Fourth Amendment and thus, no battery or constitutional violation occurred." MSJ at 19. Second, the County Defendants argue that, to the extent that M. Malone "asserts a claim for vicarious liability under the New Mexico Tort Claims Act, it fails because Deputy Thouvenell did not commit a tort against Malone." MSJ at 19. The County Defendants explain:

> Under the NMTCA, governmental entities "may be held vicariously liable for any alleged torts committed by the officers for which immunity has been waived." *Weinstein* [*v. City of Santa Fe ex rel. Santa Fe Police Dep't.*, 1996-NMSC-021, ¶

> 14,] 916 P.2d [1313,] 1318. As above, because the undisputed facts do not establish Thouvenell committed the tort of battery under the NMTCA nor did he violate the New Mexico Constitution, the County is entitled to summary judgment on the Plaintiff's *respondeat superior* theory alleged in Counts I and II of the Complaint.

MSJ at 19 (emphasis in original).

The County Defendants next argue that the Court must dismiss Count IV against the County in its municipal capacity, because Thouvenell did not act wrongfully. See MSJ at 19-22. According to the County Defendants, the Complaint's Count IV is entitled "Negligent Hiring, Training and Supervision." MSJ at 19. The County Defendants assert that, while the NMTCA permits claims for negligent supervision and hiring, the Complaint can be construed only as a municipal liability claim under 42 U.S.C. § 1983. See MSJ at 19. The County Defendants explain:

> Plaintiff's Complaint states that Dona Ana County engages in "custom[s], pattern[s] and practice[s] of hiring unqualified individuals demonstrate[ing] a deliberate indifference on the part of the County . . . for the civil rights of the community." [Doc. 1-2 at ¶ 56]. It is these customs, policies or practices which purportedly promote the unreasonable use of lethal force and failure to appropriately train and supervise its deputies. Clearly, this is a municipal liability claim under federal law. *See **Monell v. Dep't of Soc. Servs.***, [436 U.S.] 658, 695 (1978)(government only liable where injury a result of execution of custom or policy). The undisputed facts establish the County is entitled to judgment as a matter of law on these theories.

MSJ at 19-20 (emphasis in original). The County Defendants explain that, under § 1983, municipalities are not vicariously liable for the acts of those they employ. See MSJ at 20. According to the County Defendants, to impose liability on Dona Ana County, M. Malone would need to prove that the officers violated the Constitution of the United States, and an "affirmative link" between Dona Ana County's policies and that violation. MSJ at 20. The County

Defendants insist that, because Thouvenell did not violate the Constitution of the United States, the case against Dona Ana County cannot proceed.  See MSJ at 20.  The County Defendants maintain that, because the undisputed material facts establish that Thouvenell acted reasonably under the circumstances, Dona Ana County is entitled to judgment as a matter of law.  See MSJ at 20.

The County Defendants then argue that, even if Thouvenell's actions were unreasonable, Dona Ana County would still be entitled to summary judgment, because the undisputed facts establish that all of the training provided to the Sheriff's Department personnel follows the constitutional model that the Supreme Court of the United States of America established in Graham v. Connor.  See MSJ at 20-21.  The County Defendants write:

> Dona Ana County Sheriff's Office General Order No. 2014-001 is the County's use of force policy **[UF 41, 42]**.  This policy is applicable to all Department deputies.  **[UF 41, 42]**  The policy is based on Amendments IV and XIV of the United States Constitution, Articles II, Sections 10 and 18 of the New Mexico Constitution, and the federal standard as enunciated in ***Graham v. Connor***, 490 U.S. 386 (1989).  **[UF 41, 42].**  That policy outlines the objectively reasonable standard that law enforcement must follow in determining the lawfulness of use of force.  **[UF 42]**  Additionally, the policy and training outline the procedures that deputies must use when applying force.  **[UF 42]**  Specifically, the three main factors a deputy is trained to consider when using force are: (1) the severity of the crime at issue, (2) whether the suspect/subject poses an immediate threat to the safety of other law enforcement personnel or others, and (3) whether the suspect/subject is actively resisting arrest or attempting to evade arrest by flight. **[UF 42]** These are the same factors that *Graham* and its progeny use to determine whether a use of force is objectively reasonable.

MSJ at 21 (emphasis in original).  The County Defendants further explain that deputies are also trained on how to apply the three Graham v. Connor factors, and that deputies must also take into account the following three factors before using force: (i) whether the suspect is armed; (ii) whether the suspect is refusing to comply with lawful commands; and (iii) whether the suspect is

actively resisting.  See MSJ at 21.  In sum, the County Defendants maintain that Dona Ana County and the Sheriff Department have clear use of force policies, and that Thouvenell received a refresher training on November 13, 2014, approximately eight months before the incident involving Malone.  See MSJ at 21-22.  The County Defendants therefore contend that there is no evidence that could lead to a finding of municipal liability and that Dona Ana County is entitled to judgment as a matter of law on M. Malone's municipal liability claim.  See MSJ at 22.

        **2.**      **The Response.**

      M. Malone responded to the MSJ on January 29, 2016.  See Response at 1.  M. Malone first notes that he is entitled to all inferences in his favor, including that Malone complied with officers' commands.  See Response at 9.  M. Malone rejects any potential argument by the County Defendants that, even if Malone was compliant, the shooting was a reasonable mistake under the circumstances.  See Response at 9.  According to M. Malone, "[t]he Tenth Circuit recognizes situations where the negligent operations of a S.W.A.T. operation cause unreasonable risk and constitutional violations."  Response at 9 (citing Holland Ex Rel Overdorff v. Harrington, 268 F.3d 1179 (10th Cir. 2001)).  M. Malone asserts that Thouvenell was an SRT member aware that he was in an active search for an armed, possibly suicidal, subject.  See Response at 9.  M. Malone maintains that it was unreasonable for the officers to open fire upon a suspect once they were confronted with the very thing they expected to find.  See Response at 9. M. Malone further argues:

> The crux of Plaintiff's complaint in this case is that County Defendants created the very circumstances that excuse their actions.  This is not a novel argument, nor does it speak to rights that are not well established.  (See also, **Jensen v. City of Oxnard**, 145 F.3d 1078 (9th Cir. 1998), and **Estate of Smith v. Marasco**, 318 F.3d 497 (3rd Cir. 2003)).  The Court of Appeals in **Holland** noted

that the planning of an arrest was part of the totality of circumstance that must be considered: "In *Medina v. Cram*, this court recently reaffirmed that the "totality of the circumstances" surrounding a seizure embraces conduct "immediately connected with the seizure," such as police conduct "arguably creating the need for force" where use of excessive force has been alleged.  252 F.3d at 1132; *accord Bella v. Chamberlain*, 24 F.3d 1251, 1256 (10th Cir. 1994)("Obviously, events immediately connected with the actual seizure are taken into account in determining whether the seizure is reasonable.")"  *Id.* at 1189.  There was no actual planning of Malone's arrest, no consideration was given to safe apprehension, officer safety or public safety.  The factual situation described above is one which the law is clearly established by department policies, professional police standards and constitutional protections.

Plaintiff believes that further discovery will only serve to illustrate his point.  Videos, dispatch logs, and phone records will further show this lack of coordination and planning.  Plaintiff should be allowed to develop his case against both Thouvenell and Dona Ana County through discovery.

Response at 9-10 (emphasis in original).  In sum, M. Malone asks the Court to deny the MSJ or, alternatively, to suspend judgment on the MSJ until the issues can be developed through discovery.  See MSJ at 10.

3.      **The Reply.**

The County Defendants replied on February 16, 2016.  See Reply Concerning County Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed February 16, 2016 (Doc. 35)("Reply").  The County Defendants first argue that M. Malone provides little case law regarding excessive force in his argument as to why qualified immunity is not appropriate.  See Reply at 3.  According to the County Defendants, M. Malone does not explain what constitutional right that Thouvenell violated or how that right was clearly established on July 29, 2015.  See Reply at 3-4.  The County Defendants argue that, under Tenth Circuit law, if a plaintiff fails to carry either part of the two-part burden in response to the qualified immunity defense, "the Court must grant Defendant qualified immunity."  Reply at 4

(quoting <u>Medina v. Cram</u>, 252 F.3d 1124, 1128 (10th Cir. 2001)).   The County Defendants maintain that, in this case, M. Malone asserts that Thouvenell used excessive force when he shot Malone.  <u>See</u> Reply at 6.  The County Defendants assert that M. Malone discusses legal authority relating to excessive force involving the negligent operations of a SWAT team in only three sentences of the Response and does not respond to any authority that the MSJ analyzes as it relates to excessive force.  <u>See</u> Reply at 6.  The County Defendants insist that M. Malone's Response does not cite any legal authority which establishes that the shooting of an armed Malone constitutes a seizure or constitutional violation under the Fourth Amendment, and that this right was clearly established.  <u>See</u> Reply at 6-7.  In sum, the County Defendants contend that, because M. Malone fails to carry his two-part burden, Thouvenell is entitled to qualified immunity.  <u>See</u> Reply at 7.

The County Defendants next argue that, even assuming that M. Malone has met his burden of showing a violation of a clearly established constitutional right, Thouvenell is still entitled to qualified immunity, because there is no genuine issue of any material fact regarding the reasonableness of the force that Thouvenell employed.  <u>See</u> Reply at 8.  The County Defendants assert that M. Malone does not dispute their undisputed material facts establishing that: (i) Malone was a felon in possession of a firearm and had assaulted his wife with that firearm; (ii) that deputies obtained a warrant for Malone's arrest; and (iii) Thouvenell and Sanchez were aware of these facts.  <u>See</u> Reply at 8.  The County Defendants further contend that M. Malone also does not dispute the facts in paragraphs 29 through 33 of the MSJ "establishing that Thouvenell was confronted by a gun-wielding Malone and fearing for his safety, that of Sanchez and the community, fired on Malone after giving repeated commands to drop the

firearm Malone was holding."  Reply at 8.   The County Defendants explain that, although M. Malone does not address the reasonableness of Thouvenell's actions in his Response, he states: "[Thouvenell] was a SRT member who knew he was in active search of an armed, possibly suicidal, subject.  It is absolutely unreasonable for officers to open fire upon a suspect once they are confronted with the very thing they are expected to find."  Reply at 8-9 (citing Response at 9).  Addressing this point, the County Defendants write:

> To the extent this statement was meant to address the County Defendants' arguments concerning the propriety of the force used under *Graham v. Connor*, 490 U.S. 386, 396 (1989), Plaintiff's understanding of the law is incorrect. Thouvenell did not have to wait to be shot at prior to be taking action.  *Estate of Larsen v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008).  And while Plaintiff's understanding of the law implies that Thouvenell was required to use a lesser amount of force, this understanding of the law would again be incorrect.  Jon[*a*]s *v. Bd. of Comm'rs* [*of Luna Cty.*, 699 F. Supp. at 1293] (explaining that to avoid a "'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least-, or even a less-, forceful or intrusive alternative . . . so long as the use of force is reasonable under *Graham v. Connor*").  Thus, even if Plaintiff would have met his initial two-part burden, Thouvenell is nonetheless entitled to qualified immunity on Count II of Plaintiff's claim of excessive force.

Reply at 9.

The County Defendants next argue that M. Malone's failure to address their MSJ on that portion of Count I as it relates to the New Mexico Wrongful Death Act entitles the County Defendants to summary judgment on M. Malone's New Mexico Wrongful Death Act claims. See Reply at 9.  The County Defendants explain:

> Pursuant to Local Rule 7.1(a), the County Defendants incorporate the arguments found at Section II of their Motion and Memorandum in Support of Qualified Immunity and Summary Judgment [Doc. 25, pp. 16-17] herein and further assert that Plaintiff's only remedy for any state law damages claimed under the New Mexico Tort Claims Act, NMSA 1978, Section 41-4-1, et seq. [sic]

Reply at 9.  The County Defendants also argue that Thouvenell is entitled to summary judgment on M. Malone's causes of action under the Complaint's Counts I and II alleging violation of the NMTCA, because M. Malone's "failure to address the motion as it relates to these claims amounts to his consent to the requested relief and there is no genuine dispute as to any material fact entitling the County Defendants to judgment as a matter of law."  Reply at 10.  The County Defendants therefore ask the Court to enter summary judgment as a matter of law on the state tort claims that the Complaint's Counts I and II allege.  See Reply at 10.

Finally, the County Defendants argue that M. Malone does not address that part of the MSJ as it relates to municipal liability.  See Reply at 10.  According to the County Defendants, they are therefore entitled to summary judgment on Count IV as they outline in the MSJ.  See Reply at 10.  The County Defendants contend:

> Pursuant to Local Rule 7.1(a), the County Defendants incorporate the arguments and legal standards outlined in Section IV of their Motion and Memorandum in Support of Qualified Immunity and Summary Judgment [Doc. 25, pp. 19-22] herein.  Again, Plaintiff fails to address the arguments raised by the County Defendants as they relate to municipal liability.  Moreover, Plaintiff's Response does not dispute any of the applicable undisputed facts addressed by the County Defendants as they relate to municipal liability in paragraphs 41, 42 and 43 of Doc. 25 of the County Defendants' Motion and Memorandum in Support for Qualified Immunity and Summary Judgment.  [See Doc. 31, ¶ 16]  Thus, under the undisputed facts, the County Defendants are entitled to judgment as a matter of law as it pertains to Plaintiff's municipal liability claim.

Reply at 10-11.

### 4.      The City's Motion.

On February 18, 2016, the City of Las Cruces filed the City's Motion.  See City's Motion at 1.  In the City's Motion, the City of Las Cruces explains that

> this motion stems, in part, from an incident where "John Doe," an alleged officer with Las Cruces Police Department ("LCPD"), whose identity is yet to be determined, if in fact there is any identity to be determined, allegedly prohibited Plaintiff from contaminating the scene of an officer-involved shooting.  The facts alleged by Plaintiff in his complaint states that, ". . . Plaintiff moved forward toward the alleyway again to find out whether the man on the ground was his brother.  An unknown male LCPD officer stopped him by pushing him away with both hands, threatening him with arrest, and telling him to "Get the fuck out of here, M. Malone," while unclasping the holster of his gun."  *Plaintiff's Complaint* ¶16.  Plaintiff goes on to state, "He ["John Doe"] could also observe that Plaintiff was unarmed, and posed no threat to him.  *Plaintiff's Complaint* ¶17.

City's Motion at 1-2.  The City of Las Cruces does not agree that these events took place.  See City's Motion at 2.  It further asserts that even if true, the facts alleged are "insufficient to sustain a cause of action for excessive force as charged in Counts II, III, and IV of Plaintiff's Complaint."  City's Motion at 2.  The City of Las Cruces therefore argues that the City of Las Cruces and all unnamed LCPD defendants "are entitled to summary judgment against all claims including excessive force, assault and battery, and negligent hiring because the alleged actions of John Doe(s) unknown LCPD officer(s) neither overcomes qualified immunity under § 1983 nor exceeds officer's privilege of necessary assaults and batteries."  City's Motion at 2.  M. Malone did not file a response to the City's Motion and the City of Las Cruces did not file a Reply.

### 5.    **The May 9, 2016, Hearing**.

The Court held a hearing on the MSJ on May 9, 2016.  See Transcript of Hearing (taken May 9, 2016)("Tr.").[45]  The County Defendants first argued in support of the MSJ.  See Tr. at 2:5-12 (Court, Martinez).  The County Defendants noted that with respect to Dona Ana County and Thouvenell, the Complaint has three counts: (i) Count I, which is a wrongful death claim that

---

[45]The Court's citations to the transcript of this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

seems to be brought under both the NMTCA and the New Mexico Wrongful Death Act; (ii) Count II, which is an excessive force claim brought under both the Fourth Amendment and Article II, § 10 of the New Mexico Constitution; and (iii) Count IV, which is a municipal liability claim.  See Tr. at 2:12-24 (Martinez).  The Court asked whether there is any reason to distinguish between what New Mexico state courts would do with the tort claims and the Fourth Amendment.  See Tr. at 2:25-3 (Court).  The Court inquired whether the analysis is going to be the same such that, if the Court grants the MSJ on one, it should grant it on both.  See Tr. at 33:3-7 (Court). The County Defendants responded: "I think it's a package deal, Your Honor. . . .  It looks to me about the same test."  Tr. at 3:8-16 (Court, Martinez).

The County Defendants confirmed that this case is a removed one and that, if the Court were to grant the MSJ, it might remand the state claims to state court.  See Tr. at 3:25-4:8 (Court, Martinez).  They then argued that, in addition, if the Court were to grant the MSJ on the excessive force claim on Thouvenell's behalf, the municipal liability claim would necessarily have to fail.  See Tr. at 44:8-20 (Martinez).  The Court agreed with the County Defendants.  See Tr. at 4:21-22 (Court).  The County Defendants then restated its arguments from the briefing on the excessive force claim with respect to the Graham v. Connor factors.  See Tr. at 4:22-5:16 (Court).  The Court stated that it was having trouble visualizing this alley, what it looked like, and how far everybody was from each other.  See Tr. at 5:17-6:25 (Court, Kane, Martinez).  The Court examined the photograph of the alleyway attached to the Sanchez Aff., and the County Defendants explained that looking straight at the picture, you are looking at the view that the officers were seeing.  See Tr. at 5:21-20 (Court, Kane, Martinez).  The County Defendants confirmed that the gate was fully closed and that Malone was trying to climb over the fence with

a pistol in his right hand.   See Tr. at 6:21-25 (Court, Martinez).   The County Defendants

explained that, what the undisputed facts show is that, when Malone jumped on the fence, the

officers immediately commanded him to drop the weapon and get off the fence.   See Tr. at 7:13-

16 (Martinez).   According to the County Defendants, Malone backed away from the officers, still

on the other side of the fence, holding the weapon in his right hand, and not listening to their

commands to drop the weapon.   See Tr. at 7:13-9:5 (Court, Martinez).   The County Defendants

confirmed that the officers shot through the chain link fence.   See Tr. at 8:22-9:20 (Court,

Martinez).

        The Court then asked how far Malone backed up from the fence before the first shot was

fired.   See Tr. at 9:23-24 (Court).   The County Defendants explained that Malone got to about an

air conditioning unit when the three shots were fired at him.   See Tr. at 10:10-17 (Court,

Martinez).   The Court inquired how far it is from the corner to the air conditioning unit, and the

County Defendants responded that there are no measurements in the record.   See Tr. at 10:18-25

(Court, Martinez).   The County Defendants further explained:

> Only to the reference point[,] [t]he air conditioner unit, the cellphone is 14 feet, 5
> inches from the reference point and the reference point is the southwest corner of
> the motel, which would be right, the corner of the motel in the diagram where you
> see numbers 1, 2 and 3.   Those are shell casings, right there at that corner is the
> reference point for this diagram.   So there is a cellphone next to the far side of the
> air conditioning unit.   So that's 14 feet, 5 inches[.]   The handgun is 16 feet 9
> inches from that reference point, and Malone's head is 22 feet 7 inches from that
> corner of the building where you see the 1, 2, and 3.

Tr. at 10:22-11:9 (Martinez).   The Court observed, however, that there is nothing in the record

that helps us know: (i) whether he was shot and fell to the right; (ii) whether he fell exactly

where he was shot; or (iii) whether he was shot closer, and he fell or stumbled back.  See Tr. at 10-19 (Court, Martinez).

The Court explained that one of the things that troubled it was that Malone was moving backwards, and it expressed concern about granting summary judgment on someone that was moving backwards, where the police did not have to be in an exposed place.  See Tr. at 11:20-12:2 (Court).  The County Defendants confirmed that the officers put themselves in an exposed place by coming around the corner.  See Tr. at 12:2-9 (Court, Martinez).  The County Defendants noted, however, that, even if Malone was moving backwards, he had a handgun, and it does not take but a motion to lift up the arm and shoot the weapon at the officers.  See Tr. at 12:11-13 (Martinez).  The County Defendants asserted that both officers in this case explained in their affidavits that, because Malone was not heeding their commands, they were in fear for their personal safety and that of the general public.  See Tr. at 13:13-18 (Martinez).  The Court expressed concern that, if it were to grant summary judgment here, it would basically be creating a bright-line rule that, if a person has a gun in his or her hand, the police can shoot.  See Tr. at 13:3-11 (Court).  The County Defendants responded that they did not think that the Court would be creating a bright-line rule, because the case law is clear in the District of New Mexico and the Tenth Circuit that officers "do not have to wait the glint of steal before they take action."  Tr. at 13:12-17 (Martinez).  The County Defendants argued that, if there were evidence in the record showing that Malone stated that he was going to put the weapon down and that he was not given the opportunity to do so, that story would be a different one.  See Tr. at 14:2-6 (Martinez).  The County Defendants also maintained that it would be a different story if Malone had turned and run down the alley instead of walking back away from the officers with a firearm in his hand.

See Tr. at 14:6-16 (Martinez).  The County Defendants confirmed that, from the time that the officers came around the corner and saw Malone, and began to give him commands until they shoot was seconds to moments.  See Tr. at 14:17-15:6 (Court, Martinez).

The County Defendants then reasserted their argument from the briefing that M. Malone did not meet his two-part burden in responding to the MSJ on qualified immunity grounds by showing that there was a constitutional right that was clearly established at the time of the shooting.  See Tr. at 16:8-20 (Martinez).  The Court observed that the Tenth Circuit is certainly very rigorous on the qualified immunity's clearly established prong, but that it is also probably impossible for any two cases to be identical.  See Tr. at 16:21-17:2 (Court).  The County Defendants then argued that, to the extent that a claim is brought pursuant the New Mexico Wrongful Death Act under Count I, the NMTCA would exclusively govern such claims.  See Tr. at 18:1-4 (Martinez).  The County Defendants therefore asked that the Court dismiss any New Mexico Wrongful Death Act claims.  See Tr. at 18:5-7 (Martinez).  The County Defendants maintained that, with respect to the Monell v. Department of Social Services claim, they believe that the officers' actions were reasonable and that, as a result, the Court need not reach the question of municipal liability.  See Tr. at 18:7-12 (Martinez).  They further asserted that there is no evidence in the record which shows that a Dona Ana County custom, policy, or practice led to Malone's shooting.  See Tr. at 18:12-15 (Martinez).

M. Malone then argued in opposition to the MSJ.  See Tr. at 10-11 (Court, Kane).  M. Malone first asserted that the key here is that, based on the available discovery and disclosures, this shooting happened at the very most in three seconds.  See Tr. at 19:16-20 (Kane).  M.

Malone confirmed that, by three seconds, he means from coming around the corner to the first shot. See Tr. at 20:5-7 (Court, Kane). M. Malone further explained:

> [T]he way I envision it is I'm looking at the picture I believe that was [the Photograph of Alleyway], but I'm looking at that picture and Detective Thouvenell and Detective Sanchez are hiding behind that corner. They're [hiding behind] that corner. This is happening very quickly. They hear something, they come around that corner, and everybody is startled, everybody is startled. Detective Thouvenell is startled[,] Detective Sanchez is startled and you have Matthew Malone who is on the fence with a gun. Okay, what happens at that point, if you count 1, 2, 3[,] Mr. Malone is dead. 1, 2, 3[,] Mr. Malone is dead. And this is according to Detective Thouvenell'[s] statement, and you've got to remember, Your Honor, Detective Thouvenell and Detective Sanchez, they are trained special response team members. They are suited up. . . .

Tr. at 20:10-25 (Kane). M. Malone then emphasized that he believes that summary judgment is inappropriate in this case, given that unlike with the factual patterns that the County Defendants cite, at no time did Malone ever threaten any of the officers. See Tr. at 21:17-24 (Kane).

M. Malone then discussed Dona Ana County's liability and emphasized that Wilbur did not inform Malone that they had a warrant for his arrest when they spoke to him on the telephone. See Tr. at 22:17-23:10 (Kane). M. Malone contended that, according to the special response team protocol and manual, all of the officers should have met and discussed the situation at hand. See Tr. at 23:18-24:1 (Kane). The Court asked whether that violation is simply negligence and noted that it would be hard to make a constitutional violation out of it. See Tr. at 24:2-5 (Court). The Court observed that, if Malone had started raising the weapon, this lawsuit would not likely have been brought, and that the issue is whether an officer can shoot if the weapon is not being raised. See Tr. at 24:23-25:12 (Court). M. Malone noted and the Court agreed that the Court must also take into account that the officers had reason to believe that Malone had used the gun that day and committed a violent crime, and that the encounter

arose in an alleyway while Malone was retreating.  See Tr. at 25:13-25 (Court, Kane).  M. Malone emphasized that Sanchez never shot and that, when he heard shots fired, he did not know who was doing the shooting, but still did not shoot.  See Tr. at 26:1-19 (Kane).  M. Malone asserted that this situation is one where a jury could find that it was not objectively reasonable for Thouvenell to shoot and noted that the fact that Sanchez did not pull his trigger indicates that Malone's revolver was not a danger.  See Tr. at 27:1-12 (Kane).  The Court asked whether it is the case that one officer did not shoot, and it would not make the actions of the officer who shot necessarily unreasonable.  See Tr. at 27:13-16 (Court).  M. Malone responded: "You're absolutely right."  Tr. at 27:17 (Kane).

M. Malone then asserted that, at this point, he would like to take Thouvenell's and Sanchez' deposition, see Tr. at 27:20-29:9 (Kane), particularly given that, temporally speaking, the Court and parties are talking about a three-second window, id. at 29:24-30:1 (Kane).  He also explained that the reason why he has named the City of Las Cruces Police Department as a Defendant is because he thought, in the initial discovery phase, he might have discovered some intervening player at the Las Cruces police who could have derived liability.  See Tr. at 29:9-13 (Kane).  On this point, M. Malone further stated: "And I just want to alert the Court that at this point I'm not really seeing that, and more than likely if we can do a couple of depositions et cetera then more than likely we'll just go ahead and dismiss them . . ."  Tr. at 29:14-19 (Kane).  M. Malone also stated that he would like to depose Wilbur and Bryant to determine whether proper procedures were followed with respect to the special response team.  See Tr. at 30:12-19 (Kane).  As it did with the County Defendants, the Court then asked M. Malone whether he would agree that the analysis under the NMTCA against Thouvenell is identical with the Fourth

Amendment analysis.  See Tr. at 31:11-15 (Court).  M. Malone agreed that the analysis is absolutely the same and contended that he believes that he has met his two-prong burden.  See Tr. at 31:16-32:11 (Kane).  M. Malone emphasized that, unlike in the cases which the County Defendants cite, there is no indication that Malone ever made verbal threats against the officers or pointed the gun at them, or even that the gun was in motion towards the officers.  See Tr. at 32:15-33:6 (Kane).

The Court then asked M. Malone to explain for what he is faulting Dona Ana County. See Tr. at 34:10-11 (Court).  M. Malone responded that the special response team procedures should have been properly followed, which would have entailed creating an operational plan and meeting, rather than "Thouvenell telling Detective Sanchez, [g]rab your AR 15, let's go out here." Tr. at 34:12-19 (Kane).  The Court responded that it is having trouble with faulting Dona Ana County.  See Tr. at 34:20-22 (Court).  The Court observed that it seems that the Dona Ana County custom, policy, or practice is appropriate, and that M. Malone's problem is with the officers not following it.  See Tr. at 34:22-25 (Court).  M. Malone responded, stressing that this operation was a poorly employed one, and that, if this operation is business as usual, then Dona Ana County would definitely be liable.  See Tr. at 35:3-36:20 (Kane).  M. Malone agreed that, at this point, no one knows.  See Tr. at 36:16-21 (Court, Kane).  The Court then asked whether, under Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), this case is a situation where, given it could go either way, and M. Malone does not have allegations that put it on one side or the other, more allegations would be required to keep Dona Ana County in the case.  See Tr. at 36:22-37:1 (Court).  M. Malone responded that this Complaint is notice pleading and explained that, if nothing is uncovered in discovery against

Dona Ana County, he will file a dismissal against it.  See Tr. at 37:2-13 (Kane).  The Court then

asked M. Malone whether he had considered that, under Tenth Circuit law, he would not likely

be able to get into evidence the Standard Operating Procedures ("SOPs") or policies and

practices, with respect to the excessive force case against Thouvenell, and that the Court

probably cannot consider them, even as part of the totality of the circumstances.  See Tr. at

37:14-38:3 (Court).  M. Malone responded:

> Your Honor, to be honest with you, I haven't.  I haven't really looked into that
> and that's something I'll take back with me and make sure that I have that
> procedure.  This is not my typical case.  And so it's one of those things that I'm
> getting, becoming more familiar as I go.

Tr. at 38:4-9 (Kane).

The Court and parties discussed the autopsy report, and explored whether there is any

genuine issue of material fact or whether the Court must simply apply the law to the undisputed

facts.  See Tr. at 38:4-48:12 (Atkinson, Court, Kane, Limon, Martinez).  The Court then stated

how it is inclined to rule on the MSJ:

> Well, I'm inclined to think that there [are] not really genuine issues of material
> fact or if the[re] are they're on the margins of what the real issue here is -- when
> an officer can shoot when somebody has exhibited some violent tendencies earlier
> in the day -- and I guess I think that's probably an issue that if these are the facts
> that pan out through discovery, it should be left to the jury to determine whether
> that's excessive force or not.  And not have the Court make that decision as a
> matter of law.  I do think a reasonable jury could conclude that if you take all [of]
> the inferences in favor of the plaintiff, that it was not objectively reasonable to
> shoot.  And so I'm inclined to deny the motion as to officer Thouvenell.  But I'm
> just not seeing . . . what the facts were as far as the county.  So I'm inclined to
> grant the motion as to the county.  If some evidence shows up that the county had
> a custom[,] policy, or practice that's different from what's in their written
> statements that are attached, then we can think about bringing them back[,] but
> I'm not seeing [it at this point].  It seems about all that's alleged in the complaint
> is that these officers may have violated county policy[, n]ot that the county didn't

have good policies in place[.]   [S]o I'm inclined to grant the motion as to the County and leave it as to officer Thouvenell.

Tr. at 48:12-49:14 (Kane).

At the hearing on the MSJ, the Court also heard arguments on the Motion and Memorandum in Support Thereof to Stay Discovery on the Basis of Qualified Immunity, filed January 5, 2016 (Doc. 26)("Motion to Stay"), and the Motion and Memorandum for Summary Judgment Based on Qualified Immunity, filed February 16, 2016 (Doc. 34)("MSJ 2").   With respect to the Motion to Stay, the parties and the Court had the following exchange:

> MR. MARTINEZ:  If the Court is inclined to deny qualified immunity, then I think the motion becomes moot.  I think the parties have engaged in a gentleman's agreement if you will not . . . engage in discovery pending these motions, and if the Court does rule against Detective Thouvenell, then I would be of the position that . . . the city is no longer in the case, then I would be in the position to state that then the stay is moot and we should go forward with discovery.
>
> THE COURT:  Okay.  Well, why don't I do this then:  If this works for you Mr. Martinez, why don't I work on this opinion,[46] see if my inclination holds true, and then if I end up doing what I've said I'm inclined to do, then maybe you could just withdraw that motion, the motion to stay.  I won't work on it, get you the opinion on the motion we just argued and then if I do what I said I'm inclined to do you could just withdraw that motion[.]  [W]ould that work for you[?]
>
> MR. MARTINEZ:  I would have no problem doing that Your Honor.
>
> THE COURT:  Would that work for you, Mr. Kane.
>
> MR. KANE:  Yes, Your Honor.
>
> THE COURT:  Would that work for you, Mr. Limon?
>
> MR. LIMON:  Yes, Your Honor.

---

[46]The Court is referring to its opinion on the MSJ, i.e., this Memorandum Opinion and Order.

Tr. at 49:21-50:23 (Court, Kane, Limon, Martinez).  With respect to the MSJ 2, the Court and the

parties had the following exchange:

> THE COURT:  Well, isn't probably rather than me deciding the constitutional issue here first, I just thin[k] you know, I mean under Younger, suing these officers is a bit of a fiction under the 11th Amendment anyway, your ability to sue them.  But if you can't even identify them[,] it seems to me it's stretching probably the fiction pretty far to allow it to go forward and have me determine the constitutional issue first.  Shouldn't I probably just say . . . we've got [to have] something more.
>
> MR. KANE:  Absolutely, yes.
>
> THE COURT:  Dismiss these guys, and since they're John Does, it's without prejudice, because we don't even know the officers, and if you come up with something down the road, you can either sue them again or bring them back in but right at the moment they don't exist.
>
> MR. KANE:  And I agree with that, Your Honor and I think that as the Court ruled on the county[,] . . . as long as it's dismissed without prejudice, if there is something that we find, which I don't believe we will, but if there is something out there[,] then we can always file a motion to have them joined.
>
> THE COURT:  Yeah, I don't know how it works.  I don't know if it's with prejudice or without prejudice, but if we haven't identified anybody[,] I don't know how it could be with prejudice against officers that aren't named in the lawsuit.  So the effect is I think that if you find something down the road you probably can bring an identified officer back in.
>
> MR. KANE:  That is correct, Your Honor.
>
> THE COURT:  Anything else Mr. Kane.
>
> MR. KANE:  Nothing else, Your Honor.
>
> THE COURT:  Mr. Limon.
>
> MR. LIMON:  Nothing further.
>
> THE COURT:  Well, I think I'm inclined to go that way.  I think I've done this in the past.  As you can imagine[,] there will be times when plaintiffs say they got beat up by a group of police officers and they can't identify them and we get to

this point . . . which is fairly late in the case and we still don't know who they are, and I think I have to dismiss them, so I think that's what I'm inclined to do. Rather than decide the constitutional issue and we don't even know who the officer is.  So I'll take a look at it but that's what I'm inclined to do.

MR. KANE:  Thank you very much, Your Honor.

THE COURT:  All right so I will try to first of all get the opinion out on the motion for summary judgment against officer Thouvenell first. And if I stay with that[,] that will give you what you need.  Right at the moment, though, y'all just kind of have a stay in place, an informal stay.  And after I get the opinion out you will figure out where it goes[,] is that kind of what we're think[ing?]

MR. MARTINEZ:  I believe so, Your Honor.

THE COURT:  That's where you are, Mr. Kane?

MR. KANE:  Yes, Your Honor.

Tr. at 49:21-50:23 (Court, Kane, Limon).  With respect to the City's Motion, the parties agreed that the Court should, at this time, dismiss the City of Las Cruces, and the John Doe(s), unknown LCPD officers, in their individual and official capacities, as parties to this lawsuit without prejudice.  See Tr. at 50:24-57:5 (Court, Kane, Limon, Martinez); Clerk's Minutes at 1-2, filed May 9, 2016 (Doc. 42)("Clerk's Minutes"); Transcript of Hearing at 1-10 (Court, Kane, Limon, Martinez)(taken August 25, 2016)("Aug. 15th Tr.").[47]

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the

---

[47]The Court's citations to the transcript of this hearing refer to the court reporter's original, unedited version.  Any final version may contain slightly different page and/or line numbers.

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving

party's case.'"  Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M.

2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th

Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

> Before the court can rule on a party's motion for summary judgment, the moving
> party must satisfy its burden of production in one of two ways: by putting
> evidence into the record that affirmatively disproves an element of the nonmoving
> party's case, or by directing the court's attention to the fact that the non-moving
> party lacks evidence on an element of its claim, "since a complete failure of proof
> concerning an essential element of the nonmoving party's case necessarily renders
> all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for
> which it bears the burden of proof at trial, the nonmovant "must go beyond the
> pleadings and designate specific facts to make a showing sufficient to establish
> the existence of an element essential to his case in order to survive summary
> judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Norway ASA, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)

(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party

must support its motion with credible evidence -- using any of the materials specified in Rule

56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp. v.

Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[48]  Once the movant

meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that

there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

---

[48]Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme
Court of the United States of America, dissented in Celotex Corp. v. Catrett, this sentence is
widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright &
Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the
Court issued a five-to-four decision, the majority and dissent both agreed as to how the
summary-judgment burden of proof operates; they disagreed as to how the standard was applied
to the facts of the case.").

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).   See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.")(internal quotation marks omitted).   Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (citation omitted)(internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)).  "In

responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"   Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of

ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Anderson v. Liberty Lobby, Inc., 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). Fourth, the court cannot decide any issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts." York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets omitted). "The Tenth Circuit, in Rhoads v. Miller, [352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),[49]] explained that the blatant contradictions of the record must be supported by more than other witnesses'

---

[49]Rhoads v. Miller is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that Rhoads v. Miller, Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009), and United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning,

J.)(citation omitted), aff'd, 499 F. App'x 771 (10th Cir. 2012).

> In evaluating a motion for summary judgment based on qualified immunity, we
> take the facts "in the light most favorable to the party asserting the injury."  Scott
> v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the
> plaintiff's version of the facts," id. at 378, unless that version "is so utterly
> discredited by the record that no reasonable jury could have believed him," id. at
> 380.   In Scott, the plaintiff's testimony was discredited by a videotape that
> completely contradicted his version of the events.  550 U.S. at 379.  Here, there is
> no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads'
> testimony. There is only other witnesses' testimony to oppose his version of the
> facts, and our judicial system leaves credibility determinations to the jury.  And
> given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory
> problems go to the weight of his testimony, not its admissibility . . . .  Mr. Rhoads
> alleges that his injuries resulted from a beating rendered without resistance or
> provocation. If believed by the jury, the events he describes are sufficient to
> support a claim of violation of clearly established law under Graham v. Connor,
> 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291-92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291-92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court," before

inquiring into whether there are genuine issues of material fact for resolution by the jury.  584

F.3d at 1326-27 (Holmes, J., concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir.

1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are

irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts").

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights." (quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006))).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. §

1983.  See Ashcroft v. Iqbal, 556 U.S. at 675 ("Because vicarious liability is inapplicable to Bivens[50] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. at 689).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

## 1.   Color of State Law.

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'" Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . . furthers the fundamental goals of preserving an area of individual freedom by limiting the reach of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir. 1995).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at

---

[50]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at 493.  Accordingly, at a base level, to find that an action was taken under color of state law, the court must find that "'the conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).

The Tenth Circuit has directed that, while "'state employment is generally sufficient to render the defendant a state actor . . . [,]' at the same time, it is 'well settled that an otherwise private tort is not committed under color of law simply because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting Lugar v. Edmondson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d 1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

- 59 -

2.      **Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. at 663).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046).  As the Court has previously concluded, "a plaintiff who establishes liability for deprivations of constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations. The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009) (Browning, J.).[51]

The Tenth Circuit has found liability for those defendants who proximately caused an injury alleged under § 1983 and stated that the fact that the "conduct of other people may have

---

[51]The Court clarified in Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d 1188 (D.N.M. Aug. 29, 2014)(Browning, J.), that common-law causation standards do not necessarily hold in the municipal-liability context, and, in fact, "the causation standard for municipal liability cases is unclear in the Tenth Circuit."  41 F. Supp. 3d at 1273.

concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry." 72 F.3d at 400.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange Cnty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding-intervening cause, quoting the Honorable Samuel J. Alito, then-United States Circuit Judge for the United States Court of Appeals for the Third Circuit:

> Suppose that three police officers go to a suspect's house to execute an arrest warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest.  The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no."  The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally,

"[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not

supersede the defendant's responsibility."   Trask v. Franco, 446 F.3d at 1047 (quoting WILLIAM

LLOYD PROSSER ET AL., PROSSER AND KEETON ON TORTS § 44, at 303-04 (5th ed.1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in
> determining whether the intervening act relieves the actor from liability for his
> antecedent wrongful act, and under the undisputed facts there is room for
> reasonable difference of opinion as to whether such act was wrongful or
> foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing RESTATEMENT (SECOND) OF TORTS § 453 cmt.b

(1965)).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority."   Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects

federal and state officials from liability for discretionary functions, and from 'the unwarranted

demands customarily imposed upon those defending a long drawn-out lawsuit.'"   Roybal v. City

of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. Apr. 28,

2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court

deems it "untenable to draw a distinction for purposes of immunity law between suits brought

against state officials under § 1983 and suits brought directly under the Constitution against

federal officials."   Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity

analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil

War Civil Rights Acts."  <u>Breidenbach v. Bolish</u>, 126 F.3d 1288, 1291 (10th Cir. 1997), <u>overruled</u>

<u>on other grounds as recognized in</u> <u>Currier v. Doran</u>, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and <u>Bivens v. Six Unknown Fed. Narcotics</u> <u>Agents</u>, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

<u>Camreta v. Green</u>, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."

<u>Pearson v. Callahan</u>, 555 U.S. 223, 232 (2009)(quoting <u>Hunter v. Bryant</u>, 502 U.S. 224, 227

(1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public

employees who are just doing their jobs are generally immune from suit."  <u>Lewis v. Tripp</u>, 604

F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known."  <u>Pearson v. Callahan</u>, 555 U.S. at 231 (quoting <u>Harlow v. Fitzgerald</u>, 457

U.S. at 818).  Qualified immunity also shields officers who have "reasonable, but mistaken

beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.

<u>Saucier v. Katz</u>, 533 U.S. 194, 205 (2001).  When a defendant asserts qualified immunity, the

plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or

statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

### 1.  **Procedural Approach to Qualified Immunity.**

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, the protocol that Saucier v. Katz outlined -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognized that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241 (alterations omitted)(internal quotation marks omitted).  See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior case law "comports with our usual reluctance to decide constitutional questions unnecessarily").  Once the

plaintiff establishes an inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

The Supreme Court recognizes seven circumstances where district courts should proceed directly to and "should address only" the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at

2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[52]  "Courts should think carefully before

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or

───────────────

[52]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . .  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

> 407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

>> [e]very person who, under color of any statute, ordinance,

_____

regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to <u>the deprivation of any rights, privileges, or immunities secured by the Constitution and laws</u>, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  <u>See</u> E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding<u>: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases</u>, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975).  In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  <u>See</u> Christopher Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very

statutory interpretation that will 'have no effect on the outcome of the case.'"   Ashcroft v. al-

Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)).

See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think

hard again, before turning small cases into large ones.").[53]   The Tenth Circuit will remand a case

---

effective in scaring police into behaving. . . .   These theories also suggest that a
judicially administered damages regime . . . would fare significantly better at
changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional
Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing
the exclusionary rule and recommending alternatives).   In Hudson v. Michigan,
547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable
alternative to a motion to suppress when it held that the exclusionary rule was
inapplicable to cases in which police officers violate the Fourth Amendment when
they fail to knock and announce their presence before entering.   See 547 U.S. at
596-97.   Rather than being a poor or discouraged means of developing
constitutional law, § 1983 seems the better and preferable alternative to a motion
to suppress.   It is interesting that the current Supreme Court and Tenth Circuit
appear more willing to suppress evidence and let criminal defendants go free, than
have police pay damages for violations of innocent citizens' civil rights.   It is odd
that the Supreme Court has not adopted a clearly established prong for
suppression claims; it seems strange to punish society for police violating unclear
law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.),
abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL
936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).   See Richard E. Myers, Fourth
Amendment Small Claims Court, 10 OHIO ST. J. CRIM. L. 571, 590-97 (2013)(arguing that
municipalities should establish small-claims courts to adjudicate police officers' Fourth
Amendment violations and award monetary judgments).

[53]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena
Kagan's comments about "large" and "small" cases:

While the Court is, of course, obligated to follow faithfully the Supreme Court's
decisions and opinions, the Court has always been unenlightened and even
troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large"
and "small" cases.   131 S. Ct. at 2032.   As a trial judge, the Court has tried
assiduously to avoid thinking about or categorizing some cases as "large" and
some as "small."   It usually is not mentally healthy for a judge to put all his or her

energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to seek qualified immunity for Fourth and Fourteenth Amendment violations.  See 132 S. Ct. at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 S. Ct. at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565.  The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then

to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

2.      **Clearly Established Rights in the Qualified Immunity Analysis.**

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001).  On the other hand, the Supreme Court has observed that it is generally not

---

detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1222 n.35.

necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts."  Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083).  "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken

beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a second decision with greater specificity to clearly establish the law."  Casey v. City of Fed. Heights, 509 F.3d at 1284.  Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ."  Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).  A consensual encounter occurs when a police officer approaches a person to ask

questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business," 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).   Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."  Oliver v. Woods, 209 F.3d at 1186.

### 1. **Investigative Detentions and Reasonable Suspicion.**

An encounter that is not consensual may nevertheless be justified as an investigative detention.  See Dorato v. Smith, 108 F. Supp. 3d. 1064, 1118 (D.N.M. 2015)(Browning, J.).  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).  Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.   Dorato v. Smith, 108 F. Supp. 3d. at 1118.   First, the officer "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S.

1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruled on other grounds as recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct'; he or she simply must possess 'some minimal level of objective justification' for making the stop." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).   Information "falling 'considerably short' of a preponderance standard" will meet the standard for reasonable suspicion.   United States v. Winder, 557 F.3d at 1134.  See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence").   A police-citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest, which probable cause or consent must support to be valid.  See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.   "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27.  A frisk "must . . . be confined in scope to an intrusion

reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29.   In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered.   See Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in Terry v. Ohio of an investigative detention -- a "stop" -- and of a protective search -- a "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)).   The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment.   United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194.   The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal activity was afoot.   See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").   While many of the factors that the Tenth Circuit considered

would not, without more, have given rise to reasonable suspicion, the combination of circumstances was sufficient.  See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  See 355 F. App'x at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  See 355 F. App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See 355 F. App'x at 228.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See 355 F. App'x at 228.  Not investigating any particular crime or suspected crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant."  355 F. App'x at 229.  The Tenth Circuit explained, in an opinion that the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, wrote and Judges Briscoe and McWilliams joined:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian.  Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride.  She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229.  The Tenth Circuit did not require the officer to identify the particular crime of which the officer had reasonable suspicion or even to acknowledge having reasonable suspicion.  See 355 F. App'x at 229.  The Tenth Circuit was content to find that a reasonable officer would have reasonable suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  355 F. App'x at 229.  The Tenth Circuit demanded only that an officer have facts from which a reasonable officer could form a reasonable suspicion that criminal conduct was occurring or was about to occur.  See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. 2012)(unpublished), the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the defendant's

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner

consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417. At the district court level, in ruling on the motion to suppress, the Honorable Martha A. Vazquez, United States District Court Judge for the District of New Mexico, had concluded that, because the defendant's conduct in standing outside a private residence and looking in "was consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct. 483 F. App'x at 418 (quoting District Court Opinion at 19). The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior." 483 F. App'x at 418. The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling." 483 F. App'x at 417 (quoting Albuquerque Ord. § 12-2-21(B)). The Tenth Circuit, thus, reversed Judge Vazquez' decision, disagreeing with her conclusion that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home." 483 F. App'x at 417.

   2.    **Arrests.**

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest. An arrest is a seizure that is "characterized by highly

intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest. United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983). The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783, at *44-49 (D.N.M. Apr. 30, 2014) (Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun). "Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause." United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.). See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013).

"Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting

United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer."  Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

**3.     When a Detention Becomes an Arrest.**

The Tenth Circuit has held that a police-citizen encounter which goes beyond an investigative stop's limits is an arrest that probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police

and an individual which goes beyond the limits of a <u>Terry</u> stop, however, may be constitutionally justified only by probable cause or consent."). "<u>Terry</u> stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." <u>United States v. Perdue</u>, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.'" <u>United States v. Perdue</u>, 8 F.3d at 1462 (quoting <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983)).

This Court has also engaged in the balancing act of deciding when a detention becomes an arrest. In <u>United States v. Perea</u>, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), <u>aff'd sub nom</u> <u>United States v. Burciaga-Burciaga</u>, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the Court had to determine whether the police involved transformed the investigative detention into an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back of a police car. <u>See</u> <u>United States v. Perea</u>, 374 F. Supp. 2d at 976. In that case, the Court determined that such measures were appropriate and did not elevate the investigative detention to the level of an arrest. <u>See</u> 374 F. Supp. 2d at 976. The Court recognized that, "[i]n 'most scenarios,' when officers effectuate what would otherwise be considered a <u>Terry</u> stop by pointing guns at a suspect, that stop is elevated to an arrest, which requires probable cause." 374 F. Supp. 2d at 974. <u>See</u> <u>United States v. Burciaga-Burciaga</u>, 147 F. App'x at 730 (affirming the Court's determination in <u>United States v. Perea</u> that the officers had reasonable suspicion to believe that the suspect might be armed and dangerous, justifying the officers' use of firearms and not transforming the vehicle stop into a formal arrest requiring probable cause); <u>United States v.</u>

Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'").

There "exist[s], however, a limited set of circumstances in which officers may draw their guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'"  United States v. Perea, 374 F. Supp. 2d at 974.  See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "unholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards").  Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs.  See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the

safety of the agents."). <u>United States v. Perea</u> was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was the suspect whom they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous.  <u>See</u> 374 F. Supp. 2d at 976.  The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a <u>Terry</u> stop must be reasonably related in scope to the circumstances which justified the interference in the first place and may not go beyond what is necessary for officer safety.  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

<u>United States v. Burciaga-Burciaga</u>, 147 F. App'x at 730 (citations omitted)(internal quotation marks omitted).

### 4.  Officers Have a Duty to Investigate Easily Accessible Evidence Before Making an Arrest.

"[T]he Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  <u>Romero v. Fay</u>, 45 F.3d 1472, 1476-77 (10th Cir. 1995).  Police officers "may not ignore easily accessible evidence and thereby delegate their duty to investigate [to others]."  <u>Baptiste v. J.C. Penney Co.</u>, 147 F.3d 1252, 1259 (10th Cir. 1998).  However, "[o]nce probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect."

Garcia v. Casuas, 2011 WL 7444745, at *49 (citing Cortez v. McCauley, 478 F.3d 1108, 1121 n.18 (10th Cir. 2007)(en banc)).

The Tenth Circuit confronted the issue when an officer must conduct further investigation before arresting an individual in Romero v. Fay.   In that case, law enforcement officers interviewed two individuals -- Stella Gutierrez and Manuel Duran -- who implicated the plaintiff in a murder.  See 45 F.3d at 1474.  Approximately four hours later, without conducting additional investigation or obtaining a warrant, an officer arrested the plaintiff for murder.   See 45 F.3d at 1474.  After he was taken into custody, the plaintiff told the officer that he was innocent and that he had an alibi.   See 45 F.3d at 1474.   The plaintiff stated that three individuals would establish that he was asleep at home when the murder occurred.   See 45 F.3d at 1474.   The officer refused the plaintiff's offer of names of alibi witnesses and said that the witnesses "were of little significance because they would lie to protect" the plaintiff.  45 F.3d at 1474.  The officer never interviewed the alibi witnesses.  See 45 F.3d at 1474.  The plaintiff was incarcerated for three months before the government dismissed the case and he was released.   See 45 F.3d at 1474.

The plaintiff brought a § 1983 action for, among other things, violations of his Fourth Amendment rights.  See Romero v. Fay, 45 F.3d at 1474.  The plaintiff argued that, regardless whether the officers' interviews of Gutierrez and Duran established probable cause, under clearly established law, a reasonable officer would have investigated his alibi witnesses before arresting him.  See 45 F.3d at 1476.  The Tenth Circuit disagreed, in an opinion that the Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, authored, and Judges Tacha and McKay joined.   See 45 F.3d at 1476.   The Tenth Circuit stated that the Fourth Amendment

requires officers to only "reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless detention." 45 F.3d at 1476-77. The Tenth Circuit determined that,

> [o]nce [the defendant] concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, [the defendant's] failure to investigate Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

In Baptiste v. J.C. Penney Co., officers arrested the plaintiff for shoplifting after: (i) receiving reports from store security guards that they witnessed her shoplifting on store surveillance; and (ii) watching a video of the surveillance footage on which the security officers relied in reaching their conclusion -- which supported the plaintiff's story that she had not stolen anything. See 147 F.3d at 1254-55. The Tenth Circuit, in an opinion that the Honorable Michael R. Murphy, United States Circuit Judge for the Tenth Circuit, authored, and Judges Anderson and Logan joined, concluded that qualified immunity did not apply. See 147 F.3d at 1257-59. The Tenth Circuit asserted that the security guards' allegations were based solely on the plaintiff's conduct, "which was memorialized in its entirety on the videotape." 147 F.3d at 1257. The Tenth Circuit stated that the police officers "viewed the very same conduct on the videotape, which this court has concluded failed to establish probable cause." 147 F.3d at 1257. The Tenth Circuit held that, consequently, "it was . . . not reasonable for the officers to rely on the security guards' allegations." 147 F.3d at 1257. The Tenth Circuit added that

police officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation. . . .   Here, [the defendants] did conduct some investigation by viewing the videotape and questioning [the plaintiff].   They argue, however, that they should be allowed to rely on the statement of the guards for probable cause to arrest.  Because the officers knew that the allegations of the guards were based on observations of conduct captured and preserved on an available videotape, to credit this argument would allow a wholesale delegation of police officers' duty to investigate and make an independent probable cause determination.

Baptiste v. J.C. Penney Co., 147 F.3d at 1259.

In Cortez v. McCauley, officers responded to a call from a nurse stating that a woman had brought her two-year-old daughter to the hospital asserting that the child had complained that her babysitter's boyfriend had molested her.   See 478 F.3d at 1113 (internal quotation marks omitted).   Without (i) interviewing the girl, her mother, the nurse, or the attending physician; (ii) inspecting the girl's clothing for signs of sexual assault; or (iii) waiting for the results of the child's medical examination, the officers arrested the boyfriend.   See 478 F.3d at 1113.   The Tenth Circuit, in an en banc opinion that Judge Kelly authored, explained that,

whether we view it as a need for more pre-arrest investigation because of insufficient information, . . . or inadequate corroboration, what the officers had fell short of reasonably trustworthy information indicating that a crime had been committed by [the defendant].  See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986)("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, as here, it is unclear whether a crime had even taken place.").  Based on the facts above, [the defendant] was arrested without probable cause.

478 F.3d at 1116 (footnotes omitted)(citations omitted).  The Tenth Circuit further held that

it was established law that "the probable cause standard of the Fourth Amendment requires officers to reasonably interview witnesses readily available at the scene, investigate basic evidence, or otherwise inquire if a crime has been committed at all before invoking the power of warrantless arrest and detention."  Romero, 45

F.3d at 1476-77 (footnote omitted); <u>see also</u> <u>Baptiste v. J.C. Penney, Co.</u>, 147 F.3d . . . 1259 . . . ("[P]olice officers may not ignore easily accessible evidence and thereby delegate their duty to investigate and make an independent probable cause determination based on that investigation.").  In the present case, witnesses were readily available for interviews, physical evidence was available, and a medical diagnosis was forthcoming.  Defendants, however, . . . conducted no investigation.  Instead, the Defendants relied on the flimsiest of information conveyed by a telephone call.

<u>Cortez v. McCauley</u>, 478 F.3d at 1117-18 (footnotes omitted)(citations omitted).  The Tenth Circuit concluded, therefore, that qualified immunity did not apply.  <u>See</u> 478 F.3d at 1118-22.

In <u>Garcia v. Casuas</u>, a detective with the City of Rio Rancho, New Mexico -- Monica Casuas -- arrested the plaintiff, Mitchell Garcia, for sexual penetration of a minor.  <u>See</u> 2011 WL 7444745, at *8.  The plaintiff was ultimately exonerated, and subsequently filed a § 1983 claim against the arresting officer and the City of Rio Rancho for, among other things, unlawfully arresting him in violation of his Fourth Amendment rights.  <u>See</u> 2011 WL 7444745, at *12.  The Court found that the officer had probable cause to arrest the plaintiff based on information gleaned from other officers' interviews of the plaintiff, the victim -- K.J., the victim's mother -- Audrey Odom, and a witness at the scene on the night of the incident -- Jennifer Katz.  <u>See</u> 2011 WL 7444745, at *43-46.  Garcia argued that, by failing to re-interview Odom and Katz, and instead choosing to rely on the other officers' interviews of them, Casuas "fail[ed] to interview readily accessible witnesses."  2011 WL 7444745, at *15.  Garcia contended that, moreover, Casuas should have known that failing to personally interview him, Odom, Katz, K.J., and Katz' neighbors before arresting him violated his constitutional rights.  <u>See</u> 2011 WL 7444745, at *15.  Garcia argued that, had Casuas interviewed him before arresting him, she would have discovered Katz' and Odom's motivations to lie.  <u>See</u> 2011 WL 7444745, at *15.

Finding that the defendant's failure to conduct further investigation before arresting the plaintiff did not constitute a Fourth Amendment violation, the Court explained:

> Although Garcia cites Romero v. Fay and cases from several other circuits for the general proposition that officers must interview witnesses at the scene, Garcia points to no case law which would establish that, after the officers at the scene have interviewed witnesses, the Constitution requires the investigating detective to interview those witnesses again. . . .  Here, the responding police officers . . . interviewed every adult alleged to be involved in the incident and briefly spoke with K.J. . . . .

> Garcia also states that, if Casuas had investigated further, she would have known that there was no semen on the bedding, and she would have discovered Katz' and Odom's motivation if she spoke to him. . . .  The Tenth Circuit's discussion of probable cause in Romero v. Fay also undercuts Garcia's assertion that Casuas was required to do more after [K.J.'s interview] solidified the existence of probable cause.  In Romero v. Fay, the Tenth Circuit held:

>> Plaintiff contends that regardless of whether the statements by Duran and Guiterrez supplied probable cause for Defendant Fay to arrest Plaintiff, under clearly established law a reasonable police officer would have investigated his alibi witnesses before arresting him, and the exculpatory information possessed by them would have negated the probable cause to arrest. We disagree.

> 45 F.3d at 1466.  In Baptiste v. J.C. Penney Co., the Tenth Circuit also recognized that "officers are not required to conduct full investigations before making an arrest."  147 F.3d at 1257 n. 8.

> . . . .

> These cases establish that Casuas was not required to speak to [Katz' neighbors], because they did not appear to be material witnesses.  Garcia has made no allegations and presented no facts suggesting that the neighbors were ever around K.J.  Garcia has also not presented any facts demonstrating that [the neighbors] have shed light on the motivations of Katz or Odom.  Garcia only speculates that Casuas *might* have found something.  An officer is not required to exhaust every possible lead to satisfy the Fourth Amendment.  In Romero v. Fay, the Tenth Circuit held:

>> Once Defendant Fay concluded based on the facts and information known to him that probable cause existed to arrest Plaintiff for the murder of

> David Douglas, his failure to question Plaintiff's alibi witnesses prior to the arrest did not negate probable cause. Thus, Defendant Fay's failure to investigation Plaintiff's alibi witnesses prior to arrest did not constitute a constitutional violation.

45 F.3d at 1478.

. . . .

> Furthermore, Garcia's other statements belie the fact that, if Casuas had interviewed him before his arrest, he would have explained that Katz and Odom were biased or trying to frame him. When [another officer] interviewed Garcia on the night of the incident, he asked Garcia whether Katz and Odom had a reason to beat him up, and informed him that he was being accused of choking K.J. . . . Garcia responded that Katz and Odom had no reason to beat him up, and denied hurting K.J., never mentioning that Katz and Odom might have beat him up or encouraged K.J. to accuse him because they were romantically interested in him. . . . . During his interrogation after his arrest, Garcia never mentioned that Katz and Odom might have improper motives. The cases that Garcia cites establish only that the police may not ignore available material witnesses. Here, Thacker spoke with Garcia; Garcia denied doing wrong and never related that he may have been framed. Garcia presents no cases, and the Court could find none, suggesting that Casuas was required to repeat the steps other officers had already taken and re-interview all witnesses. . . . Finally, waiting for the laboratory results would not have substantially altered the probable-cause determination, because, while the New Mexico Department of Public Safety Forensic Laboratory found no semen, it does not have the capabilities to detect the presence of urine in or on a substance . . . .

> Once probable cause is established, an officer is not required to continue to investigate for exculpatory evidence before arresting a suspect. See Cortez v. McCauley, 478 F.3d at 1121 n.18 (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)). The Court has already determined that Casuas had probable cause to arrest Garcia and that there was a substantial basis for the issuance of the arrest warrant after the safe-house interview. Casuas was not required to investigate further after that determination.

Garcia v. Casuas, 2011 WL 7444745, at *47-49.

## RELEVANT LAW REGARDING EXCESSIVE FORCE

When an officer moves for qualified immunity on an excessive force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d at 1128. Accord Mata v. City of Farmington, 791 F. Supp. 2d 1118, 1137-38 (D.N.M. 2011)(Browning, J.). An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394. The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205. A court must judge the reasonableness of a particular use of force from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . That perspective includes an examination of the information possessed by the [officers]." Weigel v.

Broad, 544 F.3d 1143, 1152 (10th Cir. 2008)(citations omitted)(internal quotation marks omitted).

1.      **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable in the Qualified Immunity Context.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  "These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260.  In Weigel v. Broad, the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  A court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and [must] pay careful attention to the facts and circumstances of the particular case." Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).  Additionally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396.

Case law need not establish that the exact police procedure at issue is unreasonable for a district court to conclude that it violated the Fourth Amendment.  In Weigel v. Broad, two police officers accidentally caused the death of a suspect by using excessive force in arresting and handcuffing him.  See 544 F.3d at 1148-49.  The suspect was non-cooperative, disobeying the officers' commands and attempting to flee.  See 544 F.3d at 1148.  To gain control of the suspect, one officer tackled him and wrestled him to the ground.  See 544 F.3d at 1148.  The suspect vigorously resisted, repeatedly attempting to take the officers' weapons and evade handcuffing.  See 544 F.3d at 1148.  The officer put the suspect in a choke hold, handcuffed him, lay across his legs, and applied weight to his upper torso.  See 544 F.3d at 1148.  After several minutes, the suspect went into full cardiac arrest and died.  See 544 F.3d at 1149.

The Tenth Circuit held that the district court should not have granted summary judgment for the officers on qualified immunity grounds.  See 544 F.3d at 1152-55.  It reasoned that whether the officers' actions were reasonable was a jury question, because there was evidence that a reasonable officer would have known that: (i) the pressure created a risk of asphyxiation; and (ii) the pressure was unnecessary to restrain the suspect.  See 544 F.3d at 1152-53.  Accordingly, a reasonable jury could have concluded that an objectively reasonable officer would not have continued to apply force.  See 544 F.3d at 1149-50.  "If true, this constitutes an unreasonable use of force under the Fourth Amendment."  544 F.3d at 1153 (citing Gutierrez v. City of San Antonio, 139 F.3d 441, 449 (5th Cir. 1998)(concluding that a "material dispute of fact exists as to whether Gutierrez posed a threat of death or serious bodily injury to the officers or to others")).

In determining whether the law was clearly established, the district court in Weigel v. Broad held that the law was not clearly established, because the restraint which the officers used was different from restraints that the Tenth Circuit had previously held unreasonable.  See 544 F.3d at 1154.  Rejecting the district court's conclusion, the Tenth Circuit noted that "our analysis in this case of the constitutionality of the restraint" does not require "a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself." 544 F.3d at 1154.  Instead, according to the Tenth Circuit, the analysis relies "on more general principles."  544 F.3d at 1154.  Accordingly, the Tenth Circuit concluded that the law was settled: using any kind of restraints that seriously risks death or injury when the restraints are not necessary is unreasonable.  See 544 F.3d at 1154.

Similarly, the Tenth Circuit has made clear that, although officers may use force to apprehend a suspect, the level of force they use must be necessary to accomplish their objectives.  See Buck v. City of Albuquerque, 549 F.3d 1269, 1289-90 (10th Cir. 2008).  Accordingly, officers may use more force to apprehend a fleeing felon than they may use to arrest a submissive misdemeanant.  See Casey v. City of Fed. Heights, 509 F.3d at 1282.  In Buck v. City of Albuquerque, the Tenth Circuit concluded that, when a suspect was charged with only a misdemeanor and was not fleeing, a reasonable jury could find that the officer's acts of grabbing the suspect, dragging him, pushing him face down onto the pavement, and kneeing him in the back were unreasonable.  See 549 F.3d at 1289.  The Tenth Circuit held that, even when the suspect attempted to flee, his flight did not justify the officer's kicks in the back and push forward into the pavement.  See 549 F.3d at 1190.

Regarding whether the law was clearly established, the Tenth Circuit stated that "an officer's violation of the <u>Graham</u> reasonableness test is a violation of clearly established law if there are no substantial grounds for a reasonable officer to conclude that there was legitimate justification for acting as she did."  <u>Buck v. City of Albuquerque</u>, 549 F.3d at 1291 (quoting <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1286).  Because "each factor in <u>Graham</u> counseled against the use of a large amount of force" against the suspects, the Tenth Circuit had "little difficulty in holding that the law was clearly established."  <u>Buck v. City of Albuquerque</u>, 549 F.3d at 1291.

Courts have specifically addressed whether groin strikes are unreasonable.  For example, in <u>Johnson v. District of Columbia</u>, 528 F.3d 969 (D.C. Cir. 2008), the United States Court of Appeals for the District of Columbia held that a reasonable officer would have known that striking the suspect's groin was dangerous and that it was unnecessary to subdue the suspect.  <u>See</u> 528 U.S. at 974-75.  Regarding whether the officer knew that a groin strike was dangerous, the D.C. Circuit stated: "Striking the groin is the classic example of fighting dirty.  From the schoolyard scrapper to the champion prizefighter, no pugilist takes lightly the threat of a hit below the belt."  528 U.S. at 974-75.  In short, the D.C. Circuit stated that a groin kick was a "serious intrusion" onto the suspect's Fourth Amendment interests.  528 U.S. at 974-75.  Regarding whether the force was necessary, the D.C. Circuit acknowledged that officers may need to use more force in some situations, but that a "kick to the groin tends toward the vicious end of the scale."  528 U.S. at 975.  In other words, officers should use groin kicks only when presented with extreme resistance and danger.  Finally, the D.C. Circuit concluded that the officer's countervailing "weighty" interests in "apprehending an armed suspect and protecting

- 94 -

himself and the public from possible harm" did not outweigh the suspect's Fourth Amendment interests.  528 U.S. at 975.

In Dorato v. Smith, 108 F. Supp. 3d 1064 (D.N.M. 2015)(Browning, J.), the estate of a victim in a police shooting brought an action alleging violations of the Fourth Amendment and various state law claims.  See 108 F. Supp. 3d 1064.  The police officer moved for summary judgment, arguing, among other things, that he was entitled to qualified immunity on the constitutional claims.  See 108 F. Supp. 3d 1136.  The Court concluded that it was disputed whether a reasonable officer could have believed that the victim -- Daniel Tillison -- posed a threat of serious bodily harm to himself or others, and the law was clearly established at the time that the police officer could not use deadly force when Tillison did not pose such a threat.  See 108 F. Supp. 3d 1136.  The Court explained:

> A reasonable jury could conclude that Smith lacked probable cause to believe that Tillison posed a threat of serious physical harm to Smith or to others.  The law is clearly established that Smith could not use deadly force if these factual circumstances existed.  Every reasonable officer in Smith's shoes would have known that it was unlawful to use deadly force against a fleeing suspect merely because the suspect was holding a cellular telephone or because the suspect was driving in a reckless manner, but not in a manner that created an imminent threat to anyone.  Accordingly, the Court concludes that there is a genuine issue of material fact whether Smith violated Tillison's clearly established constitutional rights, and the Court will deny the Motion as far as it requests the Court to dismiss Count II of the Complaint.

108 F. Supp. 3d 1158.

In Martin v. City of Albuquerque, 147 F. Supp. 3d 1298 (D.N.M. 2015)(Browning, J.), a police officer allegedly kneed Plaintiff Jeremy Martin's groin and threw him to the ground while attempting to arrest him.  See 147 F. Supp. 3d at 1303.  The police officer moved for summary judgment on Martin's excessive force claim, arguing that he used reasonable force to arrest

Martin because: (i) Martin admitted to "driving while intoxicated;" (ii) Martin failed to follow

Padilla's commands, so he posed a safety risk to officers and drivers; and (iii) Martin "actively

resisted being handcuffed and taken into custody." 147 F. Supp. 3d at 1306-07.  Martin therefore

contended that he used "only the amount of force needed to effectuate the arrest of the Plaintiff."

147 F. Supp. 3d at 1307.  The Court concluded that there was a dispute whether Padilla struck

Martin in the groin and whether Padilla's actions were necessary to take Martin into custody.

See 147 F. Supp. 3d at 1330.  The Court emphasized the importance of allowing juries to make

factual findings, explaining:

> Particularly now, when scenes of police violence flood the news, court should be
> reluctant to resolve factual issues.  When a police officer seriously injures an
> unarmed person, and there is a factual question whether the officer caused the
> injury, "society's faith in the justice system is undermined when an unelected
> judge declare -- as a matter of law -- that no reasonable jury could find" that the
> officer did or did not injure Martin, while at the same time refusing to test this
> declaration by presenting the case to a jury.

147 F. Supp. at 1333-34.  The Court concluded that viewing the evidence in the light most

favorable to Martin, "a reasonable jury could find that Padilla struck Martin in the groin, and that

striking and pushing him to the ground were unreasonable under the circumstances."  147 F.

Supp. at 1334.  The Court also found that the law was clearly established at the time that Padilla

arrested Martin that there were "no substantial grounds for a reasonable officer to conclude that

there was legitimate justification for acting as she did."  147 F. Supp. at 1334-35 (quoting Buck

v. City of Albuquerque, 549 F.3d at 1291).

2.        **Least- or Less-forceful Alternatives in Excessive-Force Cases.**

"To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor." James v. Chavez, No. CIV 09-0540, 2011 WL 5822726, at *17 (D.N.M. Nov. 9, 2011)(Browning, J.). The Fourth Amendment requires only that the defendant officers choose a "reasonable" method to end the threat that the plaintiff poses to the officers in a force situation, regardless of the availability of less intrusive alternatives. Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

Michigan Dep't of State Police v. Sitz, 496 U.S. at 453-54. See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means."). "To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable." Tanner v. San Juan Sheriff's Office, 864 F. Supp. 2d 1090, 1115 (D.N.M. 2012)(Browning, J.).

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the stop of a suspected drug courier in an airport under Terry v. Ohio.  See 490 U.S. at 7.  The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics."  United States v. Sokolow, 490 U.S. at 11.  Instead, the Supreme Court stated: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."  United States v. Sokolow, 490 U.S. at 11 (internal quotation marks omitted)(citations omitted).  Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished.  But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit disagreed with the plaintiff's contention that expert testimony about when a police dog's use is objectively reasonable and about how defendant Lehocky's actions violated "well established law enforcement standards . . . should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones."  United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th

Cir. 1994).  Similarly, "violations of state law and police procedure generally do not give rise to a 1983 claim" for excessive force.  <u>Romero v. Bd. of County Comm'rs</u>, 60 F.3d 702, 705 (10th Cir. 1995); <u>see also</u> <u>Wilson v. Meeks</u>, 52 F.3d 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force)[, <u>abrogated on other grounds by</u> <u>Saucier v. Katz</u>, 533 U.S. at 205].  Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances."  <u>Olsen [v. Layton Hills Mall]</u>, 312 F.3d [1304,] 1314 [ (10th Cir. 2002)].  Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions."  [United States v.] Melendez-Garcia, 28 F.3d at 1052.

  Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez.  In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related.  This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably.  <u>[United States v.] Melendez-Garcia</u>, 28 F.3d at 1052; <u>Romero [v. Bd. of Cty. Comm'rs</u>, 60 F.3d at 705].

<u>Marquez v. City of Albuquerque</u>, 399 F.3d at 1222.

  In <u>United States v. Melendez-Garcia</u>, the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only reasonable ones."  28 F.3d at 1052 (internal quotation marks omitted).  <u>See</u> <u>Medina v. Cram</u>, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)); <u>Dickerson v. McClellan</u>, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); <u>Schulz v. Long</u>, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what

the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . .  Officers thus need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Tennessee v. Garner [471 U.S. 1 (1985)] and Graham v. Connor.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative."  Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d at 1296.  See, e.g., Blossom v. Yarbrough, 429 F.3d 963, 968 (10th Cir. 2005)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury." (quoting Medina v. Cram, 252 F.3d at 1133)); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police -- shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable).  See also Roy v. Inhabitants of the City of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury

does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.).  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983).  The Court has also rejected the consideration of a less intrusive alternative to end a threat.  See Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d at 1293 ("To avoid a 'Monday morning quarterback' approach, the Fourth Amendment does not require the use of the least-, or even a less-, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable."); Chamberlin v. City of Albuquerque, No. CIV 02-0603 JB/ACT, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## <u>LAW REGARDING THE NMTCA</u>

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity."  N.M. Stat. Ann. § 41-4-2(A).  The New Mexico Legislature also recognized, however,

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2(A).  As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the

limitations of the Tort Claims Act and in accordance with the principles established in that act."

N.M. Stat. Ann. § 41-4-2(A).  The NMTCA is also "based upon the traditional tort concepts of

duty and the reasonably prudent person's standard of care in the performance of that duty."

N.M. Stat. Ann. § 41-4-2(C).

> The NMTCA is the
>
> exclusive remedy against a governmental entity or public employee for any tort
> for which immunity has been waived under the Tort Claims Act and no other
> claim, civil action or proceeding for damages, by reason of the same occurrence,
> may be brought against a governmental entity or against the public employee or
> his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17(A).  A plaintiff may not sue a New Mexico governmental entity, or its

employees or agents, unless the plaintiff's cause of action fits within one of the exceptions to

immunity that the NMTCA grants.  See Begay v. State, 1985-NMCA-117, 723 P.2d 252, 255

("Consent to be sued may not be implied, but must come within one of the exceptions to

immunity under the Tort Claims Act."), rev'd on other grounds by Smialek v. Begay,

1986-NMSC-049, 721 P.2d 1306.  A plaintiff also may not sue a governmental entity or its

employees for a damage or damages claim arising out of violations of rights under the New

Mexico Constitution unless the NMTCA contains a waiver of immunity.  See Barreras v. N.M.

Corr. Dep't, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776 ("In the absence of affirmative legislation,

the courts of this state have consistently declined to permit individuals to bring private lawsuits

to enforce rights guaranteed by the New Mexico Constitution, based on the absence of an express

waiver of immunity under the Tort Claims Act."); Chavez v. City of Albuquerque, 1998-NMCA-

004, ¶ 8, 952 P.2d 474 (noting that a plaintiff cannot seek damages for violations of rights under

the New Mexico Constitution against a city or its employees or agents unless the NMTCA

waives immunity); <u>Rubio v. Carlsbad Mun. Sch. Dist.</u>, 1987-NMCA-127, ¶ 13, 744 P.2d 919,

922 (holding that no waiver of immunity exists for damages arising out of alleged educational

malpractice claim against a school board); <u>Begay v. State</u>, 1985-NMCA-117, ¶ 14 (finding that

no waiver exists in NMTCA for damages asserted against the State of New Mexico under Article

II, § 11 of the New Mexico Constitution).   "Thus, if no specific waiver can be found in the

NMTCA, a plaintiff's complaint [for damages] against the governmental entity or its employees

must be dismissed."   <u>Salazar v. City of Albuquerque</u>, No. CIV 10-0645 JB/ACT, 2013 WL

5554185, at *24 (D.N.M. Aug. 20, 2013)(Browning, J.)(citing <u>Begay v. State</u>, 1985-NMCA-

117).

## <u>NEW MEXICO LAW REGARDING THE INTENTIONAL TORT OF BATTERY</u>

A person is liable for the intentional tort of simple battery when the person intentionally

causes bodily contact to the plaintiff in a way not justified by the plaintiff's apparent wishes or

by a privilege, and the contact is harmful or offensive to the plaintiff.   <u>See</u> 1 Dan B. Dobbs, <u>The</u>

<u>Law of Torts</u> § 28, at 52-53 ("The defendant is subject to liability for a simple battery when he

intentionally causes bodily contact to the plaintiff in a way not justified by the plaintiff's

apparent wishes or by a privilege, and the contact is in fact harmful or against the plaintiff's

will.")(citing <u>Restatement (Second) of Torts</u> § 13).

> Under New Mexico law, wherein the <u>Restatement of Torts</u> reigns, one commits a
> battery when (a) he acts intending to cause a harmful or offensive contact with the
> person of the other or a third person, or an imminent apprehension of such a
> contact, and (b) an offensive contact with the person of the other directly or
> indirectly results.

<u>Sisneros v. Fisher</u>, 685 F. Supp. 2d 1188, 1220-21 (D.N.M. 2010)(Browning, J.)(internal

quotations omitted)(quoting <u>Desmare v. New Mexico</u>, No. CIV 07-0199 JB/RHS, 2007 WL

5231690, at *4 (D.N.M. Aug. 14, 2007)(Browning, J.)).   Accord New Mexico v. Ortega, 827

P.2d 152, 155 (Ct. App. 1992)(noting that the "elements of civil and criminal assault and battery

are essentially identical," and comparing "[t]he elements of [N.M.S.A. § 1978,] Section 30-22-

24(A)" with Restatement (Second) of Torts § 18 (1965)).   See Restatement (Second) of Torts §

18 ("An actor is subject to liability to another for battery if (a) he acts intending to cause a

harmful or offensive contact with the person of the other or a third person, or an imminent

apprehension of such a contact, and (b) a offensive contact . . . results.").[54]   "An 'officer can be

---

[54]The Court often looks to the New Mexico Civil Uniform Jury Instructions for guidance on New Mexico state law.   See, e.g., Coffey v. United States, No. CIV 08-0588 JB/LFG, 2012 WL 5995622, at *60 n.33 (D.N.M. Nov. 25, 2012)(Browning, J.)("The Supreme Court of New Mexico's adoption of uniform jury instructions proposed by standing committees of the Court establishes a presumption that the instructions are correct statements of law.")(citing State of New Mexico v. Wilson, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994)).   The Civil Uniform Jury Instruction for the intentional torts of assault and battery, however, states that the Committee concluded that the New Mexico law regarding the torts was not clearly developed to warrant an instruction.   See Civ. U.J.I. 13-1624 N.M.R.A., Committee Commentary (noting that the Committee "spent much time over a period of several months studying the matter of intentional torts," but ultimately "concluded that there was insufficient New Mexico law on assault and battery to guide the committee on this subject and that too much reliance had been placed upon the law of other jurisdictions on assault and battery to include such instructions in this work").

The Court has carefully searched New Mexico state case law on the intentional torts of assault and battery, and, in addition, considered the reference to Restatement (Second) of Torts § 18 in New Mexico v. Ortega.   The Court notes that the Court of Appeals of New Mexico, in Yount v. Johnson, 1996-NMCA-046, 915 P.2d 341, cites to W. Page Keeton et al., Prosser and Keeton on the Law of Torts (5th ed. 1984) and The Restatement (Second) of Torts for the proposition that "[c]onsent is a defense for intentional torts like assault and battery."   Yount v. Johnson, 1996-NMCA-046, ¶ 17, 915 P.2d 341.   The Court has previously noted that "New Mexico courts often look to the law as stated in the Restatement (Second) of Torts."   Coffey v. United States, 2012 WL 5995622, at *44 n. 31 (quoting Montanez v. Cass, 98 N.M. 32, 38, 546 P.2d 1195, 1201 (Ct. App. 1975)("It has long been the policy of our courts to follow in the footsteps of the Restatement of Torts, 2d."), rev'd on other grounds sub nom, N.M. Elec. Serv. Co. v. Montanez, 551 P.2d 634 (1976)).   The Court thus follows the New Mexico courts' guidance, relying on Dodds, supra, the West Group's successor treatise to Prosser and Keeton on

held liable for assault and battery if he uses excessive force.'"  Adegbuji v. Middlesex Cty., No. CIV A 03CV-1757 PGS, 2006 WL 2806289, at *12 (D.N.J. Sept. 28, 2006) (quoting Mantz v. Chain, 239 F. Supp. 2d 486, 498 (D.N.J. 2002)).

As to the intent required to commit a battery, Professor Dodds notes that the Restatement (Second) of Torts is "ambiguous" whether "the plaintiff shows intent by showing merely an intent to touch that turned out to be offensive or harmful or whether she must show that the harm or offense was intended."  Dodds, supra, § 30, at 58.  It is clear, however that "an intent to touch in a way the defendant understands is not consented to is sufficient.  So is an actual intent to harm."  Dodds, supra, § 30, at 58.  For the contact required, Professor Dodds notes that, because the intentional tort of battery rose out of the common-law action of trespass, harm is not required.  Accord Selmeczki v. New Mexico Dep't of Corr., 2006-NMCA-024, ¶ 29, 129 P.3d 158 ("It is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery.").  Rather, "[t]he gist of battery is that the plaintiff has been touched, intentionally, in a way that she has not even apparently consented to and that is not justified by some generally recognized privilege."  Dodds, supra, § 29, at 55. Thus, for purposes of battery, a harmful touching is sufficient, but not necessary.  Cf. Garety v. Demers, 589 P.2d 180, 191 (1978)(in the context of whether medical malpractice is distinct from the tort of battery, the Supreme Court of New Mexico noted: "As to causation in a battery action, the tort of battery is the wrongful touching of the patient's body which by itself gives the patient a claim for substantial damages").

---

the Law of Torts, discussing the Restatement (Second) of Torts' definition of battery, for the elements of the intentional tort of battery.

In Selmeczki v. New Mexico Department of Corrections, the Court of Appeals of New Mexico held that a disgruntled corrections department officer committed the tort of battery when the officer hit visitors to his office with a stack of coins.  See 2006-NMCA-024, ¶ 29, 129 P.3d 158.  The visitors' testimony was that the officer "rose up part way from a seated position behind a desk and forcefully slapped a stack of five to ten coins toward both visitors, which resulted in the coins striking them both on the legs."  2006-NMCA-024, ¶ 6, 129 P.3d 158.  The officer's version was quite different; he "denied slapping or striking the coins at [the visitors] but claimed that he only 'nudged or dropped' them off the desk, a gesture he admitted was probably 'not prudent.'  He denied any advance planning, claiming it was a 'spur of the moment' act."  2006-NMCA-024, ¶ 7, 129 P.3d 158.  The testimony elicited at trial was that "no injury or harm was likely from the coins being launched at [the visitors]."  2006-NMCA-024, ¶ 29, 129 P.3d 158.  The Court of Appeals of New Mexico concluded that, regardless whether "he did not 'meaningfully' commit a civil battery," he was liable, as "[i]t is black-letter law that causing an offensive touching, even indirectly to another's clothing and not resulting in injury, is the tort of battery."  2006-NMCA-024, ¶ 29, 129 P.3d 158.

## ANALYSIS

The Court will grant in part and deny in part the MSJ.  First, the Court will deny the request that the Court grant summary judgment in Thouvenell's favor on M. Malone's excessive force claim brought under the Fourth Amendment in Count II.  While the Court concludes that there are not genuine issues of material fact, it cannot conclude that, on the undisputed facts and drawing all inferences in M. Malone's favor, Thouvenell was justified in using deadly force.  Second, the Court will grant the MSJ in Dona Ana County's favor on Count IV, and dismiss

Count IV with respect to Dona Ana County.  Third, the Court will deny the County Defendants'

request that the Court dismiss Count I to the extent that it asserts claims under the New Mexico

Wrongful Death Act.  Fourth, the Court will deny the MSJ on Count I and II to the extent that

they are asserted against Thouvenell, because the New Mexico Legislature in the NMTCA has

waived Thouvenell's immunity for M. Malone's state law claims brought under the New Mexico

Wrongful Death Act and/or state common law, and under Article II, § 10 of the New Mexico

Constitution, and the Court cannot conclude on the undisputed facts that, as a matter of law,

Thouvenell did not use excessive force.  Fifth, the Court will deny the MSJ to the extent that M.

Malone asserts a claim for vicarious liability or respondeat superior against Dona Ana County

under state law in Counts I and II.  Finally, the Court will dismiss the City of Las Cruces and the

John Doe(s) as parties to this lawsuit without prejudice.

## I.      THOUVENELL IS NOT ENTITLED TO QUALIFIED IMMUNITY ON M. MALONE'S FOURTH AMENDMENT EXCESSIVE FORCE CLAIM ALLEGED IN COUNT II.

M. Malone asserts an excessive force claim against Thouvenell based upon a violation of

the Fourth Amendment in Count II.  See Complaint ¶¶ 44-49, at 7.  "In a § 1983 action,

'individual defendants are entitled to qualified immunity unless it is demonstrated that their

alleged conduct violated clearly established constitutional rights of which a reasonable person in

their positions would have known.'"  Hastings v. Barnes, 252 F. App'x 197, 201 (10th Cir.

2007)(quoting Murrell v. Sch. Dist. No. 1, Denver, Colo., 186 F.3d 1239, 1251 (10th Cir. 1999)).

"Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the

heavy two-part burden of demonstrating (1) the defendant violated a constitutional right and (2)

the constitutional right was clearly established at the time of the alleged conduct."  See Hastings

v. Barnes, 252 F. App'x at 201 (citing Reynolds v. Powell, 370 F.3d 1028, 1030 (10th Cir. 2004)).  First, the Court concludes that the facts demonstrate that Thouvenell's conduct violated a constitutional right.  Second, the Court concludes that this constitutional right was clearly established.  Accordingly, Thouvenell is not entitled to qualified immunity on M. Malone's excessive force claim brought pursuant to the Fourth Amendment in Count II.

### A.  ON THE UNDISPUTED FACTS, THE COURT CANNOT SAY THAT THOUVENELL'S CONDUCT DID NOT VIOLATE THE FOURTH AMENDMENT.

Thouvenell argues that his use of deadly force in this case was reasonable under the Fourth Amendment.  "Claims of excessive force -- deadly or not -- are analyzed under the Fourth Amendment's reasonableness standard."  Hastings v. Barnes, 252 F. App'x at 202.  See Medina v. Cram, 252 F.3d at 1131.  The reasonableness inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham v. Connor, 490 U.S. at 396 (internal quotations and citation omitted).  "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham v. Connor, 490 U.S. at 396.  Accordingly, reasonableness is evaluated by examining the totality of the circumstances of a particular seizure.  See Blossom v. Yarbrough, 429 F.3d at 967.  Further, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight." Graham v. Connor, 490 U.S. at 396.   In analyzing the reasonableness of Thouvenell's force, the Court must also consider, as an element of the totality of the circumstances test, whether the officer's own "reckless or deliberate conduct during the seizure unreasonably created the need to use such force." Blossom v. Yarbrough, 429 F.3d at 968 (quoting Jiron v. City of Lakewood, 392 F.3d at 415).

"Deadly force is reasonable under the Fourth Amendment if a reasonable officer in the defendant's position would have had probable cause to believe there was a threat of serious physical harm to himself or others." Hastings v. Barnes, 252 F. App'x at 202 (citing Jiron v. City of Lakewood, 392 F.3d at 415). See Tennessee v. Garner, 471 U.S. at 11-12. Deadly force is "force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily harm.   Purposely firing a firearm in the direction of another person . . . constitutes deadly force." Ryder v. City of Topeka, 814 F.2d 1412, 1416 n.11 (10th Cir. 1987)(approving Model Penal Code definition).   "Therefore, an officer's use of deadly force in self-defense is not unreasonable under the Fourth Amendment." Hastings v. Barnes, 252 F. App'x at 202 (citing Romero v. Bd. of Cty. Comm'rs of Cty. of Lake, Colo., 60 F.3d at 704 (holding that officer acted reasonably in shooting suspect coming at him with knife in attack position)). See Wilson v. Meeks, 52 F.3d at 1554, abrogated on other grounds by Saucier v. Katz, 533 U.S. at 205 (holding that officer acted reasonably in shooting suspect who was pointing gun in officer's direction).

The Court concludes that, on the undisputed material facts, it cannot say as a matter of law that Thouvenell acted reasonably in shooting Malone.  Taking all of the inferences in M. Malone's favor, it was not objectively reasonable for Thouvenell to shoot Malone.  In weighing

the facts and circumstances confronting Thouvenell to determine whether the use of force was objectively reasonable, the Court considers the three Graham v. Connor factors: (i) "the severity of the crime at issue;" (ii) "whether the suspect poses an immediate threat to the safety of the officers or others;" and (iii) whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." Graham v. Connor, 490 U.S. at 396.

First, Wilbur had filed a criminal complaint "against Malone for aggravated assault with a deadly weapon on a household member, possession of a firearm by a felon, and battery against a household member." MSJ ¶ 8, at 5 (setting forth this fact). See Response ¶ 1, at 3-4 (not disputing this fact).[55] The second factor -- whether Malone posed an immediate threat to the safety of the officers or others -- generally points in favor of M. Malone. The officers knew that Malone had a criminal history and that he might have a gun, and they acted reasonably in drawing their firearms and proceeding with caution. See United States v. Hensley, 496 U.S. 221, 235 (1985)(stating that officers may take steps reasonably necessary to protect their personal safety). When the officers rounded the corner, the officers observed Malone, while holding a revolver, attempting to climb over a chain-link fence. See MSJ ¶¶ 29-33, at 8. The officers

---

[55]As the Court explained in footnote 4, the Court does not accept C. Malone's description to Wilber of what occurred on July 24, 2015 for the truth of what occurred on July 24, 2015 between Malone and C. Malone. Rather, the Court accepts this evidence as proof of what C. Malone told Wilbur during her July 29, 2015, interview, and what information he had at the time, which goes to his state of mind and the total mix of information available to the officers at that time. Police officers often have to rely on information provided by citizens and third parties in order to conduct investigations and to file criminal charges. Based on the information that Wilbur had at the time, he had reason to believe that Malone had committed these crimes. The Court also notes that based on his conversation with C. Malone, Wilbur knew that they were responding to a psychiatric situation based on C. Malone's report that: (i) Malone had placed a revolver to the back of her head, while pulling the trigger, but that the weapon did not fire; and (ii) after the initial incident, Malone later called her threating suicide, which included the sound of Malone rotating the cylinder on the revolver and pulling the trigger resulting in a gun shot.

repeatedly commanded Malone to drop the revolver.  See MSJ ¶¶ 29-33, at 8.  Malone then jumped off the fence, backed up while still holding the revolver in his right hand, and lowered his arms, at which point Thouvenell fired.  See MSJ ¶¶ 29-33, at 8.  Malone did not point the weapon at the officers or shoot, nor did he suddenly charge the officers.  He did not verbally threaten the police, himself, or his family, and he was in the process of moving backwards and lowering his arms.  See MSJ ¶¶ 29-33, at 8.  While the evidence submitted does not indicate the precise time frame during which all of this happened, it appears to be several seconds.  M. Malone indicated at the May 9, 2016 hearing, once Thouvenell and Sanchez turned the corner, it was three counts until Thouvenell shot and killed M. Malone.  See Tr. at 20:10-25 (Kane). Finally, the third factor -- whether Malone actively resisted arrest or fled -- weighs in M. Malone's favor.  Malone did not physically resist arrest, and upon the officers' command, jumped off the fence and was in the process of backing up while lowering his arms.  See MSJ ¶¶ 29-33, at 8; Response ¶ 14, at 7.

Unlike in Thomson v. Salt Lake County, on the undisputed facts: (i) Malone never pointed the firearm at Thouvenell and Sanchez; (ii) never yelled at the officers that he would pull the trigger, or shoot; and (iii) never otherwise threatened Thouvenell and Sanchez or made gestures in their direction.  Cf. Thomson v. Salt Lake County, 584 F.3d at 1317-18.  On the undisputed facts and drawing all inferences in M. Malone's favor, Malone never pointed the gun at the officers prior to Thouvenell shooting him, and he was in the process of moving backwards and lowering his arms.  See MSJ ¶¶ 29-33, at 8.  Here, the totality of the circumstances indicates that it was unreasonable for Thouvenell to believe that Malone was an immediate threat to the officers or to others in the neighborhood.  Cf. Thomson v. Salt Lake County, 584 F.3d at 1318.

Although Malone was in possession of a firearm, and was believed to have threatened his wife, on the undisputed facts and construing all facts in M. Malone's favor, Malone was in the process of complying with police commands by jumping off the fence, backing up, and lowering his arms. See MSJ ¶¶ 29-33, at 8; Response ¶ 14, at 7. Unlike in Thomson v. Salt Lake County, where in the central episode the victim was "moving his gun up and down quickly, including aiming it directly at the officers at one point," see 584 F.3d at 1318, Malone was in the process of backing up with his arms lowered and he never aimed the firearm at Thouvenell and Sanchez, see MSJ ¶¶ 29-33, at 8; Response ¶ 14, at 7.

The County's reliance on Phillips v. James is equally inapposite. In that case, following an argument with his wife, the plaintiff barricaded himself in a room filled with weapons and threatened to hurt himself. See 422 F.3d at 1082-83. While speaking with the plaintiff, an officer also thought he heard the plaintiff chamber a shotgun shell. See 422 F.3d at 1083. Further, when the police chief checked to see if the door was locked, the plaintiff "threatened to fire five shotgun shells into the door, which was directly in front of Chief James." 422 F.3d at 1083. Ultimately, the officers requested the passive assistance of the SWAT team, who appeared to assist and negotiate with the plaintiff. See 422 F.3d at 1083-84.

> SWAT team members also personally saw Mr. Phillips exit his home carrying a handgun. Mr. Phillips repeatedly refused to cooperate with the officers when they requested that he put down his weapon. Id., Vol. II., at 324; Vol. III, at 379. Instead, Mr. Phillips looked directly at Sgt. Adamson who was positioned in the tree. Id., Vol. III, at 379. After he went back inside his house, Mr. Phillips opened a small window and propped it up with a cup. Id. at 379. Mr. Phillips then threatened officers who were attempting to shut off the power to his house: "Hey, a* *holes, get away from there . . . I'm gonna shoot his f* * *ing arm off." Id., Vol, II, at 324; Vol. III, at 380. Mr. Phillips then knocked the screen out of the small window, and an officer thought he saw him holding a gun in his other hand. Id., Vol. III, at 380. Mr. Phillips yelled through the window that he could

"take somebody's arm off" and that "the back screen[ was] off so [he had] a CLEAN shot." *Id.* (emphasis in original).  Immediately after exclaiming that he had a CLEAN shot, Sgt. Adamson shot Mr. Phillips.

422 F.3d at 1083-84.

The Tenth Circuit concluded that there was no reason for officers to wait to be shot at or even to see the plaintiff "raise a gun and point it at him before it would be reasonable for him, under these circumstances, to shoot Mr. Phillips."  422 F.3d at 1084.  It explained that the plaintiff's actions were unreasonable from the beginning and that the plaintiff had the power to defuse the situation by coming out of his bedroom and talking to the officers to allow them to reasonably assess the situation.  See 422 F.3d at 1084.  According to the Tenth Circuit, the officers' requests for him to do so were reasonable, but the plaintiff repeatedly refused to comply.  See 422 F.3d at 1084.  Further, according to the Tenth Circuit, the plaintiff "made the situation worse by continually threatening the officers with a high degree of physical force as they attempted to perform their job in a reasonable manner."  422 F.3d at 1084.  The Court concluded that coupled with the increasing threats of violence, gave the officer probable cause to believe that he was being threatened with serious bodily harm and that it was reasonable to shoot.  See 422 F.3d at 1084.  The Tenth Circuit therefore affirmed the district court's decision that the officers acted reasonably in their treatment of the plaintiff, and held that summary judgment in the officers' favor was proper.  See 422 F.3d at 1084.

Unlike in Phillips v. James, Malone never threatened to shoot the officers, nor did he aim his weapon at them.  Unlike the lengthy standoff involved in Phillips v. James, the central incident in this case took place in a matter of seconds.  While the plaintiff in Phillips v. James repeatedly refused to comply with the officers' commands or to exit the bedroom, on the

undisputed facts and drawing all inferences in M. Malone's favor, Malone was in the process of complying with police commands by jumping off the fence, backing up, and lowering his arms. See MSJ ¶¶ 29-33, at 8; Response ¶ 14, at 7.  Malone did not make "the situation worse by continually threatening the officers with a high degree of physical force as they attempted to perform their job in a reasonable manner."  Phillips v. James, 422 F.3d at 1084.  Moreover, the Tenth Circuit in Phillips v. James emphasized that the officers acted reasonably in shooting the plaintiff given the increasing threats of violence, which gave the officer probable cause to believe that he was being threatened with serious bodily harm.  See 422 F.3d at 1084.  Here, by contrast, Malone did not make any threats of violence, nor did he ever point the gun at the officers or make gestures in their direction.  On the undisputed facts and drawing all inferences in Malone's favor, he was in the process of complying with their commands by jumping off the fence, backing up, and lowering his arms.  See MSJ ¶¶ 29-33, at 8; Response ¶ 14, at 7.

Malone's mental health also weighed against Thouvenell shooting Malone.  The Tenth Circuit has explained that "a detainee's mental health must be taken into account when considering the officers' use of force and it is therefore part of the factual circumstances the court considers under Graham."  Giannetti v. City of Stillwater, 216 F. App'x 756, 764 (10th Cir. 2007)(citing Champion v. Outlook Nashville, Inc., 380 F.3d 893, 904 (6th Cir. 2004)).

> It cannot be forgotten that the police were confronting an individual whom they knew to be mentally ill or retarded, even though the Officers may not have known the full extent of [the plaintiff's] autism and his unresponsiveness.  This diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted.

Champion v. Outlook Nashville, Inc., 380 F.3d at 904.  See Abdullahi v. City of Madison, 423 F.3d 763, 772 (7th Cir. 2005)(noting that an officer's knowledge of mental disability "may also

be deemed relevant to the reasonableness inquiry"); Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1058 (9th Cir. 2003)("[A] detainee's mental illness must be reflected in any assessment of the government's interest in the use of force."); Deorle v. Rutherford, 272 F.3d 1272, 1283 (9th Cir. 2001)("[W]e emphasize that where it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under Graham, the reasonableness of the force employed."). Here, the officers knew that they were responding to a psychiatric situation. C. Malone had reported that Malone had placed the barrel of a black revolver to the back of her head while pulling the trigger, but that the weapon did not fire. C. Malone reported that, after the initial incident, Malone later called her threating suicide. This threat included the sound of Malone rotating the cylinder on the revolver and then pulling the trigger resulting in a gun shot.

The Court also considers the factors identified in Estate of Larsen. There, the Tenth Circuit explained that the use of deadly force "is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was *a threat of serious physical harm to themselves or to others*." Estate of Larsen v. Murr, 511 F.3d at 1260. The Tenth Circuit explained that to assess the degree of threat facing officers, courts should consider a number of non-exclusive factors, including: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." 511 F.3d at 1260. Estate of Larsen v. Murr, 511 F.3d at 1260. These factors do not support Thouvenell's use of force in the situation before the Court.

Regarding the first Estate of Larsen factor, while the officers had commanded Malone to drop the revolver, on the undisputed facts and construing the facts in M. Malone's favor, Malone then immediately jumped off the fence, backed up, and was in the process of lowering his arms when Thouvenell shot and killed him.  See MSJ ¶¶ 29-33, at 8.  Regarding the second Estate of Larsen factor, Malone did not make any hostile motions.   See MSJ ¶¶ 29-33, at 8.  It is undisputed that when Thouvenell and Sanchez encountered Malone, he was in the process of climbing over a fence.  When the officers commanded Malone to drop the revolver, he jumped off the fence, at which point, the fence separated Malone from the officers.  He did not move toward the officers or raise the revolver, but instead, slowly backed up while lowering his arms.  Finally, there is no evidence that Malone clearly manifested violent intentions towards the officers.  Considering the record taken as a whole and taken in the light most favorable to M. Malone, the Court concludes that it cannot say as a matter of law that Thouvenell's conduct in shooting Malone was objectively reasonable under the particular circumstances.  Based on the undisputed evidence, Thouvenell acted unreasonably in shooting and killing Malone.  In sum, M. Malone has sufficiently alleged facts demonstrating that Thouvenell violated Malone's Fourth Amendment rights.

Thouvenell contends that Malone was standing there with a gun and could have raised it at any point.  Thouvenell argues that he does not have to wait until Malone raises the gun to shoot at him before he fires.  Every situation is somewhat different.  Here, Thouvenell has been honest that Malone did not raise his gun and was retreating while lowering his arms.  Sanchez and Thouvenell were exposed, but could have easily moved to a covered position around the corner.  Sanchez did not fire, did not know who fired, and even not knowing whether Malone

had fired, did not fire.  Malone commands that he had at least partially obeyed the police commands; he may have been about or was in the process of obeying fully.  In this situation, on the undisputed facts and drawing all inferences in M. Malone's favor, Sanchez, not Thouvenell was objectively reasonable in not firing.  Thouvenell's position is close to saying that, anytime a suspect has a gun, a policeman can shoot the suspect.  That bright-line rule is not the law.  A citizen may have a gun for a host of reasons, some legal.  While Malone could not have a gun, that does not mean the police could shoot him because of that fact alone.  The police may use deadly force if the officer "has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others."  Tennessee v. Garner, 471 U.S. at 11.  The Court cannot say, on the undisputed facts, that an objectively reasonable police officer would have thought, coming around the corner, that Malone "pose[d] a threat of serious physical harm either to the officer or to others."  Tennessee v. Garner, 471 U.S. at 11.  The bright-line rule that Thouvenell advances has no room in the Graham v. Connor totality of the circumstances analysis.[56]

---

[56]M. Malone also advances that the County Defendants "created the very circumstances that excuse their actions."  Response at 9.  It is true that "[t]he reasonableness of the officers' use of force depends not only on whether they believed they were in danger at the time but also on whether their 'own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'"  Thomson v. Salt Lake Cty., 584 F.3d at 1220 (quoting Allen v. Muskogee, 119 F.3d 837, 842 (10th Cir. 1997)).  "The conduct of the officers before a suspect threatens force[, however,] is relevant only if it is 'immediately connected' to the threat of force."  Thomson v. Salt Lake Cty., 584 F.3d at 1220.  "Additionally, the officers' conduct is only actionable if it rises to the level of recklessness."  Thomson v. Salt Lake Cty., 584 F.3d at 1220  See Sevier v. City of Lawrence, 60 F.3d 695, 699 & n.7 (10th Cir. 1995)("Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983.").  M. Malone contends that there was no actual planning of Malone's arrest, and no consideration given to safe apprehension, officer safety, or public safety.  See Response at 9-10.  The Court cannot identify, at this time, however, any reckless actions involving the County Defendants'

**B.     THE COURT CANNOT CONCLUDE THAT THOUVENELL DID NOT VIOLATE CLEARLY ESTABLISHED LAW.**

The second step of the qualified immunity inquiry turns on whether the right allegedly violated -- the right of Malone to remain free from having lethal force used against him under the circumstances of July 29, 2015 -- was clearly established at the time of the alleged violation.  It is clearly established that the "use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness."  Saucier v. Katz, 533 U.S. at 201-02.  "At the time of the incident, it was clearly established that a police officer's violation of the *Graham* reasonableness test amounted to a violation of the Constitution if there were no substantial grounds for a reasonable officer to believe there was legitimate justification for acting as he did."  Ludstrom v. Romero, 616 F.3d 1108, 1127 (10th Cir. 2010)(citing Buck v. City of Albuquerque, 549 F.3d at 1291).  The Court concludes that the contours of the right to be free from the use of excessive force were sufficiently clear that a reasonable officer would have understood Thouvenell's actions violated that right.  See Ludstrom v. Romero, 616 F.3d at 1127.  It was clearly established at the time of the shooting that, under the circumstances of this case, to use deadly force, Malone would have needed to make some verbal threat or gesture directed at the officers.  See Thomson v. Salt Lake County, 584 F.3d at 1317-18; Phillips v. James, 422 F.3d at 1082-84.  Moreover, Zia Trust Co. ex. Rel. Causey v. Montoya, 597 F.3d 1150 (10th Cir. 2010), reaffirmed the long-standing rule that it is clearly established that an officer may not use deadly force when it is unnecessary, and when the suspect does not pose an immediate threat to the

---

planning or early execution of the SWAT team operation that was "immediately connected" to the threat of force, if any, in this case.  The Court instead bases its decision on the unreasonableness of Thouvenell's conduct in shooting Malone once Thouvenell and Sanchez turned the corner and encountered Malone climbing over a fence with a firearm.

officer or others.  See 597 F.3d at 1155 (concluding that officer violated the suspect's clearly established rights by using deadly force without probable cause that the suspect posed a serious threat of physical harm to the officer or to others)(citing Tennessee v. Garner, 471 U.S. at 11 ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.")). Accordingly, the Court concludes that M. Malone's Fourth Amendment right was established at the time of the shooting.  The Court therefore concludes that Thouvenell is not entitled to qualified immunity on M. Malone's Fourth Amendment claim alleged in Count II.

## II.    THE COURT WILL GRANT THE MSJ WITH RESPECT TO DONA ANA COUNTY ON COUNT IV.

The County Defendants ask the Court to dismiss Count IV against Dona Ana County, because Thouvenell did not act unreasonably in violation of the Constitution of the United States.  See MSJ at 19-22.  Even if Thouvenell did act unreasonably, the County Defendants insist, Dona Ana County would still be entitled to summary judgment on Count IV, because the undisputed facts establish that all of the training provided to the Sheriff's Department personnel follows the constitutional model that the Supreme Court established in Graham v. Connor.  See MSJ at 20-21.  The County Defendants therefore contend that there is no evidence that could lead to a finding of municipal liability and that Dona Ana County is entitled to judgment as a matter of law on M. Malone's municipal liability claim in Count IV.  See MSJ at 22.

The Complaint's Count IV is titled "Negligent Hiring, Training and Supervision," and alleges that the Dona Ana County Sheriff's Office's and the Las Cruces Police Department's "custom, pattern and practice of hiring unqualified individuals demonstrates a deliberate

indifference on the part of County and City Defendants for civil rights of the community."

Complaint ¶ 56, at 8.  M. Malone further alleges:

57.    The County and City Defendants offer irregular and insufficient training on threat perception, decision making, and de-escalation.

58.    Incidents involving police discourtesy, use of force, and bias lead segments of the community disenfranchised and distrustful of the police.

59.    Incidents involving excessive force cause more overall trauma to the families of both suspects and crime victims, so that the community is hesitant to request police involvement.

60.    The policies regarding leave for officers involved in shootings are inadequate to protect the mental health of the officers, leading to yet more instances of violence and cause for trauma.

61.    Officers are inadequately monitored by supervisory officers, particularly with regards to complaints or internal investigations of misconduct, so that the use of excessive force is both tolerated and sanctioned by both DASO and LCPD.

62.    The foregoing deficiencies have contributed to wrongful deaths and injury to suspects and other members of the public dealing with police in use of force situations and have contributed to a pattern of conduct that fails to meet the minimum requirements of the State and Federal Constitutions.

63.    Defendants routinely claim that because police officers risk their lives every day in situations that can suddenly escalate to violence, they are justified in using their current use of force model.  This is a fallacy.  The current model increases the likelihood that police encounters will escalate to violence. Defendants are aware of safer practices but willfully refuse to implement them.

64.    Declaratory and injunctive relief would be appropriate so that both County and City Defendants are required to: implement more thorough and consistent training; discard unlawful and unsafe policies and procedures; and replace those unlawful practices with such practices that are known to be safe and beneficial to both officers and the communities they serve.

Complaint ¶¶ 57-64, at 8-9.

M. Malone does not identify in his Complaint whether he asserts the claims set forth in Count IV under 42 U.S.C. § 1983, whether the NMTCA waives immunity for state common law claims, or whether some other statue allows the claim.  The County Defendants contend that, "[w]hile the NMTCA allows claims for negligent supervision and training, Plaintiff's Complaint can only be construed as a municipal liability claim under 42 U.S.C. Section 1983," and that, "[c]learly, this is a municipal liability claim under federal law."  MSJ at 19-20.  The Court agrees that Count IV can be construed as a municipal liability claim under 42 U.S.C. § 1983, but the County Defendants do not explain why Count IV cannot also be construed as a claim for negligent hiring, training, and supervision under state law.  The Court will therefore analyze whether the County Defendants are entitled to summary judgment on Count IV to the extent that it asserts a claim under either: (i) 42 U.S.C. § 1983; or (ii) under state law.  The Court concludes that the Dona Ana County is entitled to summary judgment to the extent that Count IV asserts a claim either under 42 U.S.C. § 1983 or under state law.  Accordingly, the Court will dismiss Count IV with respect to Dona Ana County with prejudice.

### A.    THE COURT WILL GRANT THE MSJ ON COUNT IV TO THE EXTENT THAT IT ASSERTS A CLAIM UNDER 42 U.S.C. § 1983.

The County Defendants move to dismiss M. Malone's negligent hiring, training, and supervision claim.  M. Malone contends that Dona Ana County is liable for the officers' alleged use of excessive force, because Dona Ana County's policies, practices, and procedures led to the officers' actions:

> 54.    Both LCPD and DASO have a practice of hiring extremely young and poorly educated candidates.

55.     Job candidates for both agencies are selected on their ability to follow orders without asking questions and not on their ability to exercise independent judgment.

56.     This <u>custom, pattern and practice</u> of hiring unqualified individuals demonstrates a deliberate indifference on the part of County and City Defendants for the civil rights of the community.

57.     The County and City Defendants offer irregular and insufficient training on threat perception, decision making, and de-escalation.

58.     Incidents involving police discourtesy, use of force, and bias lead segments of the community disenfranchised and distrustful of the police.

59.     Incidents involving excessive force cause more overall trauma to the families of both suspects and crime victims, so that the community is hesitant to request police involvement.

60.     The policies regarding leave for officers involved in shootings are inadequate to protect the mental health of the officers, leading to yet more instances of violence and cause for trauma.

61.     Officers are inadequately monitored by supervisory officers, particularly with regards to complaints or internal investigations of misconduct, so that the use of excessive force is both tolerated and sanctioned by both DASO and LCPD.

62.     The foregoing deficiencies have contributed to wrongful deaths and injury to suspects and other members of the public dealing with police in use of force situations and have contributed to a pattern of conduct that fails to meet the minimum requirements of the State and Federal Constitutions.

63.     Defendants routinely claim that because police officers risk their lives every day in situations that can suddenly escalate to violence, they are justified in using their current use of force model.  This is a fallacy.  The current model increases the likelihood that police encounters will escalate to violence. Defendants are aware of safer practices but willfully refuse to implement them.

64.     Declaratory and injunctive relief would be appropriate so that both County and City Defendants are required to: implement more thorough and consistent training; discard unlawful and unsafe policies and procedures; and replace those unlawful practices with such practices that are known to be safe and beneficial to both officers and the communities they serve.

Complaint ¶¶ 54-64, at 8-9 (emphasis added).

To find a municipality liable under 42 U.S.C. § 1983, M. Malone must prove that: (i) an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.  See Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d at 1252 (citing Graves v. Thomas, 450 F.3d at 1218); Holmstrom v. Bd. of Cty. Comm'rs for Cty. Chaves, 2016 WL 3396934, at *11 (quoting Chavez v. Cty. of Bernalillo, 3 F. Supp. 3d 936, 980 (D.N.M. 2014)(Browning, J.)).  Further, "[w]hen a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants."  Herrera v. Santa Fe Public Schools, 41 F. Supp. 3d at 1252 (citing Graves v. Thomas, 450 F.3d at 1218).  See Allen v. Muskogee, 119 F.3d at 841-42.

The County Defendants contend that M. Malone cannot show a constitutional violation on the officers' part, and this failure is dispositive as to Dona Ana County's liability.  See MSJ at 20-21.  See also City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." (citations omitted)); Moore v. City of Wynnewood, 57 F.3d 924, 935 (10th Cir. 1995)("Our conclusion that Moore has not shown a constitutional violation also defeats his wrongful demotion tort claim against the City insofar as it relies on his constitutional claim.").  Because the Court has not found that M. Malone's constitutional claims fail as a matter

of law, however, the County Defendants cannot prevail on that basis.  See Hernandez ex rel. Estate of Medrano v. Frias, 2011 WL 1127882, at *23.

The County Defendants further contend, however, that, even if Thouvenell's actions were not reasonable, Dona Ana County is still entitled to summary judgment on M. Malone's municipal liability claim under § 1983, because "the undisputed facts establish that all the training provided to Sheriff's Department personnel follows the constitutional model as outlines in Graham." MSJ at 20-21.  The County Defendants further explain:

> Dona Ana County Sheriff's Office General Order No. 2014-001 is the County's use of force policy **[UF 41, 42]**.  This policy is applicable to all Department deputies.  **[UF 41, 42]**  The policy is based on Amendments IV and XIV of the United States Constitution, Articles II, Sections 10 and 18 of the New Mexico Constitution, and the federal standard as enunciated in **Graham v. Connor**, 490 U.S. 386 (1989).  **[UF 41, 42].**  That policy outlines the objectively reasonable standard that law enforcement must follow in determining the lawfulness of use of force.  **[UF 42]**  Additionally, the policy and training outline the procedures that deputies must use when applying force.  **[UF 42]**  Specifically, the three main factors a deputy is trained to consider when using force are: (1) the severity of the crime at issue, (2) whether the suspect/subject poses an immediate threat to the safety of other law enforcement personnel or others, and (3) whether the suspect/subject is actively resisting arrest or attempting to evade arrest by flight. **[UF 42]**  These are the same factors that Graham and its progeny use to determine whether a use of force is objectively reasonable.
>
> Deputies are also trained on how to apply the three factors listed above. Additional factors that deputies must also take into account prior to using force include whether the suspect/subject is armed; whether the suspect/subject is refusing to comply with lawful commands; and whether the suspect/subject is actively resisting.  **[UF 42]**
>
> The County and its Sheriff's Department have clear, written policies on how force should be used.  Those policies and the trainings implementing those policies are not as Plaintiff would assert "insufficient" nor do they turn deputies into automatons who are unable to exercise independent judgment when confronted with a threat.  Indeed, Detective Thouvenell received refresher use of force training on November 13, 2014, a mere eight months prior to the incident giving rise to the complaint.  **[UF 43]**  There is thus no evidence that could lead to

a finding of municipal liability.  The County is therefore entitled to judgment as a matter of law on Plaintiff's municipal liability claim.

MSJ at 21-22 (emphasis in original).  The Court agrees with the County Defendants that there is no evidence that an unconstitutional policy or custom exists.  M. Malone does not cite to or attach any evidence to his Response indicating that an unconstitutional policy or custom exists, merely asserting that "[t]he factual situation described above is one which the law is clearly established by department policies, professional police standards and constitutional protections." Response at 9-11.  Even if Thouvenell used excessive force, there is no indication that Dona Ana County's policies, practices, or procedures played a role in the shooting.  Rather, all that the Complaint appears to allege is that the officers may have violated Dona Ana County's and the Dona Ana County Sheriff's Office's policies, not that they did not have good policies in place. Indeed, the first sentence of M. Malone's Response states: "Plaintiff is the younger brother and personal representative of Michael Malone, who was shot and killed by Detective Chase Thouvenell on July 29, 2015, when the Special Response Team ('SRT') formed by the Dona Ana Sheriff's Office (DASO) underlined failed to follow the departmental procedures governing SRT operations." Response at 1 (emphasis added).  If some evidence surfaces that Dona Ana County had a custom, policy, or practice that is different from what is set forth in the written statements that the County Defendants attach to the MSJ, the Court will consider bringing Dona Ana County back into the case.  Accordingly, the Court concludes that, at this time, Dona Ana County is entitled to summary judgment on Count IV to the extent that it asserts a claim under 42 U.S.C. § 1983.

**B.    THE COURT WILL GRANT THE MSJ ON COUNT IV  WITH RESPECT TO DONA ANA COUNTY TO THE EXTENT THAT COUNT IV ASSERTS A CLAIM UNDER STATE LAW.[57]**

The New Mexico Legislature enacted the NMTCA "in response to the New Mexico Supreme Court's decision to abolish state sovereign immunity in *Hicks v. State*." Brenneman v. Bd. of Regents of Univ. of N.M., 2004-NMCA-003, ¶ 5, 84 P.3d 685, 686 (citing Hicks v. State, 1975-NMSC-056, 544 P.2d 1153, superseded by statute as stated in Electro-Jet Tool Mfg. Co. v. City of Albuquerque, 1992-NMSC-060, 845 P.2d 770)).    The NMTCA provides: "[G]overnmental entities and public employees shall only be liable within the limitations of the Tort Claims Act and in accordance with the principles established in that act."  N.M. Stat. Ann. § 41-4-5.  See Upton v. Clovis Municipal Sch. Dist., 2006-NMSC-040, ¶ 8, 141 P.3d 1259, 1261 ("The TCA grants all government entities and their employees general immunity from actions in tort, but waives that immunity in certain specified circumstances.").  Thus, M. Malone's claim for negligent hiring, training, and supervision alleged in Count IV -- to the extent that it is brought pursuant to state law -- as directed against Dona Ana County, a governmental entity, must fit within one of the exceptions to the immunity set forth in §§ 41-4-5 to 41-4-12 of the NMTCA.  See Salazar v. San Juan Cty. Detention Ctr., No. CIV 15-0417 JB/LF, 2016 WL

---

[57]In this section, the Court addresses only M. Malone's allegations in Count IV that Dona Ana County was independently negligent in its hiring, supervision, or training.  See Complaint ¶¶ 43-64, at 8-9.  In Section V of this Memorandum Opinion and Order's Analysis Section, the Court will analyze whether Dona Ana County is not entitled to summary judgment on Counts I and II to the extent that those counts assert claims against Dona Ana County on a theory of vicarious liability or respondeat superior under state law.  As the Court will explain in Section V, the Court denies the MSJ on Counts I and II to the extent that those counts are directed at Dona Ana County based on its vicarious liability for Thouvenell's conduct.

335447, at *48 (D.N.M. Jan. 15, 2016)(Browning, J.)(citing <u>Pemberton v. Cordova</u>, 1987-

NMCA-020, ¶ 4, 734 P.2d 254, 255).

The Court has reviewed the waivers of immunity in §§ 41-4-5 to 41-4-12 of the NMTCA

and concludes that the only potentially applicable waiver is N.M. Stat. Ann. § 41-4-12, which

"provides a waiver of immunity for certain torts that law enforcement officers commit and for

negligence that causes a specified tort."  <u>Salazar v. San Juan Cty. Detention Ctr.</u>, 2016 WL

335447, at *49 (quoting <u>Williams v. Bd. of Regents of Univ. of N.M.</u>, 20 F. Supp. 3d 1177,

1189-90 (D.N.M. 2014)(Browning, J.)).  Section 41-4-12 provides:

> The immunity granted pursuant to Subsection 41-4-4 NMSA 1978 does not apply
> to liability for personal injury, bodily injury, wrongful death or property damage
> resulting from assault, battery, false imprisonment, false arrest, malicious
> prosecution, abuse of process, libel, slander, defamation of character, violation of
> property rights or deprivation of any rights, privileges or immunities secured by
> the constitution and laws of the United States or New Mexico when caused by law
> enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12.

> Thus, in order to state a tort claim under the waiver of immunity set out in Section
> 41-4-12, a plaintiff must demonstrate that the defendants were law enforcement
> officers acting within the scope of their duties, and that the plaintiff's injuries
> arose out of either a tort enumerated in this section or a deprivation of a right
> secured by law.

<u>Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dep't</u>, 1996-NMSC-021, ¶ 7, 916 P.2d

1313, 1316.

Section 41-4-12 does not, however, waive Dona Ana County's immunity for direct liability, because Dona Ana County is not a "law enforcement officer" as the NMTCA defines that phrase.[58]  Section 41-4-3D defines "law enforcement officer" as

> a full-time salaried public employee of a governmental entity, or a certified part-time salaried police officer employed by a governmental entity, whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor[.]

N.M. Stat. Ann. § 41-4-3D.  Dona Ana County is not a "full-time salaried public employee of a governmental entity, or a certified part-time salaried police officer employed by a governmental entity."  N.M. Stat. Ann. § 41-4-3D.  See Silva v. State, 1987-NMSC-107, ¶ 28, 745 P.2d at 387 ("Since the [Corrections and Criminal Rehabilitation Department] is neither a public employee nor a law enforcement officer, the trial court properly dismissed plaintiffs' Tort Claims Act claim against the CCRD."); Wittkowski v. State, 1985-NMCA-066, ¶¶ 14-16 , 710 P.2d 93, 96 ("The corrections department is not within the definition [of § 41-4-3]"), cert. quashed, 708 P.2d 1047, overruled on other grounds by Silva v. State, 1987-NMSC-107, 745 P.2d at 385; Lymon v. Aramark Corp., 728 F. Supp. 2d at 1273 ("The [New Mexico Department of Corrections] is not a

---

[58]As the Court will explain in Section V of this Memorandum Opinion and Order's Analysis Section, however, the Court will not grant summary judgment in Dona Ana County's favor on Counts I and II to the extent that those counts assert state law claims against Dona Ana County on theories of vicarious liability or respondeat superior.  The NMTCA waives liability for such theories of liability.  Unlike under federal law which does not allow for respondeat superior or vicarious liability under 42 U.S.C. § 1983, see Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)("The Supreme Court has made clear that there is no respondeat superior liability under § 1983."), "[a] governmental entity is not immune from liability for any tort of its employee acting within the scope of duties for which immunity is waived," Silva v. State, 1987-NMSC-107, ¶ 15, 745 P.2d at 385.  Moreover, in Silva v. State, the Supreme Court of New Mexico specifically overruled prior cases to the extent that they "have rejected the applicability of the tort doctrine of respondeat superior under the Tort Claims Act."  Silva v. State, 1987-NMSC-107, ¶ 15, 745 P.2d at 385.

law-enforcement officer within the definition set forth in § 41-4-3D.").  Dona Ana County is a governmental entity, and it is therefore not within § 41-4-3D's definition.  Accordingly, the Court will grant the MSJ on Count IV with respect to Dona Ana County to the extent that Count IV asserts a claim for negligent hiring, training, and supervision under the NMTCA.[59]  In sum, the Court will grant the MSJ in Dona Ana's favor on Count IV and dismiss Count IV with respect to Dona Ana County with prejudice.

### III.   THE COURT WILL DENY THE COUNTY DEFENDANTS' REQUEST THAT THE COURT DISMISS COUNT I TO THE EXTENT THAT IT ASSERTS CLAIMS UNDER THE NEW MEXICO WRONGFUL DEATH ACT.

The County Defendants argue that Dona Ana County and Thouvenell "are entitled to summary judgment on that portion of Count II[60] asserting claims under the New Mexico Wrongful Death Act because the [NMTCA] is the sole waiver of immunity against Dona Ana

---

[59]The Court again emphasizes that Dona Ana County is not dismissed as a party to this lawsuit.  The Court dismisses only the municipal liability claims premised on Dona Ana County's direct liability alleged in Count IV stemming from its alleged negligent hiring, training, and supervision.  See Complaint ¶¶ 53-64, at 8-9.  As the Court will explain in Section V of this Memorandum Opinion and Order's Analysis Section, the Court denies the County Defendants' request that the Court dismiss Count I and Count II to the extent that they assert claims against Dona Ana County on theories of respondeat superior or vicarious liability for Thouvenell's torts.

[60]The County Defendants here refer to Count II.  Count II, however, is entitled "Excessive Police Force," and alleges an excessive force claim in violation of the Fourth Amendment and Article II, § 10 of the New Mexico Constitution.  Complaint ¶¶ 44-49, at 7.  Count II does not mention the New Mexico Wrongful Death Act or the NMTCA.  See Complaint ¶¶ 44-49, at 7.  Count I, however, is entitled "Wrongful Death," and alleges that the County Defendants' actions "were the direct and proximate cause of the wrongful death of Michael Malone."  Complaint ¶¶ 39-40, at 6.  M. Malone further alleges in Count I: "By virtue of the New Mexico Tort Claims Act and Wrongful Death statute, Plaintiff is entitled on behalf of the beneficiaries of the Estate of Michael Malone, to recover compensatory and punitive damages, and damages for any medical, funeral and estate administration expenses necessitate by reason of injuries causing death."  Complaint ¶ 42, at 9.  The Court therefore construes the County Defendants' argument here as being directed at Count I and not to Count II.

County and Deputy Thouvenell for which state tort claims may be brought." MSJ at 16. The County Defendants contend that, to the extent that M. Malone brings claims under N.M. Stat. Ann. §§ 41-2-1 through 41-2-4, the Court of Appeals of New Mexico's decision in Armijo v. Regents of the University of New Mexico, 1984-NMCA-118, 704 P.2d 437, forecloses such claims. See MSJ at 16-17. In Count I, M. Malone alleges that Dona County's and Thouvenell's actions "were the direct and proximate cause of the wrongful death of Michael Malone." Complaint ¶ 40, at 6. Count I further alleges that the County Defendants' actions "constitute wrongful acts, unlawful violence, negligence and/or recklessness and/or malicious or intentional conduct for which immunity is waived." Complaint ¶ 41, at 6. Finally, Count I alleges: "By virtue of the New Mexico Tort Claims Act and Wrongful Death statute, Plaintiff is entitled on behalf of the beneficiaries of the Estate of Michael Malone, to recover compensatory and punitive damages, and damages for any medical, funeral and estate administration expenses necessitated by reason of injuries causing death." Complaint ¶ 42, at 6.

The New Mexico Legislature enacted the NMTCA, because it recognized "the inherent unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity." N.M. Stat. Ann. § 41-4-2A. The New Mexico Legislature also recognized, however,

> that while a private party may readily be held liable for his torts within the chosen ambit of his activity, the area within which the government has the power to act for the public good is almost without limit, and therefore government should not have the duty to do everything that might be done.

N.M. Stat. Ann. § 41-4-2A. As a result, it was "declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the

Tort Claims Act and in accordance with the principles established in that act."  N.M. Stat. Ann. §

41-4-2A.  Importantly, the NMTCA's § 41-4-17 -- entitled "Exclusiveness of remedy" -- states:

> The Tort Claims Act <u>shall be the exclusive remedy against a governmental entity or public employee for any tort</u> for which immunity has been waived under the Tort Claims Act and <u>no other claim, civil action or proceeding for damages</u>, by reason of the same occurrence, may be brought against a governmental entity or against the public employee or his estate whose act or omission gave rise to the suit or claim.

N.M. Stat. Ann. § 41-4-17 (emphasis added).

The County Defendants' request that the Court dismiss Count I to the extent that it asserts

claims under the New Mexico Wrongful Death Act is misguided.  "[T]he concepts of duty and

immunity under the [NMTCA] are distinct."  <u>Rutherford v. Chaves Cty.</u>, 2002-NMCA-059, ¶ 11,

47 P.3d 448, 452, <u>aff'd</u>, 2003-NMSC-010, 69 P.3d 1199.   "It is established law that the

[NMTCA] cannot be viewed as a source of duties to be imposed on government entities."

<u>Rutherford v. Chaves Cty.</u>, 2002-NMCA-059, ¶ 11, 47 P.3d 448, 452, <u>aff'd</u>, 2003-NMSC-010,

69 P.3d 1199.  "Duty or responsibility is not provided in the [NMTCA]; it must be found outside

the Act either at common law or by statute."  <u>Johnson v. Sch. Bd. of Albuquerque Pub. Sch. Sys.</u>,

1992-NMCA-125, ¶ 1, 845 P.2d 844, 845.   <u>See</u> <u>Fireman's Fund Ins. Co. v. Tucker</u>, 1980-

NMCA-082, ¶ 10, 845 P.2d 844, 897 ("No new duties are created by the Tort Claims Act.").   In

Count I, M. Malone asserts a claim under the New Mexico Wrongful Death Act, which creates a

cause of action and is a source of duty and responsibility "found outside of the [NMTCA] . . . by

statute."  <u>Johnson v. Sch. Bd. of Albuquerque Pub. Sch. Sys.</u>, 1992-NMCA-125, ¶ 1, 845 P.2d at

845.  The New Mexico Wrongful Death Act states:

> Whenever the <u>death of a person shall be caused by the wrongful act, neglect or default of another</u>, although such death shall have been caused under such

circumstances as amount in law to a felony, and the act, or neglect, or default, is such as would, if death had not ensued, have entitled the party injured <u>to maintain an action and recover damages</u> in respect thereof, then, and in every such case, the person who, or the corporation which, would have been liable, if death had not ensued, <u>shall be liable to an action for damages, notwithstanding the death of the person injured</u>.

N.M. Stat. Ann. § 41-2-1 (emphasis added).

The Court of Appeals of New Mexico's decision in <u>Armijo v. Regents of the University of New Mexico</u>, to which the County Defendants cite, does not undermine the proposition that M. Malone can maintain a cause of action against the County Defendants pursuant to the New Mexico Wrongful Death Act, which is a source of duty and responsibility "found outside of the [NMTCA] . . . by statute." <u>Johnson v. Sch. Bd. of Albuquerque Pub. Sch. Sys.</u>, 1992-NMCA-125, ¶ 1, 845 P.2d at 845. In that case, in deciding whether the doctrine of fraudulent concealment applied to toll N.M. Stat. Ann. § 41-4-15, the Court of Appeals of New Mexico stated:

> We disagree. The Wrongful Death Act does not control the disposition of this action. Section 41-4-17 of the Tort Claims Act provides that the Act shall be the *exclusive* remedy for plaintiffs with claims against governmental entities and public employees. Moreover, because of the specific inclusion of a wrongful death claim within the definition of a tort claim in Sections 41-4-5 to -12 of the Act, the limitations provision under the Wrongful Death Act does not apply to plaintiff's claims. *See Armijo v. Tandysh*, 98 N.M. 181, 646 P.2d 1245 (Ct. App. 1981). We determine, therefore, the applicability of the doctrine of fraudulent concealment by ascertaining the intent of the legislature in enacting the Tort Claims Act, *see T.W.I.W., Inc. v. Rhudy*, 96 N.M. 354, 630 P.2d 753 (1981), not the Wrongful Death Act.

<u>Armijo v. Regents of the Univ. of N.M.</u>, 1984-NMCA-118, ¶ 19, 704 P.2d at 441. The Court does not interpret <u>Armijo v. Regents of the University of New Mexico</u> as barring claims brought pursuant to the New Mexico Wrongful Death Act. Instead, <u>Armijo v. Regents of the University</u>

of New Mexico merely recognizes that a plaintiff must identity an applicable waiver of sovereign immunity in the NMTCA, and that the NMTCA's procedural and limitations provisions, will govern wrongful death claims.

In other words, it is true that under the NMTCA's § 41-4-17 only the NMTCA -- and not the New Mexico Wrongful Death Act or any other source of law -- can waive the County Defendants' sovereign immunity for tort suits.  That concept of "waiver," however, is distinct from the concept of "duty or responsibility."  Rutherford v. Chaves Cty., 2002-NMCA-059, ¶ 11, 47 P.3d at 452.  In their Reply, the County Defendants insist that M. Malone's "only remedy for any state law damages claimed [is] under the New Mexico Tort Claims Act[.]"  Reply at 9 (emphasis added).  Again, the NMTCA is not itself a remedy, it does not provide a cause of action, and there is no such thing as a NMTCA claim.  Instead, the remedy or cause of action "must be found outside the Act either at common law or by statute."  Johnson v. Sch. Bd. of Albuquerque Pub. Sch. Sys., 1992-NMCA-125, ¶ 1, 845 P.2d 844, 845.  Here, M. Malone has identified the New Mexico Wrongful Death Act as the source of the County Defendants' "duty or responsibility."  Rutherford v. Chaves Cty., 2002-NMCA-059, ¶ 11, 47 P.3d at 452.  Accordingly, whether M. Malone can permissibly assert claims under the New Mexico Wrongful Death Act against the County Defendants turns on whether the claims "fit within one of the exceptions granted for governmental entities and public employees in the NMTCA."  Lymon v. Aramark Corp., 728 F. Supp. 2d at 1251.  Section 41-4-12 provides a list of torts for which law enforcement officers' immunity is waived:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest,

> malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12.  The Court concludes that § 41-4-12 provides a waiver of sovereign immunity for M. Malone's claims brought under the New Mexico Wrongful Death Act given that § 41-4-12 specifically mentions "wrongful death . . . resulting from assault [or] battery[61.]" N.M. Stat. Ann. § 41-4-12.  Here, M. Malone alleges that Thouvenell's shooting of Malone "constitute[d] wrongful acts, unlawful violence, negligence and/or recklessness and/or intentional conduct for which immunity is waived."  Complaint ¶ 41, at 6.  M. Malone's allegation that Thouvenell intentionally, maliciously, or recklessly caused Malone's death fits within § 41-4-12's waiver of sovereign immunity for "assault [or] battery."  N.M. Stat. Ann. § 41-4-12.  While the New Mexico Wrongful Death Act is the source of Thouvenell's duty to not intentionally kill Malone, § 41-4-12 provides the waiver of sovereign immunity.   Accordingly, the Court denies the County Defendants' request that the Court dismiss Count I to the extent that it asserts claims under the New Mexico Wrongful Death Act.

---

[61]Under New Mexico law,

> one commits a battery when (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) an offensive contact with the person of the other directly or indirectly results.

Sisneros v. Fisher, 685 F. Supp. 2d at 1220-21 (internal quotations omitted)(quoting Desmare v. New Mexico, 2007 WL 5231690, at *4).

IV.  **THOUVENELL IS NOT ENTITLED TO SUMMARY JUDGMENT ON M. MALONE'S CLAIMS BROUGHT PURSUANT TO THE NEW MEXICO WRONGFUL DEATH ACT, NEW MEXICO COMMON LAW, OR ARTICLE II, § 10 OF THE NEW MEXICO CONSTITUTION IN COUNTS I AND II.**

The County Defendants ask the Court to dismiss the claims asserted against Thouvenell in Count I under the New Mexico Wrongful Death Act and/or common law, and in Count II under Article II, § 10 of the New Mexico Constitution.  See MSJ at 17-19.  The Court will deny the MSJ on Count I and II to the extent that they are asserted against Thouvenell, because the New Mexico Legislature in the NMTCA has waived Thouvenell's immunity for M. Malone's state law claims, and the Court cannot conclude on the undisputed facts that, as a matter of law, Thouvenell did not use excessive force.

A.  **THE NEW MEXICO LEGISLATURE HAS WAIVED THOUVENELL'S IMMUNITY UNDER THE NMTCA FOR M. MALONE'S STATE LAW CLAIMS ASSERTED IN COUNT I, AND THE COURT CANNOT CONCLUDE AS A MATTER OF LAW THAT THOUVENELL DID NOT USE EXCESSIVE FORCE.**

The New Mexico Legislature has waived Thouvenell's immunity under the NMTCA for M. Malone's state law claims asserted in Count I.  The NMTCA states that a "governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except as waived" by state statute.  N.M. Stat. Ann. § 41-4-4(A).  Section 41-4-12 provides a list of torts for which law enforcement officers' immunity is waived:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 does not apply to liability for personal injury, bodily injury, wrongful death or property damage resulting from assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, defamation of character, violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12.

In Count I -- titled "Wrongful Death" -- M. Malone M. Malone alleges that "[t]he forgoing actions of Defendants were the direct and proximate cause of the wrongful death of Michael Malone."  Complaint ¶ 40, at 6.  M. Malone further alleges that "[t]he forgoing actions of Defendants constitute wrongful acts, unlawful violence, negligence and/or recklessness and/or malicious or intentional conduct for which immunity is waived."  Complaint ¶ 41, at 6 (emphasis added).  Finally, M. Malone alleges:

> 42.    By virtue of the New Mexico Tort Claims Act and Wrongful Death Statute, Plaintiff is entitled on behalf of the beneficiaries of the Estate of Michael Malone, to recover compensatory and punitive damages, and damages for any medical, funeral and estate administration expenses necessitated by reason of injuries causing death.

> 43.    Plaintiff is further entitled on his own behalf, to recover compensatory and punitive damages related to the loss of his brother's companionship.

Complaint ¶¶ 42-43, at 6.  In sum, Count I alleges that Thouvenell negligently, and/or recklessly, and/or maliciously or intentionally cased Malone's death.  See Complaint ¶ 41, at 6.  Count I also specifically cites to the New Mexico Wrongful Death Act.  See Complaint ¶ 42, at 6.  The Court therefore construes Count I as asserting a claim under the New Mexico Wrongful Death Act.  It could also be construed as asserting causes of action for the common law torts of battery, assault, or negligence.

The Court already explained in Section III of this Memorandum Opinion and Order's Analysis Section why § 41-4-12 waives immunity for M. Malone's claim brought under the New Mexico Wrongful Death Act.  Further, to the extent that Count I asserts claims for the torts of battery or assault, § 41-4-12 enumerates both causes of action as torts for which the New Mexico

Legislature has waived immunity.  See N.M. Stat. Ann. § 41-4-12.  To the extent that Count I asserts a negligence claim against Thouvenell, the County Defendants correctly note that "'negligence' is not an enumerated basis under the NMTCA for which the legislature has waived sovereign immunity."  MSJ at 18 (emphasis added).  The Court has recognized, however, claims for gross negligence in using deadly force.  See Hernandez ex rel. Estate of Medrano v. Frias, CIV 10-0351, 2011 WL 1127882, at *24 (D.N.M. Mar. 15, 2011)(Browning, J.).  See also Blea v. City of Espanola, 1994, NMCA-008, ¶ 23, 870 P.2d 755, 760 (holding "allegations that [officers'] actions were grossly negligent or reckless were sufficient to state a claim . . . for which immunity has been waived under Section 41-4-12"); Browder v. City of Albuquerque, CIV 13-0599 RB/KBM, 2016 WL 3176600, at *8 (D.N.M. Apr. 27, 2016)(Brack, J.)(denying the defendants' motion to dismiss the plaintiffs' claim under § 41-4-12 for reckless or negligent conduct).  In Hernandez ex rel. Estate of Medrano v. Frias, for example, the Court denied a motion to dismiss the plaintiffs' claim that officers were grossly negligent in using deadly force against the victim -- Medrano.  See 2011 WL 1127882, at *24-25.  The Court explained:

> The Supreme Court of New Mexico has held that "a claim arising out of one of the common-law torts enumerated within the Section 41-4-12 waiver of immunity is essentially a common-law negligence claim, and the plaintiff need only show a violation of a common-law duty."  Weinstein v. City of Santa Fe, 121 N.M. at 653, 916 P.2d at 1320 (citing Blea v. City of Espanola, 117 N.M. 217, 220-21, 870 P.2d 755, 758-59 (Ct. App. 1994)(noting law-enforcement officers may be held liable for negligently inflicting on of the enumerated torts), cert. denied, 117 N.M. 328, 871 P.2d 984 (1994).  Accordingly, in Quezada v. County of Bernalillo, the Tenth Circuit stated:
>
> > The fact that Deputy Sauser did not subjectively intend to harm Ms. Griego is immaterial because under New Mexico law if "'the basis of an action is assault and battery, the intention with which the injury was done is immaterial * * * provided the [intentional] act causing the injury was wrongful * * *.'"  California First Bank

> *v. New Mexico*, 111 N.M. 64, 74 n.6, 801 P.2d 646, 656 n.6
> (1990)(quoting *Keel v. Hainline*, 331 P.2d 387, 399 (Okla. 1958)).
> The district court findings indicate Deputy Sauser's actions were
> negligent, and therefore wrongful.  Thus, Deputy Sauser's actions
> qualify as a battery for purposes of the Tort Claims Act.  *See* N.M.
> Stat Ann. § 41-4-12.

> 944 F.2d at 720 n.5.  *See* NMSA 1978, § 41-4-12 ("The immunity granted
> pursuant to [NMSA 1978, 41-4-4(A)] does not apply to liability . . . resulting from
> . . . deprivation of any rights, privileges or immunities secured by the constitution
> and laws of the United States or New Mexico when caused by law enforcement
> officers while acting within the scope of their duties.").

Hernandez ex rel. Estate of Medrano v. Frias, 2011 WL 1127882, at *24-25.  The Court then

explained that, in the case before it, "[t]he Plaintiffs' excessive force claim is essentially a

battery claim, which the Plaintiffs' allege was the result of the Defendants' gross negligence."

2011 WL 1127882, at *25.  The Court concluded:

> Because the New Mexico courts have held that law-enforcement officers may be
> held liable for negligently inflicting one of the enumerated torts, *see Weinstein v.
> City of Santa Fe*, 121 N.M. at 653, 916 P.2d at 1320, the Court will not dismiss or
> grant summary judgment on the Plaintiffs' NMTCA claim based on the officers'
> use of excessive force against Medrano.

Hernandez ex rel. Estate of Medrano v. Frias, 2011 WL 1127882, at *25.  Accordingly, to the

extent that Count I asserts an assault or battery/gross negligence claim, § 41-4-12 waives

Thouvenell's sovereign immunity.

The County Defendants do not, however, argue that the New Mexico Legislature did not

waive the NMTCA immunity for the claims asserted against Thouvenell in Count I.  They

instead content that Thouvenell's conduct does not constitute assault or battery/gross negligence.

The Court, thus, construes the MSJ as attacking the merits of M. Malone's claims.   If

Thouvenell's conduct did not constitute assault or battery/gross negligence, and if it did not

violate the New Mexico Wrongful Death Act, the New Mexico Legislature has not waived his immunity under the NMTCA.  With respect M. Malone's claims brought under the New Mexico Wrongful Death Act, and/or under common law, the Court has already concluded that, on the undisputed facts and drawing all inferences in M. Malone's favor, Thouvenell was not justified in using deadly force.  See supra Analysis Section I.  On the undisputed facts, and drawing all inferences in M. Malone's favor, Thouvenell used excessive force, and, accordingly, on the undisputed facts and drawing all inferences in M. Malone's favor, Thouvenell can be held liable under the New Mexico Wrongful Death Act and for assault and battery/gross negligence.  See Pena v. Greffet, 922 F. Supp. 2d 1187, 1229 (D.N.M. 2013)(Browning, J.)("An officer can be held liable for assault and battery if he uses excessive force.")(quoting Adegbuji v. Middlesex Cty., No. CIV 03-1757 PGS, 2006 WL 2806289, at *12 (D.N.J. Sept. 28, 2006)(Sheridan, J.)(internal quotation marks omitted)).  Contrary to the County Defendants' contention, on the undisputed facts and drawing all inferences in M. Malone's favor, Thouvenell's actions were not lawful.  See MSJ at 17-19.  Accordingly, N.M. Stat. Ann. § 41-4-12 waives Thouvenell's immunity for the state law claims asserted in Count I.  The Court will thus deny the MSJ on M. Malone's state law claims asserted against Thouvenell in Count I.

**B.      THE NEW MEXICO LEGISLATURE HAS WAIVED THOUVENELL'S IMMUNITY UNDER THE NMTCA FOR M. MALONE'S STATE CONSTITUTIONAL CLAIM IN COUNT II, AND THE COURT CANNOT CONCLUDE AS A MATTER OF LAW THAT THOUVENELL DID NOT USE EXCESSIVE FORCE.**

Count II asserts that Thouvenell's use of force when he shot and killed Malone violated "the New Mexico State Constitution."  Complaint ¶¶ 45-46, at 7.  Specifically, M. Malone alleges: "Michael Malone's rights to be free from excessive force under both the New Mexico

State Constitution and the Fourth Amendment to the Constitution of the United States of America have been violated."  Complaint ¶ 46, at 7.  M. Malone does not cite to a specific provision of the New Mexico Constitution, but given that M. Malone advances his New Mexico Constitution claim in tandem with his Fourth Amendment claim, the Court construes this claim as being brought under Article II, § 10 of the New Mexico Constitution, which is the New Mexico Constitution's analogue to the Fourth Amendment.  See MSJ at 18-19.  Article II, § 10 of the New Mexico Constitution states:

> The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the person or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation.

N.M. Const. art. II, § 10.  The County Defendants have moved for summary judgment on M. Malone's claims against Thouvenell under the New Mexico Constitution "for the same reasons qualified immunity applies."  MSJ at 18-19.  The County Defendants maintain that Thouvenell's actions were reasonable and, thus, that Thouvenell did not violate Article II, § 10 of the New Mexico Constitution.  See MSJ at 19.  The Court has concluded that, on the undisputed facts, it cannot conclude as a matter of law that Thouvenell used reasonable force under the Fourth Amendment when he shot and killed Malone.  For the same reason, the Court cannot conclude, as a matter of law, that Thouvenell did not violate Article II, § 10 of the New Mexico Constitution.  Further, § 41-4-12 waives sovereign immunity for

> violation of property rights or deprivation of any rights, privileges or immunities secured by the constitution and laws of the United States or New Mexico when caused by law enforcement officers while acting within the scope of their duties.

N.M. Stat. Ann. § 41-4-12.  The Court will therefore deny the MSJ with respect to M. Malone's

claim alleging a violation of Article II, § 10 of the New Mexico Constitution in Count II.

## V.   THE COURT WILL DENY THE MSJ TO THE EXTENT THAT M. MALONE ASSERTS A CLAIM FOR VICARIOUS LIABILITY OR RESPONDEAT SUPERIOR UNDER STATE LAW AGAINST DONA ANA COUNTY IN COUNT I AND COUNT II.

The County Defendants contend that Dona Ana County is entitled to summary judgment

on M. Malone's "*respondeat superior* theory alleged in Counts I and II of the Complaint."  MSJ

at 19 (italics in original).  Unlike under federal law which does not allow for respondeat superior

or vicarious liability under 42 U.S.C. § 1983, see Schaefer v. Las Cruces Pub. Sch. Dist., 716 F.

Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)("The Supreme Court has made clear that

there is no respondeat superior liability under § 1983."), "[a] governmental entity is not immune

from liability for any tort of its employee acting within the scope of duties for which immunity is

waived," Silva v. State, 1987-NMSC-107, ¶ 15, 745 P.2d at 385.  Under state law, "[w]hen the

act of the employee is the act of the public entity, let the master answer."  Silva v. State, 1987-

NMSC-107, ¶ 15, 745 P.2d at 385.  Moreover, in Silva v. State, the Supreme Court of New

Mexico specifically overruled prior cases to the extent that they "have rejected the applicability

of the tort doctrine of respondeat superior under the Tort Claims Act."  Silva v. State, 1987-

NMSC-107, ¶ 15, 745 P.2d at 385.  In Silva v. State, the Supreme Court of New Mexico

explained:

> As stated in *Albalos*:
>
>> To name a particular entity in an action under the Tort Claims Act
>> requires two things: (1) a negligent public employee who meets
>> one of the waiver exceptions under Sections 41-4-5 to -12; and (2)
>> an entity that has immediate supervisory responsibilities over the

employee.  If a public employee meets an exception to immunity, then the particular entity that supervises the employee can be named as a defendant in an action under the Tort Claims Act.  If the city or state directly supervises the employee, then the city or state can be named.

[*Albalos v. Bernalillo Cty. Dist. Atty's Office*, 1987-NMCA-026, ¶ 23], 734 P.2d [794,] 799.  It is only when a public employee is acting within the scope of his employment and in furtherance of the business of a public entity that immunity and the Tort Claims Act have any relevance.  *See Garcia v. Albuquerque Pub. Schools Bd. of Educ.*, 95 N.M. 391, 622 P.2d 699 (Ct. App. 1980)(Sutin, J., specially concurring), *cert. quashed*, 95 N.M. 426, 622 P.2d 1046 (1981); *cf. Candelaria v. Robinson*, 93 N.M. 786, 606 P.2d 196 (Ct. App. 1980).  Therefore, it is only when the public entity is itself acting through its employee with the right to control the manner in which the details of work are to be done, SCRA 1986, 13-403, that the Tort Claims Act comes into play.  The public entity can act only through its employees, and the act of the offending employee is the act of the public entity under traditional tort concepts.  Cf. SCRA 1986, 13-409.

While the *Abalos* [*v. Bernalillo Cty. Dist. Atty's Office*] court has held that, "[i]f the city or state directly supervises the employee, then the city or state can be named," we believe that traditional tort law requires that statement to be interpreted to include the right of control regardless of whether exercised.  Public policy recognizes the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity.  N.M.S.A. 1978, § 41-4-2(A).  While the court may apply the doctrine of remoteness in striking the state or city as a named defendant, the court must be constrained in each instance to avoid inherently unfair and inequitable results.  Adherence to a principle of "direct supervision" should never be used to defeat totally a claim which otherwise has been brought under traditional concepts of *respondeat superior*.  In the present case, we do not know whether the trial court exercised its discretion in granting defendants' motion for dismissal of the state.

Silva v. State, 1987-NMSC-107, ¶¶ 15-16, 745 P.2d at 385.

To summarize, for Dona Ana County to be held vicariously liable for Thouvenell's tortious conduct under Count I and Count II, there are two requirements: (i) Thouvenell must be a public employee who meets one of the waiver exceptions under §§ 41-4-5 to -12; and (2) Dona Ana County must have had immediate supervisory responsibilities over Thouvenell.  See Silva v.

State, 1987-NMSC-107, ¶¶ 15-16. First, the Court has concluded that, although there are not genuine issues of material fact, it cannot conclude, as a matter of law, that Thouvenell used reasonable force such that his actions were privileged when he shot Malone. See supra Analysis Section I; Analysis Section IV. Accordingly, whether Thouvenell violated the New Mexico Wrongful Death Act, or committed the common law torts of assault or battery/gross negligence, remains unanswered. See supra Analysis Section IV. Second, no party has contended that Dona Ana County did not have immediate supervisory responsibilities over Thouvenell. See Martinez v. Winner, 771 F.2d 424, 444 (10th Cir. 1985)("The 'City of Denver Police Department' is not a separate suable entity, and the complaint will be dismissed as to it."); Holmstrom v. Bd. of Cty. Comm'rs for Cty. Chaves, CIV 15-0668, 2016 WL 3396934, at *10-12 (D.N.M. Mar. 28, 2016)(Brack, J.)(holding that the Chaves County Sherriff's Department was not a separate suable entity, treating the claims asserted against the Sheriff's Department as against Chavez County, and denying the motion to dismiss the plaintiff's respondeat superior count asserted against Chavez County); Silva v. State, 1987-NMSC-107, ¶¶ 15-16, 745 P.2d at 385 (explaining that to hold a governmental entity liable for a tort of its employee acting within the scope of duties for which immunity is waived, the governmental entity must have immediate supervisory responsibility over the employee). The Court therefore concludes that Dona Ana County is not entitled to summary judgment to the extent that Counts I and II assert claims for respondeat superior or vicarious liability under state law. If Thouvenell did not use reasonable force in shooting Malone, then "let the master answer." Silva v. State, 1987-NMSC-107, ¶ 15, 745 P.2d at 385.

## VI.    THE COURT DISMISSES THE CITY OF LAS CRUCES AND THE JOHN DOE(S) AS PARTIES TO THIS LAWSUIT, WITHOUT PREJUDICE.

At the May 9, 2016 hearing, the parties agreed that the Court should, at this time, dismiss the City of Las Cruces, and the John Doe(s), unknown LCPD officers, in their individual and official capacities, as parties to this lawsuit without prejudice.  See Tr. at 50:24-57:5 (Court, Kane, Limon, Martinez); Clerk's Minutes at 1-2; Aug. 15th Tr. at 1-10 (Court, Kane, Limon, Martinez).  Pursuant to this agreement, the Court will dismiss the City of Las Cruces and the John Doe(s), unknown LCPD officers, in their individual and official capacities, as parties to this lawsuit without prejudice.  In light of the Court's rulings in this Memorandum Opinion and Order: (i) Count I remains against Thouvenell, and to the extent that Count I asserts a vicarious liability or respondeat superior claim against Dona Ana County; (ii) Count II remains against Thouvenell and to the extent that Count II asserts a vicarious liability or respondeat superior claim against Dona Ana County; (iii) Count III does not survive summary judgment given that the City of Las Cruces and the John Doe(s) are dismissed as parties without prejudice; and (iv) Count IV does not survive summary judgment given that Count IV dismissed as to the County with prejudice and as to the City of Las Cruces without prejudice.

**IT IS ORDERED** that: (i) the Defendants' Motion and Supporting Memorandum for Qualified Immunity and Summary Judgment, filed January 5, 2016 (Doc. 25), is granted in part and denied in part; (ii) the Motion and Memorandum for Summary Judgment Based on Qualified Immunity, filed February 16, 2016 (Doc. 34), is granted in part and denied in part; (iii) the Amended Motion and Memorandum for Summary Judgment Based on Qualified Immunity, filed February 18, 2016 (Doc. 37), is granted in part and denied in part; (iv) all claims against the City

of Las Cruces and the John Doe(s), unknown LCPD officers, in their individual and official capacities, are dismissed without prejudice; (v) the MSJ is denied on Count I with respect to Thouvenell and to the extent that Count I asserts a vicarious liability or respondeat superior claim against Dona Ana County; (vi) the MSJ is denied on Count II with respect to Thouvenell and to the extent that Count II asserts a vicarious liability or respondeat superior claim against Dona Ana County; (vii) Count III is dismissed as to the City of Las Cruces and the John Doe(s) without prejudice; and (viii) Count IV is dismissed as to the County with prejudice and as to the City of Las Cruces without prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*

Samuel I. Kane
Kane Law Firm
Las Cruces, New Mexico

    *Attorney for the Plaintiff*

Damian L. Martinez
Holt Mynatt Martinez P.C.
Las Cruces, New Mexico

    *Attorneys for Defendants Board of County Commissioners for the County of Dona Ana*
     *and Chase Thouvenall*

Roberto A. Cabello
Thomas R.A. Limon
City Attorney's Office, City of Las Cruces
Las Cruces, New Mexico

    *Attorneys for Defendant City of Las Cruces*